2023–1039

---

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

---

MID CONTINENT STEEL & WIRE, INC.,

*Plaintiff-Appellee*

v.

UNITED STATES,

*Defendant-Appellee*

v.

OMAN FASTENERS, LLC,

*Defendant-Appellant*

---

Appeal from the United States Court of International Trade
in Nos. 15-00214 and 15-00228, Chief Judge Mark A. Barnett

---

## APPELLANT'S OPENING BRIEF

---

Michael P. House
Michael R. Huston
Nathan K. Kelley
Andrew Caridas
Jonathan I. Tietz
PERKINS COIE LLP
700 Thirteenth Street N.W., Suite 800
Washington, D.C. 20005
(202) 654–6288
MHouse@perkinscoie.com

Dan L. Bagatell
PERKINS COIE LLP
3 Weatherby Road
Hanover, New Hampshire 03755
(602) 351–8250

Andrew T. Dufresne
PERKINS COIE LLP
33 East Main Street, Suite 201
Madison, Wisconsin 53073
(608) 663–7492

Attorneys for Appellant

February 13, 2023

## CERTIFICATE OF INTEREST

I certify that the information below is complete to the best of my knowledge.

Date: February 13, 2023          Signature:  /s/Michael P. House

Name:          Michael P. House

| 1. Represented Entity | 2. Real Party in Interest | 3. Parent Corporations and 10% Stockholders |
|---|---|---|
| Oman Fasteners LLC | n/a | Guerrero International LLC |

| 4. Other Legal Representatives | | |
|---|---|---|
| Perkins Coie LLP: | David J. Townsend*  David S. Christy, Jr.*  *  no longer affiliated with Perkins Coie | Shuaiqi Yuan |

| 5. Related Case |
|---|
| *Oman Fasteners, LLC v. United States*, No. 22-000348 (Ct. Int'l Trade) |

| 6. Organizational Victims and Bankruptcy Cases |
|---|
| none |

# TABLE OF CONTENTS

Table of Authorities ........................................................... v

Table of Abbreviations and Conventions ...................................... ix

Statement of Related Cases .....................................................x

Introduction ...................................................................1

Jurisdiction ................................................................... 3

Issue Presented ............................................................... 4

Statement of the Case ......................................................... 4

    I.    Statutory Background..........................................................5

        A.    Commerce may impose antidumping duties as a remedial measure when merchandise is "dumped" .................5

        B.    Commerce must calculate the dumping margin as accurately as possible based on the subject merchandise's fair value............................................. 6

    II.    Factual Background ............................................. 9

        A.    Commerce imposed an antidumping duty on Oman Fasteners' merchandise ............................................. 9

        B.    The Trade Court remanded for Commerce to explain or reconsider its use of subsidy-tainted financial information, and Commerce made the same choice again ...................................................11

        C.    This Court remanded because of Commerce's unreasonable failure to account for subsidies ..........................12

        D.    On remand, Commerce once again bypassed other options, failed to analyze comparative deficiencies, and relied on subsidy-tainted financial statements ...................... 14

E.    The Trade Court sustained Commerce's remand results ........21

Summary of Argument ...................................................................... 23

Argument ..........................................................................................27

I.    Standard of review ...............................................................27

II.    Whether Commerce's approach was reasonable is a legal
question that embraces the statutory duty of accuracy ................ 28

A.    Commerce must determine antidumping margins as
accurately as possible ................................................. 28

B.    Commerce's duty of accuracy constrains its choice of
methodology in several ways ...................................... 29

C.    Commerce's approach must also be reasonable under the
circumstances of the case ......................................... 34

III.    Commerce's determination here was unreasonable...................... 36

A.    Commerce unreasonably relied on subsidy-distorted
financial information associated with dissimilar
products ......................................................................37

B.    Commerce acted unreasonably by not comparing the
accuracy of the subsidized data with the accuracy of the
other data it prematurely discarded ......................................... 46

1.    Commerce did not weigh the comparative
deficiencies of the alternative sources .............................. 46

2.    A meaningful comparison would have produced a
more accurate result........................................... 48

3.    Commerce misapplied precedent by concluding that
it did not need to compare particular deficiencies...........51

C.    If Commerce was stuck with two admittedly inaccurate
sources, it could and should have reopened the record.......... 56

Conclusion..................................................................................................61

Certificate of Compliance ..................................................................... 63

Certificate of Authority ........................................................................ 64

# Table of Authorities

**Cases** **Pages**

*Albemarle Corp. & Subsidiaries v. United States,*
821 F.3d 1345 (Fed. Cir. 2016) ...........................................5, 9, 12, 28, 33, 35

*Changzhou Wujin Fine Chem. Factory Co. v. United States,*
701 F.3d 1367 (Fed. Cir. 2012) ......................................................... 27, 36, 44

*CP Kelco US, Inc. v. United States,*
949 F.3d 1348 (Fed. Cir. 2020) ...................................................51, 52, 53, 55

*CS Wind Vietnam Co. v. United States,*
832 F.3d 1367 (Fed. Cir. 2016) .......................... 31, 32, 36, 42, 45, 55, 57, 58

*F.lli De Cecco di Filippo Fara S. Martino S.p.A. v. United States,*
216 F.3d 1027 (Fed. Cir. 2000) ................................................................ 33, 34

*FCC v. Fox Television Stations, Inc.,*
556 U.S. 502 (2009)................................................................................. 58, 60

*Fine Furniture (Shanghai) Ltd. v. United States,*
748 F.3d 1365 (Fed. Cir. 2014) ...................................................................... 42

*Gallant Ocean (Thailand) Co. v. United States,*
602 F.3d 1319 (Fed. Cir. 2010).......................................................... 33, 34, 48

*Husteel Co. v. United States,*
98 F. Supp. 3d 1315 (Ct. Int'l Trade 2015)................................................... 54

*Mid Continent Steel & Wire, Inc. v. United States,*
203 F. Supp. 3d 1295 (Ct. Int'l Trade 2017) ................................................. 11

*Mid Continent Steel & Wire, Inc. v. United States,*
273 F. Supp. 3d 1348 (Ct. Int'l Trade 2017) ................................................. 12

*Mid Continent Steel & Wire, Inc. v. United States,*
551 F. Supp. 3d 1360 (Ct. Int'l Trade 2021) ............................. 14, 15, 18, 42

*Mid Continent Steel & Wire, Inc. v. United States,*
    586 F. Supp. 3d 1349 (Ct. Int'l Trade 2022)
    ..............................................5, 16, 17, 19, 21, 22, 23, 26, 36, 38, 47, 51, 56, 58

*Mid Continent Steel & Wire, Inc. v. United States,*
    941 F.3d 530 (Fed. Cir. 2019)................................................ *passim*

*Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Automobile Ins. Co.,*
    463 U.S. 29 (1983) ................................................................. 36

*Mueller Comercial de Mexico, S. de R.L. de C.V. v. United States,*
    753 F.3d 1227 (Fed. Cir. 2014) ....................................... 41

*NEXTEEL Co. v. United States,*
    28 F.4th 1226 (Fed. Cir. 2022) ........................................ 41

*NTN Bearing Corp. v. United States,*
    74 F.3d 1204 (Fed. Cir. 1995) ................................... 6, 28

*Nucor Corp. v. United States,*
    927 F.3d 1243 (Fed. Cir. 2019) .......................................37

*Rhone Poulenc, Inc. v. United States,*
    899 F.2d 1185 (Fed. Cir. 1990) ..................... 9, 28, 33, 34

*SEC v. Chenery,*
    332 U.S. 194 (1947)........................................................ 44

*SKF USA Inc. v. United States,*
    263 F.3d 1369 (Fed. Cir. 2001).....................................5, 7

*SKF USA Inc. v. United States,*
    630 F.3d 1365 (Fed. Cir. 2011) ...................................... 36

*SNR Roulements v. United States,*
    402 F.3d 1358 (Fed. Cir. 2005) ..................................... 28

*Thai Pineapple Canning Indus. Corp. v. United States,*
    273 F.3d 1077 (Fed. Cir. 2001) ............................... 34, 35

*Yangzhou Bestpak Gifts & Crafts Co. v. United States*,
    716 F.3d 1370 (Fed. Cir. 2013) ............................. 6, 13, 29, 30, 33, 35, 57, 60

## Statutes and Regulations                                                    Pages

19 C.F.R. § 351.301(c)(4) ........................................................................ 56

19 C.F.R. § 351.405(a) .............................................................................7

19 U.S.C. § 1516a(a)(2)(B)(i) .................................................................. 3

19 U.S.C. § 1516a(b)(1)(B)(i) ................................................................27

19 U.S.C. § 1673 ......................................................................................5

19 U.S.C. § 1673a(b) ...............................................................................5

19 U.S.C. § 1673e .....................................................................................5

19 U.S.C. § 1675 ..................................................................................... 6

19 U.S.C. § 1677a......................................................................................5

19 U.S.C. § 1677b .................................................................................5, 7

19 U.S.C. § 1677b(a) ............................................................................... 6

19 U.S.C. § 1677b(a)(1)(B) ..................................................................... 6

19 U.S.C. § 1677b(a)(1)(B)(ii)(II) ...........................................................7

19 U.S.C. § 1677b(a)(1)(C)(ii) .................................................................7

19 U.S.C. § 1677b(a)(4).............................................................................7

19 U.S.C. § 1677b(c)(5) ......................................................................... 41

19 U.S.C. § 1677b(e)..................................................................................7

19 U.S.C. § 1677b(e)(2)(A) ..................................................................... 8

19 U.S.C. § 1677b(e)(2)(B).......................................................................8

19 U.S.C. § 1677b(e)(2)(B)(i) ................................................................... 8

19 U.S.C. § 1677b(e)(2)(B)(ii) .................................................................. 8

19 U.S.C. § 1677b(e)(2)(B)(iii) ...................................................... 8, 10, 35

19 U.S.C. § 1677f-1(c)(1) ........................................................................ 6

28 U.S.C. § 1295(a)(5) ............................................................................ 4

28 U.S.C. § 1581(c) ................................................................................. 3

## Other Authorities                                                   Pages

*Certain Steel Nails from India, the Republic of Korea, Malaysia, the*
    *Sultanate of Oman, Taiwan, the Republic of Turkey, and the*
    *Socialist Republic of Vietnam,*
    79 Fed. Reg. 36,019 (June 25, 2014) .................................................... 9

*Certain Steel Nails from the People's Republic of China,*
    79 Fed. Reg. 19,316 (Apr. 8, 2014) .................................................. 10, 50, 59

*Certain Steel Nails from the People's Republic of China,*
    80 Fed. Reg. 18,816 (Apr. 8, 2015) ................................................. 44, 50, 59

*Certain Steel Nails from the Sultanate of Oman,*
    79 Fed. Reg. 78,034 (Dec. 29, 2014) ............................................. 11

*Certain Steel Nails from the Sultanate of Oman,*
    80 Fed. Reg. 28,972 (May 20, 2015) ............................................. 11

## TABLE OF ABBREVIATIONS AND CONVENTIONS

| | |
|---|---|
| Appx____ | appendix page ____ |
| Commerce | U.S. Department of Commerce |
| Mid Continent | plaintiff-appellee Mid Continent Steel & Wire, Inc. |
| Oman Fasteners | defendant-appellant Oman Fasteners, LLC |
| Trade Court | United States Court of International Trade |
| § | unless otherwise specified, all uses of "§" refer to sections of U.S.C. Title 19 |

**STATEMENT OF RELATED CASES**

The underlying cases before the United States Court of International Trade were previously before this Court in two parallel appeals, No. 18-1250, brought by plaintiff-appellee Mid Continent Steel & Wire, Inc., and No. 18-1296, brought by Oman Fasteners, LLC. This Court (through Judges Dyk, Lynn, and Taranto) summarily affirmed in No. 18-1250 under Rule 36, *Mid Continent Steel & Wire, Inc. v. United States*, 777 F. App'x 515 (Fed. Cir. 2019), and vacated and remanded in part in No. 18-1296, *Mid Continent Steel & Wire, Inc. v. United States*, 941 F.3d 530, 546 (Fed. Cir. 2019).

The Court's decision in this appeal may directly affect *Oman Fasteners, LLC v. United States*, No. 22-00348 (Ct. Int'l Trade), a pending case that challenges the final results in the most recently completed administrative review of the underlying antidumping duty order that is the subject of this appeal.

# INTRODUCTION

The last time this case came up on appeal, the Court remanded because the U.S. Department of Commerce ("Commerce") had relied on an unreasonable method of calculating antidumping duties that depended on data tainted by foreign-government subsidies. Yet despite this Court's decision, Commerce has doubled down—indeed, tripled down—on that same unreasonable approach.

The Tariff Act of 1930 authorizes Commerce to impose antidumping duties if imported merchandise is sold in the United States below its "fair value." Those duties are not penalties and are instead meant to offset the "dumping margin," i.e., the difference between that merchandise's "normal value" (typically its home-market price) and its lower "dumped" price in the United States. In some cases, however, there is not a suitable home-market price to use as a benchmark. In that case, Commerce must calculate a "constructed value" that approximates what the home-market price for the subject merchandise would be, and that calculation typically involves profit and expense information from a surrogate source. As a matter of law, Commerce's methodology for calculating constructed value must be as accurate as possible, and its method of calculating profit must be reasonable.

This case arose from an antidumping investigation concerning steel nails imported from Oman to the United States by Oman Fasteners. Because Oman Fasteners sells almost all its products in the United States, it had insufficient home-market sales to determine a home-market price, and Commerce chose to rely on a surrogate company's financial data. But Commerce's choice of surrogate was unreasonable: it originally selected a company called Hitech, a Thai steel-screw producer that received government subsidies affecting its financial information. In the previous appeal, this Court remanded for Commerce to confront the distortionary effects of those subsidies on Hitech's financial information and to consider, by analyzing the comparative deficiencies of the alternative sources, whether another surrogate financial statement would more accurately estimate Oman Fasteners' dumping margin.

On remand, Commerce finally accepted that Hitech's subsidy-distorted financial data were unreliable. But rather than heed the core lesson of this Court's decision, Commerce jumped from the frying pan to the fire: for its new proxy, it selected an Indian company, Sundram, that not only *also* had received government subsidies but largely produced merchandise entirely dissimilar to that of Oman Fasteners. Commerce had other options—

the record contains financial information from several other companies that do not receive subsidies. Commerce could have selected other Omani steel producers like Al Jazeera. Or it could have picked LSI, a steel-nail producer whose financial statement Commerce had previously found to be accurate in contemporaneous proceedings involving identical merchandise.

But Commerce did not analyze the comparative deficiencies of those alternative sources, and it did not weigh the accuracy of using Sundram or Hitech's data against the accuracy of other options. Rather, it categorically rejected data from nine of eleven potential surrogate companies in the record. Then, when faced with the two subsidized sources that remained, Commerce simply shrugged off the subsidy distortion as unavoidable, admitted that it had no means to calculate the impact of that distortion, and picked between those two instead of examining the others or reopening the record.

That was unreasonable, and this Court should now remand for Commerce to conduct a proper comparative analysis.

## Jurisdiction

This appeal arises from an action filed in the United States Court of International Trade (the "Trade Court"). The Trade Court had jurisdiction under 19 U.S.C. § 1516a(a)(2)(B)(i) and 28 U.S.C. § 1581(c). The Trade Court

issued a final judgment on August 8, 2022. Appx1-21. Oman Fasteners filed a timely notice of appeal from that judgment on October 6, 2022. Appx61. This Court has jurisdiction under 28 U.S.C. § 1295(a)(5).

## ISSUE PRESENTED

The Tariff Act of 1930 requires Commerce to calculate antidumping margins using a "reasonable method" and requires that calculation to be as accurate as possible. This Court previously remanded because Commerce had not considered the distortionary effects of government subsidies. On remand, Commerce again relied on subsidy-distorted financial statements, even though Commerce could not quantify the subsidies, did not evaluate the comparative deficiencies of the subsidized surrogates against other options, and did not reopen the record to accept readily available, accurate information.

The question presented is: Was Commerce's approach reasonable?

## STATEMENT OF THE CASE

This Court previously held that Commerce's method for calculating antidumping duties was unreasonable: Commerce disregarded its statutory duty to determine the dumping-margin rate as accurately as possible, and failed to consider important aspects of the problem, when it relied on

financial information that was tainted by government subsidies. On remand, Commerce again relied on subsidy-tainted financial information. The Trade Court upheld Commerce's determination. *Mid Continent Steel & Wire, Inc v. United States*, 586 F. Supp. 3d 1349 (Ct. Int'l Trade 2022) ("*Mid Continent V*"); Appx1-19. Oman Fasteners now appeals from the Trade Court's decision.

# I.    Statutory Background

## A.    Commerce may impose antidumping duties as a remedial measure when merchandise is "dumped"

The antidumping provisions of the Tariff Act of 1930 authorize Commerce to impose antidumping duties on "subject merchandise" that "is being, or is likely to be, sold in the United States at less than its fair value" to the detriment of a domestic industry. 19 U.S.C. § 1673; *see SKF USA Inc. v. United States*, 263 F.3d 1369, 1372 (Fed. Cir. 2001). Those duties are supposed to equal the dumping margin, which is the amount by which the subject merchandise's "normal value" exceeds its export price. 19 U.S.C. §§ 1673, 1673e, 1677a, 1677b; *see Albemarle Corp. & Subsidiaries v. United States*, 821 F.3d 1345, 1347–48 (Fed. Cir. 2016).

Domestic industries may petition the government for relief if they think they are being injured by unlawful dumping. *See* 19 U.S.C. § 1673a(b).

Commerce investigates to determine whether dumping exists and, if so, the degree of dumping. It then imposes antidumping duties based on that dumping margin.

Antidumping duties are not meant to punish foreign companies. *NTN Bearing Corp. v. United States*, 74 F.3d 1204, 1208 (Fed. Cir. 1995). Nor are they meant to prop up domestic industries. They are meant to be remedial—to offset dumping and level the playing field. That statutory purpose makes the accuracy of the underlying calculations especially important.

### B.  Commerce must calculate the dumping margin as accurately as possible based on the subject merchandise's fair value

To calculate antidumping duties, Commerce must determine a respondent's dumping margin for the subject merchandise during a particular time period. 19 U.S.C. §§ 1675, 1677f-1(c)(1); *see Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1372 (Fed. Cir. 2013). Determining the dumping margin requires calculating the difference between "the export price or constructed export price and normal value." 19 U.S.C. § 1677b(a). Ideally, "normal value" is based on the selling price of the merchandise in the respondent's home market or a third country. *Id.* § 1677b(a)(1)(B). But if the amount of subject merchandise sold in that home market or a cited third

country is below five percent of that sold in the United States, then Commerce must instead calculate the merchandise's "constructed value." *Id.* § 1677b(a)(1)(B)(ii)(II), (1)(C)(ii), (4). That is the situation here because Oman Fasteners' sales volumes in Oman and the other countries where it operates amount to less than five percent of its U.S. sales. *Mid Continent Steel & Wire, Inc. v. United States*, 941 F.3d 530, 535 (Fed. Cir. 2019) ("*Mid Continent III*"). Constructed value is not an actual price; it is a "proxy for a sales price" of the subject merchandise in the home market. *SKF*, 263 F.3d at 1373 (citation omitted). Computing an accurate constructed value requires considering manufacturing costs, general expenses, and profits. *Id.*; 19 U.S.C. § 1677b; 19 C.F.R. § 351.405(a).

The statute identifies four methods as options for calculating a constructed value: one preferred method and three alternatives. *SKF*, 263 F.3d at 1374. All of them consider the respondent's actual costs of producing and packaging the merchandise, but they differ in handling profits and "selling, general, and administrative" (SG&A) expenses. 19 U.S.C. § 1677b(e); *see Mid Continent III*, 941 F.3d at 535.

The statutory preference is to look at a respondent's "actual amounts" of profits and SG&A expenses "in connection with the production and sale

of a foreign like product, in the ordinary course of trade, for consumption in" the respondent's home market. 19 U.S.C. § 1677b(e)(2)(A). When such data are unavailable—as they are for Oman Fasteners, which does not have "viable home or third country markets," *Mid Continent III*, 941 F.3d at 535— Commerce may select among the three alternative methods to obtain profit and SG&A data from other sources. *Id.* § 1677b(e)(2)(B); *see Mid Continent III*, 941 F.3d at 535. The first alternative considers data from the respondent's other products "in the same general category of products as the subject merchandise." 19 U.S.C. § 1677b(e)(2)(B)(i). The second alternative considers a "weighted average" of profits and SG&A expenses from other respondents in the investigation. 19 U.S.C. § 1677b(e)(2)(B)(ii). And the third alternative considers profit and SG&A data "based on any other reasonable method." 19 U.S.C. § 1677b(e)(2)(B)(iii).

This case involves the "other reasonable method" option. Although that category is broad, it is not boundless. Commerce's "choices must be reasonable ones within the dual constraints of the statute and the record." *Mid Continent III*, 941 F.3d at 542. To that end, the "objective is to find a good proxy (or surrogate) for the profits that the respondent can fairly be expected to build into a fair sales price for the particular merchandise." *Id.* Commerce

– 8 –

accordingly has a statutory duty to perform the calculation as accurately as possible. *Id.* (citing *Albemarle*, 821 F.3d at 1354 ("[A]ccuracy and fairness must be Commerce's primary objectives."), and *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990) (explaining that the "basic purpose of the statute" is to "determin[e] current margins as accurately as possible")).

## II.    Factual Background

### A.    Commerce imposed an antidumping duty on Oman Fasteners' merchandise

On a petition by Mid Continent Steel & Wire, Inc., Commerce initiated an antidumping investigation in June 2014 into steel nails from Oman and other countries. *Certain Steel Nails from India, the Republic of Korea, Malaysia, the Sultanate of Oman, Taiwan, the Republic of Turkey, and the Socialist Republic of Vietnam*, 79 Fed. Reg. 36,019 (June 25, 2014) (initiation decision); *see Mid Continent III*, 941 F.3d at 534. Oman Fasteners was named as a mandatory respondent. *Mid Continent III*, 941 F.3d at 534; Appx66.

Commerce set out to calculate a constructed value for Oman Fasteners' subject merchandise and opted to use the last statutory option ("any other reasonable method") for approximating the company's expected home-

market profits and expenses. That approach permits resorting to third-party financial statements. 19 U.S.C. § 1677b(e)(2)(B)(iii); *Mid Continent III*, 941 F.3d at 535.

Two weeks before its preliminary determination, Commerce asked Oman Fasteners and Mid Continent to submit data relevant to its chosen methodology. *Mid Continent III*, 941 F.3d at 535. Oman Fasteners submitted several financial statements from other Omani producers of steel products and a partially translated financial statement from LSI, a Thai producer of steel nails. *Id.* Commerce had previously accepted that same partially translated LSI financial statement as accurate in concurrent proceedings involving steel nails. *See id.* at 536; *Certain Steel Nails from the People's Republic of China*, 79 Fed. Reg. 19,316 (Apr. 8, 2014) (final results); Appx1118-1121 (accompanying decision memorandum). Mid Continent submitted statements from Hitech (a Thai firm) and Sundram (an Indian firm)—both of which received government subsidies—as well as two partially translated statements from Taiwanese producers. *Mid Continent III*, 941 F.3d at 535–36.

In its preliminary determination, Commerce selected Hitech's financial statement as a surrogate for Oman Fasteners. Based on that decision, Commerce calculated constructed-value general expenses and profit and

preliminarily concluded that Oman Fasteners had dumped steel nails during the investigation period. *Certain Steel Nails from the Sultanate of Oman*, 79 Fed. Reg. 78,034, 78,035 (Dec. 29, 2014) (preliminary determination); Appx1412 (accompanying decision memorandum).

Oman Fasteners argued that relying on Hitech was inappropriate because that company received subsidies—specifically, subsidies that Commerce had previously found to be countervailable. Appx1795, Appx1805. Nevertheless, in its final determination, Commerce again relied on the Hitech statement and determined that Oman Fasteners had dumped at a margin exceeding the *de minimis* threshold of two percent. *Certain Steel Nails from the Sultanate of Oman*, 80 Fed. Reg. 28,972 (May 20, 2015) (final determination); Appx1798-1805 (accompanying decision memorandum). On that basis, it imposed an antidumping duty on Oman Fasteners. Appx1816.

**B.    The Trade Court remanded for Commerce to explain or reconsider its use of subsidy-tainted financial information, and Commerce made the same choice again**

Oman Fasteners challenged Commerce's constructed-value determination in the Trade Court. That court remanded for Commerce to explain or reconsider its reliance on Hitech's data. *Mid Continent Steel & Wire, Inc. v. United States*, 203 F. Supp. 3d 1295, 1308–11, 1316 (Ct. Int'l Trade 2017) ("*Mid*

*Continent I*"). Commerce picked Hitech again. *See Mid Continent III*, 941 F.3d at 537. In a footnote, the Trade Court sustained Commerce's use of the sub-sidy-tainted Hitech financial statements. *Mid Continent Steel & Wire, Inc. v. United States*, 273 F. Supp. 3d 1348, 1352 n.1 (Ct. Int'l Trade 2017) ("*Mid Continent II*").

### C.  This Court remanded because of Commerce's unreasonable failure to account for subsidies

This Court vacated and remanded because Commerce had not demon-strated adherence "to the governing statutory standard" or shown that it had applied a "reasonable … calculation method[]." *Mid Continent III*, 941 F.3d at 537.

The Court first explained the legal standard that Commerce must fol-low. When calculating constructed value, Commerce's "choices must be rea-sonable" as it strives to "find a good proxy (or surrogate) for the profits that the respondent can fairly be expected to build into a fair sales price for the particular merchandise." *Mid Continent III*, 941 F.3d at 542. Under the stat-ute, "accuracy and fairness must be Commerce's primary objectives." *Id.* (quoting *Albemarle*, 821 F.3d at 1354). While Commerce has some discretion to weigh the evidence in the record, its "overriding purpose" in

"administration of antidumping laws" must be "to calculate dumping margins as accurately as possible." *Id.* (quoting *Bestpak*, 716 F.3d at 1379).

The Court explained why Commerce's prior decision failed to satisfy that standard. In purporting to find a "good proxy" for Oman Fasteners' fair sales price for the subject merchandise, Commerce had relied on Hitech's financial information, but Hitech was subsidized by the Thai government. *Id.* at 544–45. And Commerce had failed to explain why that choice was reasonable and likely to produce an accurate margin. *Id.* at 544. Commerce had invoked its "practice" of considering subsidies in "nonmarket economy" proceedings, but Oman is a market economy. *Id.* And in any event, regardless of the kind of economy a country has, this Court held that "government subsidies are precisely the kind of factor that could distort the accuracy of a surrogate company's information." *Id.* They might "increase recorded profit" or "take the form of artificially lower input costs." *Id.* Commerce had "not provided any explanation at all of why" it was "reasonable to decline to consider government subsidies." *Id.*

The Court cautioned that, if Commerce felt that it needed to rely on subsidized information, then it had an obligation to consider "the comparative deficiencies of the alternative source[s]" and to make sure that its

selected source was not "a weaker surrogate for constructed value." *Id.* at 544. The Court told Commerce to follow its "statutory duties, including the broad duty to strive for accuracy." *Id.* at 545. To that end, the Court required Commerce to "articulate an explanation of why its result is a reasonable one, given [those] relevant statutory duties." *Id.* And it reminded Commerce that it can be reversible error under the APA "for an agency to refuse to obtain readily available, highly relevant information." *Id.* at 544–45.

> **D.**    **On remand, Commerce once again bypassed other options, failed to analyze comparative deficiencies, and relied on subsidy-tainted financial statements**

1. Commerce did not relent. On remand, it initially selected Hitech again. *Mid Continent Steel & Wire, Inc. v. United States*, 551 F. Supp. 3d 1360 (Ct. Int'l Trade 2021) ("*Mid Continent IV*"); Appx1945, Appx1947-1951. Commerce got there in two steps. First, it categorically refused to consider the financial information already in the record from nine other companies, leaving only Hitech and Sundram. *Mid Continent IV*, 551 F. Supp. 3d at 1363–64 & nn. 4–5. Second, Commerce rejected Sundram as an inaccurate proxy because "a large portion of its production consists of various automobile parts that are not comparable to nails." *Id.* at 1364. Commerce then selected Hitech once again. *Id.* at 1364–65.

The Trade Court set aside Commerce's "largely conclusory" decision, held that Commerce had again failed to justify its reliance on Hitech's financial statements, and sent the case back for Commerce do the work required by the statute. *Id.* at 1361, 1366–67. The Trade Court faulted Commerce for not explaining why Hitech could serve as a reliable surrogate in light of Commerce's own admission that Hitech received foreign subsidies. *Id.* at 1366. And the court criticized Commerce for not adequately comparing the two financial statements it had left after eliminating the first nine. *Id.* at 1367. Commerce had simply declared Hitech's subsidy non-quantifiable and thrown up its hands. *Id.* at 1367–68. The Trade Court explained that "a serious analysis of any deficiencies in the various data sources before the agency is required." *Id.* at 1368. It reiterated that, if Commerce found defects in Hitech's financial statements, "the agency may reconsider any such data source on the record." *Id.* And it reminded Commerce that it could reopen the record if doing so "would provide the most reasonable path forward." *Id.*

2.    On remand, Commerce finally conceded that Hitech was subsidized and gave up attempting to rely on it as a surrogate. At that point, the path for Commerce to follow this Court's instructions was obvious: Commerce should have used one of the *non-subsidized* companies in the record as

a surrogate; or else, if Commerce found those choices inadequate, it should have reopened the record for the parties to submit other reliable sources. Either option would have been sensible and reasonable, and either would have comported with the duty of accuracy.

But Commerce did not take either of those paths. Instead, Commerce decided to select another company (Sundram) that was *both* subsidized *and* that had previously been rejected as an inaccurate proxy because it made fundamentally different products. Appx23-44.

The record on remand contained financial statements from eleven companies. *Mid Continent V*, 586 F. Supp. 3d at 1353; Appx28. Commerce categorically discarded six of them (all Omani companies) because they did not produce steel nails or what Commerce deemed comparable merchandise. *Mid Continent V*, 586 F. Supp. 3d at 1353; Appx28-29. Commerce did so even though those companies shared a home market with Oman Fasteners, and even though they produced merchandise (including steel tubes, pipes, and bars, *see* Appx1947) far closer to steel nails than that of other companies that Commerce considered—Sundram, notably, mostly makes auto parts including steel pump assemblies and engine components. *See* Appx33.

Commerce next discarded three of the remaining five companies (the two Taiwanese companies and LSI) because English translations of their financial statements were not complete. *Mid Continent V*, 586 F. Supp. 3d at 1353. Commerce did so even though (1) LSI was the only company on the record that made steel nails, (2) Commerce had elsewhere accepted that same partially translated LSI financial statement as accurate and reliable, and (3) Oman Fasteners had offered to corroborate that statement with the fully translated version. Appx29, Appx36.

After discarding all other data sources, Commerce left itself with only two remaining prospective surrogates: Hitech and Sundram. *Mid Continent V*, 586 F. Supp. 3d at 1354. Commerce could no longer deny that both companies' statements were distorted by subsidies; it simply chose to ignore those subsidies altogether.

Commerce did not try to compare the subsidies' magnitude: it called the two companies "equal" in this regard without diving deeper. Appx31. Indeed, on this record, Commerce concluded that it *could not* comparatively quantify those subsidies or determine where they factored in the companies' accounting. Appx29-31; *see also* Appx1949 ("[T]he financial statements of

Hitech do not report an amount associated with the potential subsidy in the financial statements at issue.").

Commerce then found that the greater contemporaneity of Sundram's information (Hitech's fell outside the investigation period entirely) weighed in Sundram's favor, and weighed more heavily than Commerce's finding that a substantial majority of Sundram's merchandise (64%) was fundamentally "dissimilar" to Oman Fasteners' steel nails. Appx32-34. Commerce backtracked from its previous determination, where it had faulted Sundram's data because "a large portion of [Sundram's] production consist[ed] of various automobile parts that are not comparable to nails." *Mid Continent IV*, 551 F. Supp. 3d at 1364. Unlike Oman Fasteners, which makes almost nothing but nails, Sundram makes a complex array of products and its financial statements and manufacturing processes cover them all. Appx402; Appx497; Appx1758-1759; Appx1762.

Sundram is mostly an automotive company: It makes radiator caps, gears, crankshafts, and brackets. Appx402-403; Appx497-498; Appx1194; Appx1758; Appx1762. It also makes gear shifters, tire carriers, and engine components. Appx402-403; Appx498; Appx1187, Appx1189; Appx1758. It makes entire pump assemblies for water pumps, oil pumps, and fuel pumps

used in passenger vehicles, boats, agricultural equipment, and more. Appx402-403, Appx497-498; Appx1187, Appx1189; Appx1197; Appx1758; Appx1762. It makes powder metal parts, including rotors and gears, transmission hubs, and shock-absorber components, as well as timing pulleys, sprockets, and parts necessary for fuel injection. Appx402-403, Appx497-498; Appx1187, Appx1189, Appx1195; Appx1762. Sundram does make *some* fasteners, but they are more elaborate and specialized than the construction nails made by Oman Fasteners: banjo bolts, carriage screws, castle nuts, two-wheeler spindles, bi-hex nuts, caliper bolts, propeller shaft bolts, adjusting screws, friction-grip bolts, flange weld nuts, and more. Appx1192. Sundram's business is thus fundamentally different from Oman Fasteners'.

Despite the subsidies and distinct products encumbering the two options that Commerce considered, and despite Oman Fasteners' seven years of repeated attempts to submit a fully translated financial statement for LSI (the only steel-nail producer available), Commerce refused to reopen the record. *Mid Continent V*, 586 F. Supp. 3d at 1359; Appx29, Appx40-41. Commerce did not find that reopening the record was impracticable or that doing so would not improve the accuracy of its determination. Instead, it declined to reopen the record on grounds that Hitech's and Sundram's statements

– 19 –

"reflect profit from the sale of comparable merchandise, are complete and fully translated, and were timely submitted on the record of this investigation." Appx29. Remarking that the parties had "already had the opportunity to submit readily available, highly relevant information," Commerce insisted that it would "only reopen the record when there is a compelling need for additional information." Appx40-41.

Commerce also did not analyze or explain whether using the two subsidy-distorted statements would be more or less accurate than using any of the nine statements that it had discarded at the outset. Indeed, because Commerce could not determine the extent or nature of the subsidies involved, it could not have done so even if it had wanted to. Commerce explained its general preference for comparable merchandise, contemporaneous data, and full translations, but it did not weigh these concerns against the subsidies' distortions. Appx40. Instead, it ignored the subsidies altogether.

In the end, having discarded all but two financial statements—both tainted by government subsidies and neither reflecting production of subject merchandise—Commerce selected Sundram's financial statement for the calculation of general expenses and profit in Oman Fasteners' constructed value. On that basis, Commerce calculated a new dumping margin for Oman

Fasteners of 4.22%. Appx44. Although this margin was lower than the one that Commerce had calculated from Hitech's unreliable data (i.e., 9.10%, *id.*), it still exceeded the 2.0% *de minimis* threshold, resulting in an antidumping order that would subject Oman Fasteners to antidumping duties and costly administrative reviews for years.

### E.    The Trade Court sustained Commerce's remand results

Oman Fasteners challenged Commerce's remand decision in the Trade Court. The Trade Court acknowledged this Court's instruction to consider the "comparative deficiencies" of the sources of record, and it agreed that "Commerce did not directly compare each of the eleven financial statements on the record." *Mid Continent V*, 586 F. Supp. 3d at 1356–57. But the court disagreed that Commerce was required to perform such a comparison as a matter of law. *Id.* Instead, the Trade Court accepted Commerce's decision to reject all of the non-subsidized companies and then choose from among what was left—even though Commerce knew that its remaining choices were inaccurate. *Id.* at 1358 (sustaining Commerce's "iterative process" and rejecting any need for Commerce to "further compare").

Commerce had ignored the LSI and Taiwanese statements on grounds that they were "missing what Commerce called 'vital' information" to

confirm their contents. *Id.* at 1357. The Trade Court agreed with Commerce that there was "no way to ascertain whether the companies have properly captured their revenues and costs" in accordance with generally accepted accounting principles and that this missing information was "vital." *Id.* (citation omitted). That reasoning overlooked the fact that Commerce had not only seen the fully translated version of LSI's statement (which confirmed its accuracy) but had also found the partially translated statement to be accurate in other proceedings involving the same subject merchandise.

Commerce had also ignored the six Omani companies' statements on grounds that those companies did not produce "comparable merchandise." *Id.* at 1358. The Trade Court sustained Commerce's elimination of those companies from consideration, without discussing Commerce's own acknowledgment that its new pick, Sundram, also made dissimilar merchandise. *Id.* at 1357–58.

Commerce concluded that it was unable, on this record, to "dissect" the subsidies. Appx31. Commerce thus did not consider the magnitude of the subsidies, and their implications for free-market profit were unknown and ignored. But the Trade Court concluded that Commerce had done enough. The Trade Court did not fault Commerce for declining to compare the

amounts of subsidies, despite this Court's instruction that the "size of any subsidies would obviously be relevant," *Mid Continent III*, 941 F.3d at 544.

As to reopening the record, the Trade Court simply said that whether to do so was within Commerce's discretion. *Mid Continent V*, 586 F. Supp. 3d at 1359. It declined to find error in Commerce's decision not to reopen, concluding that that "substantial evidence support[ed] Commerce's choice of Sundram's financial statements." *Id.* at 1359–60. Because the Trade Court viewed Commerce's conclusion as accurate, the court saw no need to consider other information. The Trade Court did not explain how Commerce's conclusion *could* have been accurate without considering subsidies.

## SUMMARY OF ARGUMENT

The Court should reverse the Trade Court's judgment sustaining Commerce's remand decision and remand for further proceedings.

**I.**    Commerce must use a reasonable methodology that fulfills its statutory obligation to calculate a dumping margin as accurately as possible. Although Commerce has *some* discretion to make choices during antidumping proceedings, that discretion is limited by its fundamental obligation to make an accurate calculation. Whether Commerce used a "reasonable method" is primarily a legal question framed by the agency's statutory

duties and this Court's precedents. Commerce must provide an adequate explanation showing that its choices were reasonable and complied with its statutory duty of accuracy.

**II.**    Commerce's methodology here was unreasonable because it relied on admittedly unreliable data, did not evaluate the comparative deficiencies of the data that it had, and did not reopen the record despite knowing that reliable, accurate data were readily available.

**A.**    Commerce once again relied on subsidized financial data without even attempting to calculate the degree of distortion. As this Court previously explained, government subsidies distort the accuracy of a company's financial information when used to calculate constructed value. Sundram's financial information (on which Commerce relied this time) and Hitech's (on which it relied before) reflected government subsidies. Commerce's only purported justification for yet again using subsidy-tainted information was that it had only those two options to pick from. But Commerce did not explore the extent and nature of those subsidies or compare them—nor could it on this record. Commerce simply considered the two companies "equal" in that regard and *again* ignored the subsidies. Commerce's decision was based on a false choice, and it should not have used either company.

**B.**    After limiting itself to two options that were both inaccurate, Commerce should have reconsidered its decisions to reject all other information in the record—including data from multiple non-subsidized Omani companies. Commerce acted unreasonably in not comparing the accuracy of the subsidized data that it chose with the other data that it preemptively discarded. This Court instructed that accuracy required weighing the "comparative deficiencies" of the record evidence. Instead, Commerce culled nine of the eleven financial statements at the outset based on *theoretical* concerns that it did not weigh against the *known* inaccuracies in Hitech's and Sundram's data.

Proper comparison of those eleven statements likely would have changed Commerce's ultimate determination because several of the alternative statements had meaningful advantages. The six Omani companies were rejected out of hand only because they made dissimilar products: for instance, steel rods rather than steel nails. But Commerce relied on Sundram despite acknowledging that most of Sundram's products were even more dissimilar. Commerce did not explain why any difference in merchandise outweighed the distortive effects of subsidies and the fact that Hitech and Sundram manufacture and sell in Thailand and India, not Oman.

Commerce rejected the other three statements because they were only partially translated, speculating that they *might* have been missing information that *might* have reduced their accuracy. But Commerce knew at least one statement—LSI's—to be accurate in fact. Commerce had relied on that partially translated statement as accurate before, and it continued to do so after seeing a corroborating fully translated version. Moreover, LSI was the only potential surrogate that produced identical merchandise to Oman Fasteners: steel nails.

**C.**    Even if Commerce did not err in discarding the other data, it was unreasonable not to reopen the record when Commerce itself knew that all its remaining options were flawed and inaccurate. Commerce did not reopen the record because it concluded that its available information was "sufficient … in order to render an accurate determination." *Mid Continent V*, 586 F. Supp. 3d at 1359. But that premise was flawed because the information on which Commerce ultimately chose to rely was admittedly subsidy-distorted, and the agency did not bother to determine the degree of the distortion. Commerce did not know, and without further investigation could not have known, whether its calculation was accurate enough.

Commerce abused its discretion by refusing to consider readily available, highly relevant information. Commerce knew for years that LSI's fully translated statement was available and would be the most reliable source. Commerce need not demand information "that cannot practically be obtained in reliable form," but this is not such a case. The information was available. No practical barriers impeded its use, and Commerce did not cite any as justification. Disregarding that information also violated the agency's duty of accuracy. Commerce cited finality concerns but did not weigh that interest against ensuring accuracy and avoiding unreliable information.

## ARGUMENT

### I.   Standard of review

This Court reviews Commerce's decision anew using the same standard applied by the Trade Court. *Mid Continent III*, 941 F.3d at 537. The Court thus reviews legal issues de novo and upholds Commerce's factual determinations if, but only if, they are supported by substantial evidence. 19 U.S.C. § 1516a(b)(1)(B)(i); *Mid Continent III*, 941 F.3d at 537. The Court will set aside the "agency's reasoning" in its methodology if that reasoning was "arbitrary and capricious" or "contrary to law." *Changzhou Wujin Fine Chem. Factory Co. v. United States*, 701 F.3d 1367, 1377 (Fed. Cir. 2012).

– 27 –

## II. Whether Commerce's approach was reasonable is a legal question that embraces the statutory duty of accuracy

### A. Commerce must determine antidumping margins as accurately as possible

Commerce has a duty to be as accurate as possible in its antidumping-margin calculations. That makes sense because antidumping duties are remedies designed to level the playing field, not to punish. *NTN*, 74 F.3d at 1208; *SNR Roulements v. United States*, 402 F.3d 1358, 1363 (Fed. Cir. 2005) ("Anti-dumping laws intend to calculate antidumping duties on a fair and equitable basis."). The point of a constructed-value calculation is to accurately approximate what a home-market sales price would be. To that end, the data selected must provide a "good proxy" for the "profits that [a] respondent can fairly be expected to build into a fair sales price." *Mid Continent III*, 941 F.3d at 542.

That duty comes from the statute. Commerce must make "reasonable choices within statutory constraints" during the constructed-value analysis. *Mid Continent III*, 941 F.3d at 537. The "basic purpose of the statute" is to determine margins "as accurately as possible." *Rhone Polenc*, 899 F.2d at 1191. Thus, "accuracy and fairness must be Commerce's primary objectives." *Albemarle*, 821 F.3d at 1354. And Commerce must explain "why its result is a

reasonable one, given relevant statutory duties, including the broad duty to strive for accuracy." *Mid Continent III*, 941 F.3d at 545.

### B. Commerce's duty of accuracy constrains its choice of methodology in several ways

1.    The duty of accuracy constrains Commerce's ability to rely on a too-thin record instead of seeking more information. *See Bestpak*, 716 F.3d 1370. In *Bestpak*, that duty underlay this Court's conclusion that Commerce's calculation method was unreasonable. Commerce had calculated a duty rate using a simple average of two other rates (each individually inaccurate), rather than using a more sophisticated weighted-average approach. *Id.* at 1378. Although the Court acknowledged that the statute did not render Commerce's choice unlawful per se, in that context its selected method was unsupportable. *Id.* The reason was accuracy: Commerce's determination did not "reflect[] economic reality." *Id.* It had relied on just one data point to show that its simple-average rate reflected reality. *Id.* at 1378–79. But this Court rejected Commerce's attempt to prop up its conclusion with "such slim findings." *Id.* at 1379. It cautioned that Commerce's "overriding purpose" in administering the statute was to "calculate dumping margins as accurately as possible." *Id.* Commerce thus could not rely on "conjecture or

supposition," and it could not "explain the absence of evidence by invoking procedural difficulties that were at least in part a creature of its own making." *Id.* at 1378–79 (citation omitted).

In addition, Commerce's use of unreliable data sources was "not reasonable," as those sources did not enable Commerce to calculate an accurate result. *Id.* at 1379. In particular, Commerce chose two sources that both suffered from accuracy problems: one received a *de minimis* margin (too low to be meaningful to the respondent) and the other a higher adverse-inference rate (too high to be accurate relative to the respondent). *Id.* at 1380. As here, Commerce complained that it did not have enough other information to go on. But Commerce knew of the inaccuracies and "could have gathered more information." *Id.* And Commerce's pointing to a "limited record" was no justification where there was no statutory or precedential support "for the proposition that limited resources or statutory time constraints can override fairness or accuracy." *Id.* If the record was insufficient, the proper course was "additional investigation or explanation." *Id.* The Court further chastised Commerce for assuming that it could not seek more information if it did not have enough on the record. *Id.* at 1380.

2.    The duty of accuracy informs proper selection among multiple available data sources. *CS Wind Vietnam Co. v. United States*, 832 F.3d 1367 (Fed. Cir. 2016).

In *CS Wind*, Commerce had calculated the weight of the respondent's products by picking one data source over another: it discarded weights reported by the respondent in favor of those from a customer's packing slips for transoceanic shipping. *Id.* at 1369, 1372. The latter were higher, which increased the calculated normal value and thus the dumping margin. *Id.* at 1372.

That selection did not pass muster because there was no "basis for Commerce reasonably to find" that the data it chose were "more accurate" than the data it ignored. *Id.* at 1373. Commerce reasoned that there was a discrepancy between the respondent's reported weights and the packing-slip weights, and because inaccuracies in shipping-container weights would risk dangerously misbalancing a ship, the latter were probably accurate. *Id.* That did not suffice. As this Court observed, Commerce lacked *specific* evidence of the inaccuracy concern it cited and had just "assume[d]" it to be so. *Id.* at 1374. There were various reasons that the agency could have been wrong. *Id.* This Court reversed and directed Commerce to use the respondent-

reported weights, which had been more thoroughly documented and verified. *Id.* at 1373–74.

3. The duty of accuracy also constrains methodological choices in Commerce's calculations.

In *CS Wind*, this Court further held that Commerce had failed to explain how an aspect of its calculation methodology was reasonable under the statutory standard. 832 F.3d at 1375–76. Commerce had rejected a simple income-minus-expense calculation for determining profit in favor of a more baroque pick-and-choose approach. *Id.* at 1377–79. Commerce expressed some uncertainty about the reliability of some entries reported on the relevant financial statements, and this Court agreed that such entries "might well differ greatly" in their reliability for the necessary calculations. *Id.* at 1380. But this Court explained that, if there were uncertainties in the underlying data, Commerce should "weigh uncertainties" against each other and fully explain its approach. *Id.* at 1378. Commerce had failed to do so.

4. The duty of accuracy outweighs offhand reliance on what Commerce "normally" does or "has done before." *See Mid Continent III*, 941 F.3d at 537–38 (citation omitted).

For instance, this Court's previous decision in this case held that Commerce's general practice of ignoring subsidies did not render a determination reasonable where those subsidies could impair accuracy. *Id.* at 543–44. This Court has also invoked the duty of accuracy in rejecting Commerce's general "policy" of not using *de minimis* margins in its calculations. *Albemarle*, 821 F.3d at 1353–54; *see also Bestpak*, 716 F.3d. at 1380 (disapproving Commerce's assumption, based on its typical practice, that it could not seek more information).

5.    Finally, the duty of accuracy places a guard rail even on imposition of adverse inferences and penalties imposed against uncooperative respondents, where the agency's discretion is particularly broad. *See Gallant Ocean (Thailand) Co. v. United States*, 602 F.3d 1319, 1323–24 (Fed. Cir. 2010); *F.lli De Cecco di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000); *Rhone Poulenc*, 899 F.2d 1185.

In *Gallant Ocean*, this Court recognized that Commerce has "broad discretion in making antidumping determinations," especially as to "uncooperative respondents" like the ones in that case. 602 F.3d at 1323. But that discretion was "not unbounded." *Id.* (citation omitted). Even though Congress provided Commerce with a menu of statutory choices when dealing with an

uncooperative respondent, the result still had to be "reasonably accurate." *Id.* (emphasis and citation omitted). This Court faulted Commerce for "incorrectly presum[ing]" that its selected data were "reliable in the face of much more reliable information" and for not corroborating the information it used or turning to more-reliable sources. *Id.* at 1323–24.

In *De Cecco*, this Court likewise held that accuracy bounded agency discretion. 216 F.3d at 1032. Despite Commerce's expertise and options when calculating a dumping margin for another uncooperative respondent, Commerce's choice of data was not reasonably accurate and its inadequately corroborated rate was unlawful. *Id.* at 1032–33. And in *Rhone Poulenc*, this Court similarly assessed whether Commerce's chosen penalty "sacrific[ed] the basic purpose of the statute: determining current margins as accurately as possible." 899 F.2d at 1191.

## C.    Commerce's approach must also be reasonable under the circumstances of the case

Whether Commerce's calculation approach is a reasonable method in view of its statutory duty is a legal question, albeit one whose resolution can depend on underlying facts. *See Mid Continent III*, 941 F.3d at 537; *Thai Pineapple Canning Indus. Corp. v. United States*, 273 F.3d 1077, 1083–85 (Fed. Cir.

2001). The statute provides that Commerce must use a "reasonable method," 19 U.S.C. § 1677b(e)(2)(B)(iii), and the determination whether Commerce's method was reasonable is therefore a decision for the Court, *see Thai Pineapple*, 273 F.3d at 1084–85 (asking "whether Commerce's methodology is a reasonable interpretation of the statute"); *Bestpak*, 716 F.3d at 1378 (treating whether Commerce's methodology was "reasonable method" under the statute as a question of law). If Commerce's "position is unreasonable, deference does the agency no good." *Thai Pineapple*, 273 F.3d at 1083.

Even if Commerce's approach might be a "reasonable method" as a general matter, its application in a particular case may still be unreasonable. *Bestpak*, 716 F.3d at 1378; *Thai Pineapple*, 273 F.3d at 1084–85. If, for instance, a factual underpinning of Commerce's methodological decision is unsupported, then its methodology lacks support too. *See, e.g.*, *Albemarle*, 821 F.3d at 1355 (change in methodology unjustified by data); *Bestpak*, 716 F.3d at 1378 ("lack of substantial evidence" for determination underlying choice of simple-average methodology). And although factual findings are reviewed only for substantial evidentiary support, the "agency's reasoning" in its methodology is "reviewed under the arbitrary and capricious (or contrary to

law) standard." *Changzhou Wujin*, 701 F.3d at 1377 (citing *Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 48–49 (1983)).

To enable review, Commerce "must provide an explanation that is adequate to enable the court to determine whether its choices are actually reasonable," and that explanation "must reasonably tie the determination … to the governing statutory standard and to the record evidence by indicating what statutory interpretations the agency is adopting and what facts the agency is finding." *Mid Continent III*, 941 F.3d at 537. "[A]n agency's statement of what it 'normally' does or has done before is not, by itself, an explanation of why its methodology comports with the statute." *Id.* at 537–38 (cleaned up); *see also CS Wind*, 832 F.3d at 1376 (similar). The agency's explanation will likely be unreasonable when it has "failed to consider an important aspect of the problem." *SKF USA Inc. v. United States*, 630 F.3d 1365, 1374 (Fed. Cir. 2011) (quoting *State Farm*, 463 U.S. at 43). And as this Court has emphasized, the effect of subsidies on accuracy is an "important aspect" of the constructed-value determination. *Mid Continent III*, 941 F.3d at 545.

## III.    Commerce's determination here was unreasonable

The Trade Court sustained Commerce's approach and held that Commerce did not need to reopen the record. *Mid Continent V*, 586 F. Supp. 3d

at 1359–60. That was error for three reasons. First, it was unreasonable for Commerce to rely on subsidy-distorted financial information when it had no means to quantify the impact of those subsidies and better information was available. Second, it was unreasonable not to weigh the comparative deficiencies of all the data sources of record. And third, it was unreasonable not to reopen the record given the ready availability of more reliable information.

### A.    Commerce unreasonably relied on subsidy-distorted financial information associated with dissimilar products

Several factors demonstrate why Commerce's reliance on the Sundram financial data was untenable.

1.    Commerce found that Sundram, like Hitech, "received subsidies during the fiscal period" because it was paid by its state government under a special industrial program. Appx30-31. And Commerce noted that it had "previously found this [subsidy] program to be countervailable." Appx31. A countervailable subsidy is one in which a government gives a company specific financial assistance in a way that creates unfairness and warrants offsetting import duties. *See Nucor Corp. v. United States*, 927 F.3d 1243, 1245

(Fed. Cir. 2019). Sundram's subsidies thus significantly undermined its fitness for selection as a surrogate for Oman Fasteners.

That was not the only flaw in the Sundram data that Commerce credited. As Commerce acknowledged, Sundram's financial statements made clear that most of its merchandise was "dissimilar." *Mid Continent V*, 586 F. Supp. 3d at 1355; Appx33. Sundram mostly made very different things: "various auto components for the automobile sector, including pump assemblies, engine components, and powder metal parts." Appx33; *see also* Appx1980 ("[A] large portion of Sundram's production and sales consist of automobile parts, which are not comparable to steel nail[s]."); Appx1950 (similar). Even Sundram's fasteners, including dozens of varieties of elaborate fasteners such as friction-grip bolts and flange weld nuts, are a far cry from Oman Fasteners' construction nails. Appx1192. Commerce never explained why Sundram's complicated, highly dissimilar products could provide a better surrogate than simple steel pipes and rods made by the other Omani companies—which Commerce had categorically discarded as "dissimilar." *See* Appx37. And Commerce's choice was doubly problematic because Commerce acknowledged the "statutory preference" for the "home market," but Sundram manufactures in India, not Oman. Appx26, Appx34, Appx37.

Oman Fasteners had also argued to Commerce that Sundram's target market was very different, affecting consumer expectations and, accordingly, acceptable profits and prices. *See, e.g.*, Appx1392-1393; Appx1656. Sundram, after all, characterized itself as a manufacturer of "automotive and engineering components," Appx371, not a manufacturer of basic construction nails. *See also* Appx462 (analyzing demand from automotive manufacturers); Appx1187; Appx1758-1759. As Oman Fasteners explained to Commerce, average profit rates for makers of non-construction fasteners and automotive parts tends to be much higher—typically fourfold higher—than profit margins for steel nails for construction. *See* Appx1661-1662. End users of Oman Fasteners' nails build houses and fasten furniture and pallets; Sundram's customers are Jaguar, John Deere, Mitsubishi, Volkswagen, and the like. Appx887; Appx1655; Appx1759; Appx1884. Although Commerce concluded in *this* remand that Sundram's "profit experiences and customer bases should … closely match those of Oman Fasteners," Appx32, it did not provide any explanation for that conclusion.

That explanatory failure is problematic enough on its own. But it is made worse by Commerce's about-face from its previous position, in the same proceeding, that "Sundram's fastening products are not comparable to

either screws or steel nails." Appx1925 (remand results). It added that "Sundram's fasteners would be used in automotive end use applications, in contrast to steel nails and screws, which are used in construction applications." Appx1925-1926. It emphasized that the two companies' "fasteners ... are not particularly similar, and there would be little overlap in customer base." Appx1926. And it insisted that "Sundram's fasteners would not involve the same input or production process as either nails or screws." Appx1926.

Commerce's second choice, Hitech, was also subsidized. On remand, Commerce acknowledged that it had found in another administrative review that Hitech's statement reflected government subsidies for producing steel screws and was not suitable as a surrogate for constructed value. Appx29-30. It concluded that Hitech's financial statements reflected subsidies here too. Appx30. And like Sundram's, Hitech's subsidies had also previously been found countervailable. Appx27.

That was not the Hitech data's lone blemish. Although Hitech produced fasteners, it made screws and rivets, not nails. Appx32. Moreover, Hitech's financial statement covered 2012, which ended four months before the investigation period began. Appx33. And like Sundram, Hitech

manufactured and sold in a different country than the home market in this case—Thailand, not Oman. Appx25.

2.    As this Court explained in the previous appeal, "subsidies are precisely the kind of factor that could distort the accuracy of a surrogate company's information." *Mid Continent III*, 941 F.3d at 544. There is no ivory-tower mystique to that point; it is common sense. If a company is receiving government subsidies to make merchandise, then its balance sheets do not reflect theoretical fair-market income, costs, and profits. As a result, Commerce may entirely disregard subsidy-tainted information in certain kinds of cases. *See* 19 U.S.C. § 1677b(c)(5).

Commerce's mere knowledge that a subsidy exists is not enough to understand how it affects accuracy. Magnitude matters, *see Mid Continent III*, 941 F.3d at 544, but so does accounting. A subsidy might "increase recorded profit" by appearing "on the receipt side," or it might "take the form of artificially lower input costs." *Id.* at 544. A subsidy could also affect production costs, *NEXTEEL Co. v. United States*, 28 F.4th 1226, 1235–36 (Fed. Cir. 2022) (citation omitted), by, for example, subsidizing an input, *Mueller Comercial de Mexico, S. de R.L. de C.V. v. United States*, 753 F.3d 1227, 1234 (Fed. Cir. 2014). It might affect a direct cost (like component parts) or overhead (like

electricity). *See, e.g.*, *Fine Furniture (Shanghai) Ltd. v. United States*, 748 F.3d 1365, 1368 (Fed. Cir. 2014). It might affect exports only, or domestic sales too. *See, e.g.*, *CS Wind*, 832 F.3d at 1375. A subsidy's significance thus depends on where and how it is accounted for. Without an appropriate investigation, Commerce may know *that* a financial statement is inaccurate, but it cannot know *how* and *by how much*.

3. Commerce's sole justification for using Sundram's subsidy-distorted financial statements was that it only had two options to pick from, and both were subsidized. Appx30, Appx33-34. But Commerce was constrained to those two options only by its own unreasonable choice, not by accuracy considerations.

Indeed, Commerce did not determine the subsidies' effect on accuracy at all. It instead simply "consider[ed] Hitech and Sundram equal in that they both indicate that they received some form of a subsidy." Appx31. Hitech's statement did not report the amount of the subsidy at all, only its existence. *Mid Continent IV*, 551 F. Supp. 3d at 1366. Commerce was unable to quantify the subsidies' effects on accuracy—for instance, whether they affected costs, profits, expenses, or the like, and by how much. And Commerce explained that its "practice is not to dissect the [financial statement] of a surrogate

company" that is not a party to the proceeding because it "do[es] not seek information from or verify the information from the surrogate company." Appx31. The upshot is that Commerce did not even try to evaluate the subsidies' effects on accuracy or to weigh those effects against other sources' merits. Nor could Commerce do that on this record: the subsidized statements were submitted by Oman Fasteners' competitor, which did not submit the information needed to dissect them, and Commerce refused to open the record to gather more information.

Below, petitioner Mid Continent argued that Commerce did not need to compare the subsidies' amounts because Sundram's subsidy was small. *See* Appx2128-2129. But there are three problems with that dismissive approach. First, whatever the magnitude of Sundram's subsidy, Commerce could not compare it against Hitech's completely unquantified subsidy— which it was required to do in order to calculate the most accurate dumping margin. Second, as Commerce explained, it did not "dissect" the financial statement or "seek information from or verify the information from" the surrogate company. Appx31. Accordingly, Commerce lacked a basis in the record to understand the role of the subsidy in Sundram's operations or profitability. And third, Commerce did not determine or rely on the purportedly small

size of Sundram's subsidy, and this Court cannot affirm Commerce's decision on grounds not relied on by the agency. *Changzhou Wujin*, 701 F.3d at 1379 (citing *SEC v. Chenery*, 332 U.S. 194, 196 (1947)).

4.      On this record, Commerce could not reasonably select financial data from Sundram or Hitech at all, both because Commerce could not quantify the subsidies' impact on accuracy and because Commerce had other, better options.

Most of the sources that Commerce discarded did not suffer from a similar unquantifiability problem. Commerce disregarded three financial statements that were partly translated because the untranslated content might theoretically affect reliability. Appx29. Two of the discarded Taiwanese sources may well have been missing vital information. Appx29. But Commerce knew—and had ready access to information confirming—that *LSI's* financial statement was accurate and reflected the same goods as Oman Fasteners' subject merchandise. Commerce had relied on the same LSI statement before. *Mid Continent III*, 941 F.3d at 536; *Certain Steel Nails from the People's Republic of China*, 80 Fed. Reg. 18,816 (Apr. 8, 2015) (final results);

80 ITADOC 18,816 cmt. 2 (accompanying decision memorandum).[1] And Commerce knew that the full translation previously corroborated the accuracy of that partially translated statement. Commerce also identified no unquantifiable inaccuracies with the records from the Omani companies, and it pointed to nothing missing from those records.

By failing to account for the distorting effect of subsidies, Commerce's choice of Sundram failed to comply with this Court's remand instructions. And precedent confirms the error.

In *CS Wind*, this Court directed Commerce to pick one source over another. Commerce had speculated that the data it picked (the weights of shipped merchandise according to packing slips) were better than the respondent's reported data where the two differed. 832 F.3d at 1372–73. But this Court disagreed. The accuracy of the latter was corroborated; the accuracy of the former was speculative. *Id.* at 1374. Commerce should have chosen the better-verified source, and this Court remanded with instructions for it to do so. *Id.* So too here: Commerce picked its source by speculating about accuracy

---

[1] Decision memorandums accompanying Commerce's determinations are available on Westlaw through the ITADOC citation.

and neglected a set of sources without quantifiability problems. That was unreasonable.

Even if it were reasonable for Commerce to have refused to reopen the record for more information, it was unreasonable not to use one of these alternative sources instead, as they lacked the unquantifiable inaccuracies in the two flawed sources on which Commerce relied. This Court should instruct Commerce on remand not to consider Hitech or Sundram's data if it limits itself to the existing record. (And as discussed below, Commerce should not limit itself to the existing record.)

### B.    Commerce acted unreasonably by not comparing the accuracy of the subsidized data with the accuracy of the other data it prematurely discarded

Commerce acted unreasonably by failing to compare the accuracy of the subsidized Hitech and Sundram data against the accuracy of the sources that it prematurely discarded.

### 1.    Commerce did not weigh the comparative deficiencies of the alternative sources

A meaningfully accurate determination required weighing the "comparative deficiencies of the alternative sources." *Mid Continent III*, 941 F.3d at 544. But Commerce did not compare the eleven financial statements in the

record. *Mid Continent V*, 586 F. Supp. 3d at 1357. It instead took a categorical approach that focused on the possible uncertainties or weaknesses of *individual* sources. It categorically eliminated the six Omani companies because they did not make steel nails or "merchandise comparable enough." Appx29-30, Appx37. It never explained why these goods, including steel rods, were worse proxies than Sundram's automobile pump and engine components. And it never weighed the Omani companies' home-country status against the differences in Sundram's and Hitech's products from the subject merchandise.

Commerce then categorically eliminated the three partially translated statements because they were "not complete." Appx29, Appx38-39. Specifically, those sources were missing both an auditor's report and accounting-compliance disclosures, which led Commerce to speculate that these companies *might* in theory not have "properly captured their revenues and costs (and thereby their profits)." Appx38. But Commerce never weighed that theoretical problem against the *known* distortions that were necessarily built into the Hitech and Sundram statements. And it never identified any missing data needed to make any calculation from LSI's statement.

Commerce thus turned to the subsidized statements only after discarding nine of the eleven data sources, and it compared those two statements only against each other. Appx29-34. In so doing, Commerce "incorrectly presumed" that the data it picked were "reliable in the face of much more reliable data." *Gallant Ocean*, 602 F.3d at 1323–24.

### 2.    A meaningful comparison would have produced a more accurate result

Meaningful comparison of all the financial statements would have produced a more accurate result. The statements that Commerce categorically ignored had meaningful accuracy advantages over Sundram and Hitech, but Commerce ignored their advantages. At a bare minimum, a reasonable process would have involved weighing those advantages against Sundram's and Hitech's flaws, and it was unreasonable for Commerce not to perform that assessment.

a.    The six Omani companies were set aside at the outset because they were "involved in production of dissimilar merchandise outside of the steel nails general category." Appx37. But Commerce ultimately relied on Sundram, and Sundram's data had the same flaw—with subsidies to boot. Sundram's merchandise was even further off the mark, as it mostly made

elaborate steel auto parts like pumps, while Al Jazeera, for instance, made steel bars and pipes. Appx1800; Appx1947; Appx33. Commerce did not explain why the difference between the mix of merchandise produced by other Omani companies and Oman Fasteners was more significant than the distortionary subsidies that Hitech and Sundram collected, especially when those companies manufacture and sell outside Oman.

Al Jazeera's financial statement reflected the profit of a company that made and sold similar fabricated steel products in Oman without subsidies. Appx36. Indeed, Al Jazeera's financial statement was originally submitted *by Mid Continent* as an accurate proxy for constructed-value profit, and it served as the basis for Commerce's initiation of the investigation. Appx36. That home-market context and lack of subsidies made Al Jazeera a superior surrogate, and the fact that its steel products were not nails or fasteners should have been less significant than the facts that Hitech and Sundram are both non-Omani and subsidized and Sundram produces highly dissimilar merchandise. Commerce, however, never made any such comparison.

b.     The other three potential surrogates, including LSI, were rejected because their financial statements were only partially translated, and Commerce speculated that some omitted information could undermine their

accuracy. But Commerce made no finding that LSI's statement was *actually* inaccurate. Its rejection was predicated on a speculative possibility. In contrast, Commerce *knew* Hitech's and Sundram's data to be unreliable and knew that it could not determine how unreliable they were.

Commerce's speculative rejection of LSI's information is even more indefensible because Commerce knew that LSI's partially translated statement *was* accurate. Indeed, Commerce had relied on that statement before, *see Certain Steel Nails from China*, 79 Fed. Reg. 19,316; Appx1116-1119 (accompanying decision memorandum), and it continued to rely on it after having corroborated it using the full translation, *see Certain Steel Nails from China*, 80 Fed. Reg. 18,816; 80 ITADOC 18,816 (accompanying decision memorandum). To be sure, this Court previously affirmed Commerce's decision not to use the partially translated LSI financial statement. *Mid Continent III*, 941 F.3d at 540–42, 543–45. But at that time there was a possibility that Commerce had other reliable data on the record. Once Commerce determined that both the Sundram data *and* the Hitech data were subsidy-distorted, that premise disappeared, and Commerce no longer had a reliable basis to refuse to consider LSI. This Court did not prohibit Commerce from reconsidering

and selecting the LSI data in that circumstance, or from reopening the record to accept the fully translated financial statement.

### 3. Commerce misapplied precedent by concluding that it did not need to compare particular deficiencies

Commerce nevertheless concluded that it did not need to compare the "particular deficiencies" of the various financial statements. Appx39. The Trade Court agreed, citing *CP Kelco US, Inc. v. United States*, 949 F.3d 1348 (Fed. Cir. 2020), for the proposition that Commerce did not actually need to compare them. *Mid Continent V*, 586 F. Supp. 3d at 1357. But that holding misapplied *CP Kelco* and ignored what this Court said in this case.

This Court's previous discussion of the reasonableness of Commerce's application of the statute, and its review of Commerce's original decision to select Hitech over the Omani companies and LSI, came with a significant caveat: the Court had yet to discuss the issue of subsidies. *Mid Continent III*, 941 F.3d at 542–43 ("putting aside" the subsidies issue). The Court was not then faced with a conclusion by Commerce that its only options were two financial statements that were not only subsidy-distorted but unquantifiably so. When this Court turned to the issues of subsidies and their distortive impact on surrogate sources of constructed-value profit, it directedly addressed

Commerce's obligation to weigh the significance of such subsidies against other information sources. The Court explained that "government subsidies are precisely the kind of factor that could distort the accuracy of a surrogate company's information." *Id.* at 544. Thus, the "comparative deficiencies" of the other sources "would obviously be relevant." *Id.*

*CP Kelco* discussed Commerce's choice between just two sources for calculating "surrogate financial ratios," companies called Fermentation and Ajinomoto. 949 F.3d at 1352–53. Both sources had one flaw: Fermentation's financial statement was incomplete and Ajinomoto's reflected subsidies. *Id.* at 1352. Commerce had not initially compared the sources at all. *Id.* at 1353. Instead, it had excluded the incomplete Fermentation statement under its own general "practice" of not considering incomplete documents, no matter what was missing. *Id.* The Trade Court remanded for Commerce to compare the financial statements, and Commerce again categorically excluded the incomplete statement because "*any* missing information may be 'vital'" and it did not want to speculate on what was left out. *Id.* at 1354. That was still not good enough, and this Court—remanding again—gave Commerce the option of "(1) explicitly exploring the relative impact of the imperfection in the Thai Ajinomoto statements (evidence of subsidies) and that in the Thai

Fermentation statements (incompleteness); or (2) making a fact-sensitive finding that the Thai Fermentation statements are missing 'vital' information." *Id.* (citation omitted).

Commerce finally explained that it needed to calculate both profit and SG&A ratios, of which "depreciation expense[s]" were an "integral component." *Id.* at 1359. But the Fermentation statement was missing paragraphs about the company's fixed assets, which were a "critical component" of calculating depreciation. *Id.* Further, no one had tried to submit the full translation of Fermentation's financial statement. *Id.* at 1353. Accordingly, Commerce provided the "fact-sensitive" finding that this Court required: specific data that Commerce needed for a calculation was both missing and not readily obtainable.

For its part, Ajinomoto's information was complete, and there was no suggestion that the impact of Ajinomoto's subsidies was unknown. Under those circumstances, Commerce *did* compare both its sources and *did* find that one was better. It chose a "complete and reliable" option, *id.* at 1354, over one that could not be used for a calculation at all due to missing data, and this Court found that specific choice reasonable, *id.* at 1359.

Commerce did not face or make any such hard choice here. It had eleven options on the record, not two, and their differences were not so stark. None was categorically unusable. Subsidies were not the only flaw of the two financial statements Commerce actually compared—they reflected different time periods than the investigation, different countries than Oman, and goods dissimilar to the subject merchandise. And although the other Omani companies had some perceived disadvantages (such as producing different merchandise), nothing about them was unknown. They also had advantages that went unaddressed, such as home-country status, reflecting the statute's preference that constructed value reflect as much as possible the home market under investigation—in this case, Oman. *See Husteel Co. v. United States*, 98 F. Supp. 3d 1315, 1349 (Ct. Int'l Trade 2015) ("The goal in calculating [constructed value] profit is to approximate the home market profit experience of the respondents."); *Mid Continent III*, 941 F.3d at 542. Moreover, while the partially translated Taiwanese financial statements may have been of uncertain accuracy, the same was not true of LSI's: Commerce had treated the same partially translated statement as reliable and accurate before, had corroborated its accuracy against the full translation, and had access to the

full translation here if it wanted it. LSI's data also had an advantage over any other source in that LSI produced *identical* merchandise: steel nails.

*CP Kelco* also differed in the nature of the missing information. In *CP Kelco*, the missing information was necessary for a specific input into a specific calculation, making the statement's use impossible. 949 F.3d at 1359. Here, in contrast, Commerce said only that the statements were missing corroborating information and therefore *might* be inaccurate. (Moreover, LSI's statement was not inaccurate, as Commerce knew, so it was unreasonable to deem the information missing from LSI's statement vital.) Unlike in *CP Kelco*, Commerce here chose an indisputably and unquantifiably inaccurate option.

Other precedent supports the same conclusion. As in *CS Wind*, Commerce did not provide a basis to find that its chosen data were "more accurate" than the nine financial statements it ignored. 832 F.3d at 1373. Rather, it pulled those companies out of the running based on speculative, nonspecific concerns, ignoring unquantified inaccuracies in the subsidy-distorted data. In doing so, Commerce failed to "weigh uncertainties" as required. *Id.* at 1378.

In short, precedent lent Commerce no license to sidestep a proper, substantive comparison of the choices available here. Commerce should have weighed the comparative advantages and disadvantages of all the sources, and it was unreasonable not to do so.

### C.    If Commerce was stuck with two admittedly inaccurate sources, it could and should have reopened the record

If Commerce truly had been left only with two inaccurate options—both indisputably subsidy-distorted—then it could and should have reopened the record. It could have done so under its regulations. 19 C.F.R. § 351.301(c)(4). And it knew that further information was readily available. Its failure to accept that information was unreasonable under these circumstances, and the Trade Court erred in concluding otherwise.

Commerce declined to reopen the record on grounds that its available information was "sufficient … to render an accurate determination." *Mid Continent V*, 586 F. Supp. 3d at 1359. But that premise was flawed. As explained above, Commerce did not meaningfully compare the financial statements that were in the record. Even as to the statements that Commerce did compare, the agency could not have known how inaccurate they were

because it was unable to determine, on the record, the comparative extent or nature of Sundram's and Hitech's subsidies.

When framing the scope of its previous remand, this Court previewed that obtaining new clarifying information might very well be the only reasonable course. And the Court explained that although it "might be reasonable to avoid methods that demand information that cannot practically be obtained in reliable form," it also "can be unreasonable for an agency to refuse to obtain readily available, highly relevant information." *Mid Continent III*, 941 F.3d at 544–45.

*Bestpak* and *CS Wind* illustrate the point. In *Bestpak*, Commerce relied on a too-thin record, using two concededly inaccurate duty rates to calculate the respondent's duty rate and using a single other data point to corroborate that calculation's accuracy. 716 F.3d at 1378. "[S]uch slim findings" were inadequate in view of Commerce's "overriding purpose" of accuracy." *Id.* at 1378–79. And although Commerce claimed that it did not have any other information in the record, it knew of the inaccuracy problem and "could have gathered more information." *Id.* at 1380. The proper course was "additional investigation or explanation" if the record was inadequate. *Id.* Similarly, in *CS Wind* Commerce declined to "go behind" a third party's financial

statements to seek additional clarifying information. 832 F.3d at 1380. This Court remanded for Commerce to justify that choice. *Id*. And it cautioned that an agency's failure to get readily obtainable information "sometimes require[s] setting aside an agency's decision" under the APA. *Id*. at 1380 n.7 (citing *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 519 (2009)). The Court offered the same caution in this case. *Mid Continent III*, 941 F.3d at 545.

The same logic should have driven Commerce to reopen the record here. It is beyond dispute that Commerce had ready access to additional highly relevant information. Oman Fasteners repeatedly sought to submit the full translation of LSI's financial statement after Commerce changed course from its prior acceptance of the partial one and rejected it. *Mid Continent V*, 586 F. Supp. 3d at 1359; Appx1525-1526; Appx1584-1585; Appx29, Appx40-41; Appx2115-2116. That statement confirmed that LSI's partially translated statement, which Oman Fasteners had originally submitted, was accurate.

As explained above, Commerce knew this: it had relied on the same partially translated LSI financial statement in multiple administrative reviews in a concurrent proceeding and had there determined that it was the most reliable source of constructed-value profit information for a steel-nail

manufacturer. *Mid Continent III*, 941 F.3d at 536; *Certain Steel Nails from China*, 79 Fed. Reg. 19,316; Appx1118-1121 (accompanying decision memorandum); Appx1527-1528. Even Mid Continent, the petitioner here, represented to Commerce that LSI's partially translated statement was "complete," "usable," and replete with "high quality data." Appx1589 (emphasis omitted); Appx 1530; Appx1642, Appx1645. Indeed, in that proceeding Commerce continued to rely on the partially translated LSI statement in its final determination after the fully translated statement was submitted in the interim. *See Certain Steel Nails from China*, 80 Fed. Reg. 18,816 (Apr. 8, 2015); 80 ITADOC 18,816 cmt. 2 (accompanying decision memorandum).

The upshot is that the fully translated LSI statement not only lacked the flaws that Commerce saw in the partially translated one—it *corroborated* that the partially translated statement was accurate. And that full statement was readily available. Commerce itself reopened the record and invited the full translation to be submitted for that very reason in the concurrent steel-nails proceeding. Appx1591-1592. Commerce thus knew that the theoretical possibility of inaccuracies in LSI's financial statement was a fiction and that readily available information would confirm as much. But instead of obtaining that information, Commerce relied on "conjecture or supposition" and

– 59 –

an "absence of evidence" that stemmed from its own procedural choices. That was legal error and an abuse of discretion. *Bestpak*, 716 F.3d at 1378–79 (citation omitted).

This Court's previous decision recognized that "[p]ractical considerations" might guide Commerce's approach on remand. *Mid Continent III*, 941 F.3d at 544. But there is a difference between "adduc[ing] empirical data that can readily be obtained" and "insist[ing] on obtaining the unobtainable." *Fox*, 556 U.S. at 519. There was nothing "unobtainable" here. There was no practical reason for Commerce not to open the record in this remand— much less a reason that outweighed the accuracy mandate. This Court remanded for a specific purpose—to explain and account for subsidies' impact on determining an accurate constructed value—and the information Commerce had was inadequate for that. The primary command was accuracy, and faced with two inaccurate choices, Commerce "could" and should "have gathered more information." *Bestpak*, 716 F.3d at 1380.

This Court stressed that Commerce must "articulate an explanation of why its result is a reasonable once," considering "the broad duty to strive for accuracy." *Mid Continent III*, 941 F.3d at 545. Commerce gave no adequate explanation for refusing to reopen the record that was reasonable in view of

that foundational duty. Commerce declared that it would "only reopen the record when there is a compelling need for additional information," and that the record "contain[ed] sufficient [financial statements] in order to render an accurate determination." Appx40-41. But "compelling need" was not the relevant legal standard, and Commerce's determination could not have been "accurate" in light of the admitted flaws of the two financial statements it picked from.

Commerce's choice was based on mere convenience: it declared that the parties "already had the opportunity" to submit information at the outset. Appx40. But that is always true, and such logic would excuse Commerce from *ever* needing to reopen the record. In any event, that previous opportunity occurred *before* Commerce had determined that Hitech and Sundram not only were subsidized but also unquantifiably so, making the need for additional information clear.

## Conclusion

The Court should reverse the Trade Court's order sustaining Commerce's remand determination and remand for further proceedings.

Respectfully submitted,

PERKINS COIE LLP

by <u>/s/Michael P House</u>

        Michael P. House
        Michael R. Huston
        Dan L. Bagatell
        Nathan K. Kelley
        Andrew T. Dufresne
        Andrew Caridas
        Jonathan I. Tietz

Counsel for Appellant

# ADDENDUM

Slip Op. 22-88

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| MID CONTINENT STEEL & WIRE, INC.,<br><br>    Plaintiff/Consolidated Defendant-Intervenor,<br><br>        v.<br><br>UNITED STATES,<br><br>    Defendant,<br><br>        and<br><br>OMAN FASTENERS, LLC,<br><br>    Defendant-Intervenor/Consolidated Plaintiff. | Before: Mark A. Barnett, Chief Judge<br>Consol. Court No. 15-00214 |

<u>**OPINION**</u>

[Sustaining Commerce's surrogate company selection to calculate constructed value profit in this antidumping duty investigation of certain steel nails from the Sultanate of Oman]

Dated: August 8, 2022

<u>Adam H. Gordon</u>, <u>Jennifer M. Smith</u>, and <u>Lauren Fraid</u>, The Bristol Group PLLC, of Washington, DC, for Plaintiff/Consolidated Defendant-Intervenor Mid Continent Steel & Wire, Inc.

<u>Mikki Cottet</u>, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for Defendant United States. With her on the brief were <u>Brian M. Boynton</u>, Principal Deputy Assistant Attorney General, and <u>Patricia M. McCarthy</u>, Director. Of counsel on the brief was <u>Ian McInerney</u>, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

<u>Michael P. House</u>, <u>Andrew Cardias</u>, and <u>Shuaiqi Yuan</u>, Perkins Coie LLP, of Washington, DC, for Defendant-Intervenor/Consolidated Plaintiff Oman Fasteners, LLC.

Consol. Court No. 15-00214                                    Page 2

Barnett, Chief Judge:  This matter arises out of a challenge to the U.S.

Department of Commerce's ("Commerce" or "the agency") third remand results in its

antidumping duty investigation of certain steel nails from the Sultanate of Oman.  *See*

Final Results of Redetermination Pursuant to [Third] Court Remand ("Third Remand

Results"), ECF No. 150-1.[1]  Commerce issued the Third Remand Results in response to

an opinion by the U.S. Court of International Trade ("the court" or "CIT") holding that

Commerce had not adequately explained its reliance on a financial statement from

Hitech Fastener Manufacturer (Thailand) Co., Ltd. ("Hitech"), a third-country company,

to determine constructed-value profit because the agency had not sufficiently

considered the existence or potential impact of subsidies on Hitech's financial

statements.  *Mid Continent Steel & Wire, Inc. v. United States*, 45 CIT __, 551 F. Supp.

3d 1360 (2021) ("*Mid Continent 2021*").

In the Third Remand Results, Commerce chose to rely instead on the financial

statements of Sundram Fasteners Limited ("Sundram"), another third-country company,

rather than those of Hitech, to determine constructed-value profit.  Third Remand

Results at 2.  For the reasons discussed herein, the court will sustain Commerce's

determination.

---

[1] The administrative record associated with the Third Remand Results is contained in a
public administrative record ("PR"), ECF No. 152-2, and a confidential administrative
record, ECF No. 152-3.  Parties submitted a public Joint Appendix ("JA"), ECF No. 160,
containing record documents cited in their comments on the Third Remand Results.

Consol. Court No. 15-00214                                                    Page 3

## BACKGROUND

The instant matter originated when Plaintiff Mid Continent Steel & Wire, Inc. ("Mid Continent") and Consolidated Plaintiff Oman Fasteners, LLC ("Oman Fasteners") each challenged separate aspects of Commerce's determination that Oman Fasteners was selling goods at less than fair value, or "dumping," in the United States.  *See Certain Steel Nails From the Sultanate of Oman*, 80 Fed. Reg. 28,972 (Dep't Commerce May 20, 2015) (final determination of sales at less than fair value), ECF No. 16-1, and accompanying Issues and Decision Mem., A-523-808 (May 13, 2015) ("I&D Mem."), ECF No. 16-2.  Their respective cases were consolidated under this lead case. Consolidation and Scheduling Order at 2, ECF No. 18.

When determining whether a company is dumping, section 773(a) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1677b(a) (2012),[2] directs Commerce to calculate the difference between the export price and the normal value, a value usually based on the price at which the merchandise is sold in the exporting country or in a third country other than the United States.  *Id.*  If, however, there are insufficient home-market and third-country sales, as was the case with Oman Fasteners, Commerce calculates the "constructed value" of the merchandise to use as the normal value. 19 U.S.C. § 1677b(a)(4).  Constructed value consists of the sum of (1) the cost of producing the merchandise; (2) amounts for selling, general, and administrative expenses; and (3) an amount for profit.  *See* 19 U.S.C. § 1677b(e).  The method used for the constructed

---

[2] Further citations to the Tariff Act of 1930, as amended, are to Title 19 of the U.S. Code, and references to the U.S. Code are to the 2012 edition, unless stated otherwise.

value profit calculation depends on what data is available: Commerce either uses the

"preferred method," which is based on actual profits and expenses, or, if no "actual

data" are available, one of three alternative methods, among which there is no hierarchy

or preference.  *See SKF USA Inc. v. United States*, 263 F.3d 1369, 1374 (Fed. Cir.

2001).

In this case, because "actual data" were not available, Commerce chose the third

of the alternative methods, which allows Commerce to utilize "any other reasonable

method" to determine constructed value profit, subject to a profit cap provided in the

statute.  *See Mid Continent Steel & Wire, Inc. v. United States*, 941 F.3d 530, 535–36

(Fed. Cir. 2019) ("*Mid Continent CAFC*") (citations omitted); 19 U.S.C.

§ 1677b(e)(2)(B)(iii).  Other reasonable methods may include, as Commerce chose in

this case, the use of financial statements from a third-country company. *See Mid

Continent CAFC*, 941 F.3d at 542–545.

As proposed sources of constructed value profit, Oman Fasteners submitted

financial data from several Omani companies along with partially translated financial

statements from L.S. Industry Co., Ltd. ("LSI"), a Thai producer of steel nails.  *Id.* at 535.

Mid Continent, in turn, submitted financial statements from two Taiwanese producers of

steel nails; those of Hitech, a Thai producer of steel screws; and those of Sundram, an

Indian producer of auto parts and fasteners.  *Id.* at 535–36; I&D Mem. at 14.

Commerce initially chose Hitech as the source of constructed value profit,

declined to consider the partially translated LSI statements, and found no profit cap

available to apply to the constructed value profit determination.  *Mid Continent CAFC*,

Consol. Court No. 15-00214                                          Page 5

941 F.3d at 536.  In choosing Hitech's financial statements, Commerce found that a

note on Hitech's financial statements stating that "The company has been support [*sic*]

for production screws (SCREW) Category 4.7 Manufacture of wire products, metal wire,

Promotional Number 1447/2538 on July 10, 1995," did not establish that Hitech's receipt

of a countervailable subsidy, even though the program indicated by the above quotation

had "previously [been] found to be countervailable."  *See* Final Results of

Redetermination Pursuant to [Second] Court Order, ECF No. 135-1.

     These findings were challenged, and subsequent litigation has led to three

remands.[3]  Familiarity with this procedural history is presumed.

     Most recently, this court remanded the determination to Commerce to further

explain or reconsider the choice of Hitech's financial statements, consistent with this

court's opinion and that of the Federal Circuit in *Mid Continent CAFC*.  *Mid Continent

2021*, 551 F. Supp. 3d at 1365.  The court found that Commerce had failed to justify its

reliance on Hitech's financial statements because it "did not explain why this case is

distinguishable from a case in which Hitech's financial statements were disregarded due

to evidence of a countervailable subsidy" or "why, given its finding that the potential

subsidies could not be quantified, Hitech's financial statements were a better choice

---

[3] For the additional history in this case, see *Mid Continent Steel & Wire, Inc. v. United States* ("*Mid Continent I*"), 41 CIT __, 203 F. Supp. 3d 1295 (2017), and *Mid Continent Steel & Wire, Inc. v. United States* ("*Mid Continent II*"), 41 CIT __, 273 F. Supp. 3d 1348 (2017).  *Mid Continent I* remanded the determination, and Commerce issued the first remand results.  *Mid Continent II* affirmed the first remand results; that decision was appealed to the U.S. Court of Appeals for the Federal Circuit ("Federal Circuit"), which remanded the determination back to this court for further proceedings consistent with *Mid Continent CAFC*, 941 F.3d 530.

than Sundram's."  *Id.* at 1366.  The court ordered Commerce to "seriously engage with

the possible inclusion of subsidies" in Hitech's statements, and to "address whether a

comparative analysis inclusive of the other financial statements on the record is

appropriate."  *Id.* at 1368.  The court did not require Commerce to reopen the record,

but instead left that decision to Commerce's discretion.  *Id.*

In response to *Mid Continent 2021*, Commerce issued the Third Remand Results

in which the agency continued to use the alternative method for calculating constructed

value pursuant to 19 U.S.C. § 1677b(e)(2)(B)(iii), that is, "any other reasonable

method," and relied on third-country sources as affirmed in *Mid Continent CAFC*.  Third

Remand Results at 4.  In these Third Remand Results, Commerce selected Sundram,

rather than Hitech, as the source of financial statements to calculate constructed value

profit, resulting in a dumping margin of 4.22 percent.  *Id.* at 2, 20.

Commerce addressed each of the eleven financial statements on the record in

the Third Remand Results.  Of the eleven statements, six were from Omani companies.

*Id.* at 4.  Commerce found that these companies did not "produce[] steel nails or any

type of merchandise comparable enough to steel nails to satisfy the statutory

preferences."  *Id.* at 4–5.  Commerce also declined to use either of the two Taiwanese

financial statements or LSI's financial statements because they lacked complete English

translations.  *Id.* at 5.  The agency noted that the Federal Circuit upheld its decision not

to rely on LSI's partially translated financial statements and to reject the late submission

of full translations.  *Id.* at 5 & n.23 (citing *Mid Continent CAFC*, 941 F.3d at 540–42).

Commerce found that "the Taiwanese [financial statements] and LSI's [financial

Consol. Court No. 15-00214                                                    Page 7

statements] contain significant defects which prevent Commerce from effectively

evaluating their appropriateness as sources of [constructed value] profit." *Id.* at 15.

Between the two remaining financial statements on the record, Hitech's and

Sundram's, Commerce chose to use Sundram's. *See id.* at 5–10, 13–16. Commerce

found that both companies received subsidies and that both companies produced

comparable merchandise. *Id.* at 6, 16. While Commerce had previously found that

Hitech's financial statements did not contain evidence of a subsidy, this time the agency

concluded that Hitech's statements "contain evidence of subsidies." *Id.* at 6

(analogizing to the facts examined in *Steel Wire Garment Hangers From the People's

Republic of China*, 79 Fed. Reg. 65,616 (Dep't Commerce Nov. 5, 2014) (prelim. results

of antidumping duty admin. review; 2012-2013)). Commerce also found that Sundram

received subsidies of "30 Lakhs during the 2013–14 period" from the "state government

of Uttarakhand as special capital subsidy, for setting up an industrial undertaking in the

state." *Id.* at 6–7 & n.26 (citing Pet'r [Mid Continent's] [Constructed Value] Submission

(Oct. 31, 2014), Ex. 10A,[4] PR 104, JA Tab 4).

Acknowledging that "it is not [the agency's] preference to use data which include

subsidies, [Commerce] consider[ed] Hitech and Sundram equal in that they both

indicate that they received some form of a subsidy." *Id.* at 7. The agency went on to

compare the two, finding that "[b]ecause the record shows that no other companies

derived profit from the production and sale of comparable merchandise, we must rely on

---

[4] Although Commerce cites to Exhibit 10A to support this assertion and the cover page to Tab 4 states 10A, the cover page to the exhibit is labeled 9A.

Consol. Court No. 15-00214                                                    Page 8

the [financial statements] of either Hitech or Sundram, even though both companies

received some form of a subsidy." *Id.* Commerce's stated practice in such a

circumstance involves considering:

> (1) the similarity between a potential surrogate's business operations and
> products and those of the respondent; (2) the extent to which a potential
> surrogate has sales in the United States and the home market; (3) the
> contemporaneity of the surrogate data; and (4) the similarity of customer
> base between a potential surrogate and the respondent.

*Id.* at 7–8 (citations omitted). Commerce noted that it was unable to consider criterion

(2) because "the record of this investigation does not sufficiently identify the

geographical breakdown of sales for either Hitech or Sundram." Third Remand Results

at 8. Commerce also found that criterion (4) did not weigh in favor of either Hitech or

Sundram, as both likely had "customer bases [that should] also closely match those of

Oman Fasteners." *Id.*

Commerce found that "[b]oth Hitech and Sundram produce comparable

merchandise," with Hitech producing "various screws and rivets (i.e., fasteners) and

Sundram produc[ing] high tensile fasteners, all of which [Commerce considered]

comparable to steel nails." *Id.* at 8. Accordingly, Commerce found that "their respective

production experiences, raw materials consumption, supply and demand conditions,

and facilities should resemble those of Oman Fasteners," and that "their respective

profit experiences and customer bases should also closely match those of Oman

Fasteners." *Id.* Citing its preference to use contemporaneous data, Commerce noted

that Sundram's financial statements were contemporaneous with the period of

investigation, while Hitech's were not. *Id.* at 9. Commerce considered this sufficient to

Consol. Court No. 15-00214                                             Page 9

tilt the scales in favor of using Sundram's financial statements despite "dissimilar"

merchandise making up 64 percent of Sundram's production.  *Id.* at 9–10.

Oman Fasteners opposes the Third Remand Results, arguing that Commerce

did not sufficiently compare the financial statements on the record and that Sundram's

financial statements were improperly selected.  *See generally* Cmts. of [Oman

Fasteners] in Opp'n to Commerce Dept.'s Remand Redetermination ("Opp'n Cmts.") at

2, 10–11, ECF No. 153.  Defendant United States ("The Government") and Mid

Continent support the Third Remand Results.  *See generally* Deft.'s Resp. to Cmts. on

Remand Redetermination ("Govt. Reply"), ECF No. 159; Cmts. of [Mid Continent] on

Final Remand Redetermination ("Mid Continent Reply"), ECF No. 158.

### JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 19 U.S.C. § 1516a(a)(2)(B)(i) and 28

U.S.C. § 1581(c).  The court will uphold an agency determination that is supported by

substantial evidence and otherwise in accordance with law.

### DISCUSSION

### I.    Parties' Contentions

Oman Fasteners contends that Commerce did not sufficiently explain its

preference for Sundram's financial statements over LSI's or those of Al Jazeera (which

is one of the six Omani companies that Commerce determined does not produce

comparable merchandise).  Opp'n Cmts. at 2, 10–11; *see also* Third Remand Results at

13.  Oman Fasteners argues that because both Hitech's and Sundram's financial

statements contained evidence of subsidies, Commerce should have rejected them in

favor of another financial statement on the record.  Opp'n Cmts. at 6–7.  Oman

Fasteners also asserts that Commerce ignored this court's remand instructions by not

considering and comparing all financial statements on the record side-by-side—as

opposed to rejecting all but two before commencing the comparison.  *Id.* at 7–8 (citing

*Mid Continent 2021*, 551 F. Supp. 3d at 1367; *CP Kelco US Inc. v. United States* ("*CP

Kelco I*"), Slip Op. 15-27, 2015 WL 1544714 (CIT Mar. 31, 2015)).  Oman Fasteners

contends that had Commerce properly compared all of the financial statements on the

record, rather than reducing the comparison to Sundram and Hitech, the agency would

have found that LSI or, alternatively, Al Jazeera, was a better alternative.  *Id.* at 10.

Lastly, Oman Fasteners argues that Commerce should have reopened the record in

order to allow Oman Fasteners to submit full translations of LSI's financial statements,

because, in its view, there was no other suitable financial statement on the record.  *Id.*

at 11–13.

The Government contends that "Commerce reasonably tied its determination to

the governing statutory standard and to the record evidence by indicating what statutory

interpretations the agency adopted and what facts the agency found."  Govt. Reply at 5–

6 (citing *Mid Continent CAFC*, 941 F.3d at 537).  The Government contends that

Commerce was not required to compare the financial statements, *id.* at 12, and that

Commerce "reasonably exercised its discretion" in compliance with the court's remand

order*, id.* at 10.  Emphasizing that the Federal Circuit upheld Commerce's refusal to use

LSI's incomplete financial statements or accept the late submission of the full version,

the Government also contends that the missing information in LSI's financial statements

rendered that information unusable because Commerce could not evaluate its appropriateness or accuracy. *Id.* at 12. The Government also supports Commerce's rejection of Al Jazeera's financial statements because that company does not produce comparable merchandise. *Id.* at 13. Lastly, the Government contends that Commerce was not required to reopen the record because Commerce properly enforced its deadlines, there were other sources of constructed value profit on the record, and the Federal Circuit already affirmed this decision. *Id.* at 13–14.

Mid Continent contends that because Hitech's financial statements were not contemporaneous with the period of investigation but Sundram's were, Commerce's selection of Sundram's financial statements for constructed value profit calculations should be sustained. Mid Continent Reply at 2–3, 8. Mid Continent argues that Oman Fasteners' citation to *CP Kelco* is inapposite. *Id.* at 3–4. Lastly, Mid Continent contends that the amount of Sundram's subsidy was quantifiable and small, making the effect of the subsidy "negligible" in terms of Sundram's financial experience for the relevant time period. *Id.* at 7–8.

## II.    Analysis

As discussed in the "Background" section above, the court reviews the Third Remand Results against the backdrop of its prior opinions in this case and the opinion of the Federal Circuit. Therein, the Federal Circuit restated the standard against which the court reviews Commerce's determinations, including that substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion" considering the record as a whole. *Mid Continent CAFC*, 941 F.3d at 537 (citing

Consol. Court No. 15-00214                                      Page 12

*Novartis AG v. Torrent Pharm. Ltd.*, 853 F.3d 1316, 1324 (Fed. Cir. 2017); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–88 (1951)).  Additionally, "Commerce must provide an explanation that is adequate to enable the court to determine whether its choices are actually reasonable."  *Id.*; *see also CS Wind Vietnam Co. v. United States*, 832 F.3d 1367, 1376 (Fed. Cir. 2016) (finding that Commerce had "failed to meet its obligation to set forth a comprehensible and satisfactory justification for its approach as a reasonable implementation of statutory directives supported by substantial evidence"); *Yangzhou Bestpak Gifts & Crafts Co. v. United States,* 716 F.3d 1370, 1378 (Fed. Cir. 2013) (finding that Commerce must "examine the record and articulate a satisfactory reason for its action").  "[T]he required explanation must reasonably tie the determination under review to the governing statutory standard and to the record evidence by indicating what statutory interpretations the agency is adopting and what facts the agency is finding."  *Mid Continent CAFC*, 941 F.3d at 537.

The Federal Circuit has emphasized that comparing the options on the record and considering their "comparative deficiencies" is an important part of Commerce's selection of financial statements for determining constructed value profit.  *Id.* at 544 ("The size of any subsidies would obviously be relevant, as would the comparative deficiencies of the alternative sources.").  Oman Fasteners cites to *CP Kelco I* to argue that Commerce was required to compare, side-by-side, all eleven financial statements, and that this comparison would have led the agency to choose either LSI or Al Jazeera's financial statements.  Opp'n Cmts. at 7–8 (citation omitted).  In *CP Kelco I*, the court remanded Commerce's selection of the financial statements of a company that

**Appx0012**

Consol. Court No. 15-00214                                    Page 13

contained evidence of countervailable subsidies over financial statements that were not

fully translated.  *CP Kelco I*, 2015 WL 1544714, at \*7–8.  The *CP Kelco I* court found

that "Commerce must faithfully compare the strengths and weaknesses of each

[potential surrogate-data source] before deciding which to use."  *Id.* at \*7.

While *CP Kelco I* required Commerce to fully compare the two financial

statements at issue, a full review of the *CP Kelco* litigation shows that the case does not

stand for the proposition that a side-by-side analysis of every financial statement on the

record is always required.  *See CP Kelco US Inc. v. United States* ("*CP Kelco VI*"), 949

F.3d 1348, 1359 (Fed. Cir. 2020); *CP Kelco US Inc. v. United States*, 41 CIT __, __,

211 F. Supp. 3d 1338, 1343 (2017).  In *CP Kelco VI*, the Federal Circuit upheld

Commerce's determination to reject incomplete financial statements "after making a

fact-sensitive finding that the [incomplete financial statements were] missing 'vital'

information."  949 F.3d at 1359.  The appellate court upheld Commerce's decision not to

compare directly each of the financial statements when Commerce had sufficiently

explained that the missing paragraphs in the rejected financial statement were a "key

component of a company's financial statements" and "integral" to the necessary

calculations—that is, of "critical importance."  *Id.*

Here, while Commerce did not directly compare each of the eleven financial

statements on the record, Commerce explained its decision to reject the financial

statements from the six Omani companies, the two Taiwanese companies, and LSI,

such that it did not need to compare these statements to those of Hitech and Sundram.

Regarding LSI's financial statements and the Taiwanese financial statements,

Consol. Court No. 15-00214                                            Page 14

Commerce explained that there was "no way to ascertain whether the companies have

properly captured their revenues and costs (and thereby their profits) in accordance with

their respective [generally accepted accounting principles] or whether the [financial

statements can serve as reliable sources for the profit 'normally' experienced by a

producer of steel nails.'"  Third Remand Results at 14–15.  The agency concluded that

the partially translated financial statements "contain[ed] significant defects which

prevent[ed] Commerce from effectively evaluating their appropriateness as sources for

[constructed value] profit."  *Id.* at 15.  In addition, Commerce highlighted that the Federal

Circuit upheld Commerce's decision not to use the LSI or Taiwanese statements

because they were missing what Commerce called "vital" information.  *Id.* at 5 & n.23

(citing *Mid Continent CAFC*, 941 F.3d. at 540–42).  Consistent with the requirements

outlined in *CP Kelco VI*, 949 F.3d at 1359, and *Mid Continent CAFC*, 941 F.3d at 540–

42, Commerce found that these defects rendered the LSI and Taiwanese financial

statements unusable.  Accordingly, Commerce adequately explained its reasons for not

relying on these financial statements to determine constructed value profit.

Regarding the rejection of the six Omani companies' financial statements,

Commerce found that "data reflecting the production and profit from sale of comparable

merchandise are always preferable to a profit experience wholly dissimilar to the

mandatory respondent," indicating that because none of the six Omani companies

produced comparable merchandise, they were not "suitable source[s]" of "[constructed

value] profit information."  Third Remand Results at 15; *see also Mid Continent CAFC*,

941 F.3d at 542 (explaining that Commerce must reasonably choose, given the record,

Consol. Court No. 15-00214                                              Page 15

a surrogate company that accurately reflects the home market profit experience of the

respondents in order to "build into a fair sales price for the particular merchandise").

Commerce also explained, elsewhere in the Third Remand Results, that "producers of

comparable merchandise will likely share a number of similarities in their respective

production experiences and raw material consumptions, . . . [such that their

experiences] should resemble those of Oman Fasteners."  Third Remand Results at 8.

Indeed, having found that "data about sales in the ordinary course of trade"—a phrase

that means "the conditions and practices which . . . have been normal in the trade under

consideration with respect to merchandise of the same class or kind— is necessary for

the preferred method to apply, the Federal Circuit upheld Commerce's decision not to

use home-market financial statements in part because no Omani company produced

comparable merchandise.  *Mid Continent CAFC*, 941 F.3d at 539 (quoting 19 U.S.C. §

1677b(e)(2)(A), and § 1677(15)).

        Nevertheless, Commerce went on to explain further its rejection of the Omani

companies' data: Commerce found that their production of wholly non-comparable

merchandise meant that "all six Omani [financial statements] likely do not share

similarities to Oman Fasteners in their respective production experiences or raw

material consumptions and are not subject to the same supply and demand conditions

in the global marketplace as Oman Fasteners" and, thus, constitute "less ideal sources"

of information.  Third Remand Results at 13.  Because it is within Commerce's

discretion to choose which criteria to prioritize in making these determinations, and

Commerce explained how it reached its determination and why it considered

Consol. Court No. 15-00214                                             Page 16

comparability to be so important, the court finds that Commerce's determination not to use the Omani companies' financial statements was supported by substantial evidence.

Commerce's explanation of its rejection of the LSI, Taiwanese companies', and Omani companies' financial statements was sufficient to justify its choice not to further compare these financial statements to other financial statements on the record but, instead, to use an iterative process to eliminate these statements from consideration. *See* Third Remand Results at 4–5. Because Hitech and Sundram were the only two companies with sufficient information on the record that would accurately reflect the experience of a nail producer, Commerce found, these were the only two for which a detailed comparison of their statements was warranted. *See id.* at 8. Oman Fastener's remaining arguments in favor of the rejected financial statements are unpersuasive.

Commerce's comparative analysis of the two financial statements satisfied the remand order in *Mid Continent 2021*. The court did not require Commerce to select Sundram's financial statements; instead, it required Commerce to compare Hitech's and Sundram's financial statements in a meaningful way, addressing any subsidies, the similarity of each company's production, and other considerations Commerce considered relevant. *See Mid Continent 2021*, 551 F. Supp. 3d at 1368. In the Third Remand Results, Commerce addressed the court's question of "why [certain] language [related to subsidies on Hitech's financial statements] is sufficient to be considered 'evidence of a subsidy' in *Steel Wire Garment Hangers From China* yet may be ignored in this case." *Id.* The agency examined the evidence and found that there was insufficient difference between Hitech's financial statements in this case and in *Steel*

Consol. Court No. 15-00214                                            Page 17

*Wire Garment Hangers From China* to justify a different finding.  Third Remand Results at 6.

The agency noted that although it preferred not to use data which included subsidies, Hitech and Sundram were "equal" in that both received subsidies.  *Id.* at 7. Therefore, Commerce turned to other considerations, explaining how the four criteria for selecting surrogate financial statements applied to its evaluation of Hitech and Sundram.  *Id.* at 7–8.

With a focus on contemporaneity and comparability of merchandise, Commerce provided a well-reasoned explanation of its choice of Sundram over Hitech.  The agency explained that producing comparable merchandise is an important consideration because it will likely lead to similarities in production experience and raw material consumption with similar supply and demand conditions affecting raw material inputs. *Id.* at 8.  Thus, Commerce took into account Sundram's production of comparable merchandise when it weighed this criterion.  *See id.* at 9.

Commerce also explained how contemporaneity played into its selection of Sundram, finding that while Hitech's financial statements cover a period ending four months before the period of investigation, Sundram's financial statements match the period of investigation.  *Id.*  Commerce explained that it prefers contemporaneous data because they "better reflect a mandatory respondent's cost and sales data, along with the same market conditions and operating environment of the respondent."  *Id.* at 9–10.

Commerce concluded that "the record contains two companies with imperfect data which produce and sell comparable merchandise," and it found Sundram's data to

be superior given the above criteria; therefore, Commerce selected Sundram's financial

statements.  *Id.* at 10.  Commerce acknowledged that neither Hitech's nor Sundram's

financial statements were perfect; however, Commerce explained why it chose

Sundram's financial statements, presenting the evidence it relied upon and the criteria it

prioritized.  As such, Commerce's choice of Sundram's financial statements is

supported by substantial evidence and in accordance with law.

Oman Fasteners asserts that Commerce should be required to re-open the

record to allow Oman Fasteners to submit a full translation of LSI's financial statements.

Opp'n Cmts. at 11–13.  The court will not require Commerce to reopen the record.

In *Mid Continent 2021*, the court stated that "the agency is not required to reopen

the record," but that "such a decision is within the agency's discretion if it determines

that reopening would provide the most reasonable path forward."  551 F. Supp. 3d at

1368.  Here, Commerce found that "the record contains sufficient [financial statements]

in order to render an accurate determination" and, accordingly, it was unnecessary to

reopen the record.  Third Remand Results at 17.  Reopening the record "is not

something the court will require simply based on a plaintiff's argument that better

information is available."  *Pro-Team Coil Nail Enter., Inc. v. United States*, Slip Op. No.

22-84, 2022 WL 2783885, at *8 (CIT Jul. 15, 2022).  Instead, "Commerce retains

significant discretion to determine whether to reopen the record on remand."  *Id.*

Interested parties bear the burden of developing the record, *QVD Food Co. v.

United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011), and the court will not "set aside

application of a proper administrative procedure because it believes that properly

Consol. Court No. 15-00214                                        Page 19

excluded evidence would yield a more accurate result if the evidence were considered,"

*Mid Continent CAFC*, 941 F.3d at 541 (quoting *PSC VSMPO-Avisma Corp. v. United*

*States*, 688 F.3d 751, 761 (Fed. Cir. 2012)).  The interests of finality also suggest that

the court should limit interfering with the agency's procedures and deadlines.  *See, e.g.,*

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 554–55

(1978); *Pro-Team*, 2022 WL 2783885, at *8.

     Having found that substantial evidence supports Commerce's choice of

Sundram's financial statements among the eleven financial statements on the record,

the court finds no error in Commerce's determination that "reopening the record was not

necessary."  Third Remand Results at 17.  Here, Commerce properly enforced its

deadlines when it declined to allow Oman Fasteners to submit LSI's complete translated

financial statements after the deadline for such information and the court will not disturb

that decision.

CONCLUSION

     Based on the foregoing, the court will sustain Commerce's Third Remand

Results.  Judgment will enter accordingly.

/s/     Mark A. Barnett<br>Mark A. Barnett, Chief Judge

Dated: August 8, 2022
      New York, New York

**UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| MID CONTINENT STEEL & WIRE, INC., | |
| Plaintiff/Consolidated Defendant-Intervenor, | |
| v. | |
| UNITED STATES, | Before: Mark A. Barnett, Chief Judge |
| Defendant, | Consol. Court No. 15-00214 |
| and | |
| OMAN FASTENERS, LLC, | |
| Defendant-Intervenor/Consolidated Plaintiff. | |

## <u>JUDGMENT</u>

This case having been duly submitted for decision, and the court, after due deliberation, having rendered a decision herein; now therefore, in conformity with said decision, it is hereby

**ORDERED** that the U.S. Department of Commerce's final results in this antidumping duty investigation of certain steel nails from the Sultanate of Oman, *Certain Steel Nails From the Sultanate of Oman*, 80 Fed. Reg. 28,972 (Dep't Commerce May 20, 2015) (final determination of sales at less than fair value), ECF No. 16-1, as

Consol. Court No. 15-00214                                              Page 2

amended by each of the Final Results of Redetermination Pursuant to Court Remand,

ECF Nos. 95-1, 135-1, and 150-1, are **SUSTAINED.**

/s/      Mark A. Barnett
Mark A. Barnett, Chief Judge

Dated: August 8, 2022
New York, New York

**Appx0021**

Barcode:4232067-01 A-523-808 REM - Remand  -  Oman Fasteners



UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-523-808
Remand
**Public Document**
E&C/Office IV: DP

April 14, 2022

MEMORANDUM TO:    The File

THROUGH:    Robert Bolling
Program Manager
AD/CVD Operations, Office IV

FROM:    Dakota Potts    DP
International Trade Compliance Analyst
AD/CVD Operations, Office IV

SUBJECT:    Final Results of the Third Remand Redetermination in the Antidumping Duty Investigation of Certain Steel Nails from the Sultanate of Oman**:**  Final Analysis Memorandum for Oman Fasteners, LLC

---

This memorandum transmits the Department of Commerce's (Commerce) final remand redetermination results margin calculation for Oman Fasteners LLC (Oman Fasteners) in the above-referenced antidumping duty investigation of certain steel nails from the Sultanate of Oman (Oman).  On April 12, 2022, Commerce released the finals results of redetermination pursuant to remand.[1]  In the final remand redetermination, Commerce made no changes to its draft calculations for Oman Fasteners.[2]

---

[1] *See* Memorandum, "*Mid Continent Steel & Wire Inc. v. United States*, Consol. Court No. 15-00214, Slip Op. 21-172: Certain Steel Nails from the Sultanate of Oman Final Results of Redetermination Pursuant to Court Remand," dated April 12, 2022 (final remand redetermination).
[2] *See* Memorandum, "Draft Results of the Third Remand Redetermination in the Antidumping Duty Investigation of Certain Steel Nails from the Sultanate of Oman: Draft Analysis Memorandum for Oman Fasteners, LLC," dated March 16, 2022.



**UNITED STATES DEPARTMENT OF COMMERCE**
**Office of the General Counsel**
OFFICE OF THE CHIEF COUNSEL FOR TRADE ENFORCEMENT & COMPLIANCE
Washington, D.C. 20230

April 12, 2022

**FILED ELECTRONICALLY VIA CM/ECF**

Mario Toscano
Clerk of the Court
U.S. Court of International Trade
One Federal Plaza
New York, NY 10278-0001

Re:    Redetermination Pursuant to Court Remand Order in
       *Mid Continent Steel & Wire, Inc. v. United States*, Consol. Court No. 15-00214

Dear Mr. Toscano:

In accordance with the Court's orders, please find attached the U.S. Department of Commerce's Redetermination Pursuant to Court Remand in the above-captioned action. The Department's remand redetermination is a public document.

In accordance with Court Rule 56.2(h)(1), filing of the administrative record index for the remand proceeding will follow under separate cover. Should you have any questions concerning the matter, please contact me at (202) 482-4378.

Respectfully submitted,

/s Ian McInerney
Ian McInerney
Attorney
Office of the Chief Counsel
   for Trade Enforcement & Compliance

Attachment

Appx0023

Mr. Mario Toscano
April 12, 2022
Page 2


cc:

Mikki Cottet
U.S. Department of Justice
Commercial Litigation Branch - Civil Division
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
(202) 307-0962
Fax: (202) 514-7965
Email: mikki.cottet@usdoj.gov

Adam Henry Gordon
The Bristol Group PLLC
1707 L Street, NW.
Suite 570
Washington, DC 20036
(202) 991-2701
Email: adam.gordon@bristolgrouplaw.com

Michael Paul House
Perkins Coie, LLP
700 Thirteenth Street, NW.
Suite 600
Washington, DC 20005-3960
(202) 654-6288
Fax: (202) 654-9667
Email: mhouse@perkinscoie.com

A-523-808
Remand
Court No. 15-00214
**Public Document**
ITA/E&C/OIV: DP

### Mid Continent Steel & Wire Inc. v. United States
### Consol. Court No. 15-00214, Slip Op. 21-172 (CIT December 22, 2021)
### Certain Steel Nails from the Sultanate of Oman

### FINAL RESULTS OF REDETERMINATION
### PERSUANT TO COURT REMAND

## I.    SUMMARY

The Department of Commerce (Commerce) prepared these final results of

redetermination pursuant to the *Remand Order* by the U.S. Court of International Trade (CIT or

Court), issued on December 22, 2021.[1]  These final results of redetermination concern

Commerce's final determination in the antidumping duty (AD) investigation of certain steel nails

(steel nails) from the Sultanate of Oman (Oman).[2]  In the *Remand Order*, the Court remanded

Commerce's *Second Remand Results*[3] for further reconsideration and explanation of

Commerce's calculation of constructed value (CV) and its reliance upon the 2012 financial

statements (FS) of Hitech Fastener Manufacturer (Thailand) Co., Ltd. (Hitech), as outlined in the

*Remand Order* and consistent with the U.S. Court of Appeals for the Federal Circuit (CAFC) in

the *CAFC Remand Order*.[4]  On March 11, 2022, this Court granted an extension of the deadline

to issue the remand redetermination until April 12, 2022.[5]  Accordingly, Commerce must issue

its remand redetermination on or before April 12, 2022.

---

[1] *See Mid Continent Steel & Wire, Inc. v. United States*, 551 F.Supp.3d 1360 (CIT Dec. 22, 2021) (*Remand Order*).
[2] *See Certain Steel Nails from the Sultanate of Oman:  Final Determination of Sales at Less Than Fair Value*, 80 FR 28972 (May 20, 2015) (*Final Determination*), and accompanying Issues and Decision Memorandum (IDM).
[3] *See Final Results of Redetermination Pursuant to {Second} Court Order*, ECF No. 135 (*Second Remand Results*).
[4] *Id.*; *see also Mid Continent Steel & Wire, Inc. v. United States*, 941 F.3d 530, 542–45 (CAFC 2019) (*CAFC Remand Order*).
[5] *See* ECF No. 149, Order Granting Motion for Extension of Time (March 11, 2022).

In accordance with the *Remand Order*, Commerce has reexamined the potential surrogate CV information on the record, and we have determined not to continue to use Hitech's FS data to calculate CV profit and indirect selling expenses (ISE), which we used in the underlying investigation and maintained in the *Second Remand Results*. For these final results of redetermination, we have determined to use the 2013-14 FS of Sundram Fasteners Limited (Sundram), an Indian producer of comparable merchandise, to calculate CV profit and ISE. Consequently, for the purpose of these final results of redetermination, Commerce has revised the CV profit and ISE used in the calculation of the antidumping margin for the underlying investigation.

## II.    BACKGROUND

On May 20, 2015, Commerce published the *Final Determination*, which examined the sole mandatory respondent, Oman Fasteners LLC (Oman Fasteners), for the period of investigation (POI) of April 1, 2013, through March 31, 2014.[6] As part of its determination, Commerce used the FS of Hitech, a Thai producer of comparable merchandise, to calculate CV profit and ISE.[7]

On January 26, 2017, this Court remanded the *Final Determination* to Commerce to further "explain why third-country data of comparable merchandise better represents Omani sales of steel nails than home-market sales data from Omani steel producers," or to change its selection of FS.[8] Pursuant to these instructions, in the *First Remand Results*, Commerce explained that Hitech's FS were superior to those of the Omani producers on the record because none of the six Omani companies on the record produced merchandise comparable to steel nails

---

[6] *See Final Determination.*
[7] *Id.*; *see also Final Determination* IDM at 4.
[8] *See Mid Continent Steel & Wire, Inc. v. United States,* 203 F. Supp. 3d 1295, 1310 (CIT 2017) (*Mid Continent I*).

or in the same general category as steel nails, and comparable merchandise comprised a greater portion of Hitech's sales revenue than Sundram's.[9]   Therefore, Commerce determined to use Hitech's FS for calculating CV profit and ISE.[10]   On November 20, 2017, this Court sustained Commerce's *First Remand Results*, and Oman Fasteners appealed that decision to the CAFC.[11]

On October 17, 2019, the CAFC remanded, in part, *Mid Continent I*, ordering Commerce to further explain or reconsider why it refused to consider whether Hitech was receiving subsidies from the Government of Thailand.[12]   On December 11, 2019, this Court remanded the *First Remand Results* to Commerce for further consideration and explanation in accordance with the CAFC's opinion.[13]   Pursuant to this Court's order, in the *Second Remand Results*, Commerce explained that none of the Omani FS on the record indicated that those Omani companies produced steel nails or any merchandise comparable to steel nails, leaving only third-country sources for CV information.[14]   Of the two remaining companies, Hitech and Sundram, Commerce determined the record lacked sufficient evidence to conclude that Hitech's FS showed that Hitech received countervailable subsidies and Hitech's sales revenue more closely reflected that of a nails producer and seller, because Hitech produced only comparable merchandise, whereas Sundram produced comparable and dissimilar merchandise.[15]

---

[9] *See Final Results of Redetermination Pursuant To {First} Court Order*, ECF No. 95 (*First Remand Results*) at 27-32.
[10] *Id*.
[11] *See Mid Continent Steel & Wire, Inc. v. United States*, 273 F. Supp 3d 1348, 1355 (CIT 2017); *see also* ECF No. 116, Dec. 12, 2017.
[12] *See CAFC Remand Order*, 941 F.3d at 543-44.
[13] *See* ECF No. 130, Dec. 11, 2019.
[14] *See Second Remand Results* at 4-5.
[15] *See Second Remand Results* at 4-7.

On December 22, 2021, this Court remanded the *Second Remand Results* to Commerce for further reconsideration and explanation of the choice of Hitech's FS for determining CV profit and ISE, consistent with the opinion set therein and that of the *CAFC Remand Order*.[16]

## III.   DISCUSSION

In accordance with section 773(a)(4) of the Tariff Act of 1930, as amended (the Act), in instances where there are insufficient home or third-country market sales, as in this case, Commerce bases normal value (NV) on CV. In this investigation, we cannot use the "preferred method" to calculate CV, *i.e.*, by relying on the actual profits and expenses incurred by the respondent, because Oman Fasteners' volume of sales of subject merchandise in the home market is not meaningfully significant.[17] Nor can we rely on alternative methods (i) or (ii) enumerated in section 773(e)(2)(B) of the Act. Therefore, we continue to find the alternative method for calculating CV under section 773(e)(2)(B)(iii) of the Act, *i.e.*, any other reasonable method, and relying on third-country data, to be appropriate in this case, based on the facts in the *Final Determination*,[18] reiterated in the *First Remand Results* and *Second Remand Results*.[19] The CAFC has upheld our decision to rely on third-country sources for the calculation of CV in this case.[20]

In the instant case, there are eleven FS on the record. Consistent with the *Final Determination* and reiterated in the *First Remand Results* and the *Second Remand Results*, we continue to decline to rely upon the FS of the six Omani companies on the record. We determined that none of the six Omani companies produced steel nails or any type of

---

[16] *See Remand Order*.
[17] *See* section 773(e)(2)(A) of the Act.
[18] *Id.*
[19] *See First Remand Results* at 4-10; *see also Second Remand Results* at 4-5.
[20] *See CAFC Remand Order*, 941 F.3d at 538-40.

Appx0028

merchandise comparable enough to steel nails to satisfy the statutory preferences, and the CAFC has upheld our decision to rely, instead, on the third-country data on the record, which better reflect the profit experience of the mandatory respondent.[21]  We also decline to use the two Taiwanese FS on the record, because they were not complete, *i.e.*, they contain portions that lack English translations, a decision that the CAFC upheld.[22]  Oman Fasteners argues that Commerce should reconsider its decision to not rely upon the FS of L.S. Industry Co., Ltd. (LSI), a Thai producer of steel nails, which Commerce declined to use because they were not complete, *i.e.*, only partially translated.  After determining that LSI's FS were incomplete, Oman Fasteners resubmitted a complete translation of LSI's FS, which Commerce rejected because it was untimely filed.  The CAFC upheld Commerce's decisions not to rely upon LSI's partially translated FS and to reject the late submission of LSI's fully translated FS because vital information was left untranslated and was not submitted to Commerce before the applicable deadline.[23]  Therefore, we have not considered LSI's FS in the calculation of CV profit and ISE. We also find it unnecessary to reopen the record of the investigation, because the two remaining FS on the record, those of Hitech and Sundram, reflect profit from the sale of comparable merchandise, are complete and fully translated, and were timely submitted on the record of this investigation.

In the *Second Remand Results*, we concluded that Hitech's FS lacked sufficient evidence to determine whether the company received subsidies from the Thai government, which therefore, along with Hitech's production of comparable merchandise, meant that Hitech's FS more closely reflected the profit experience of a nail producer than Sundram.[24]  Note 1 in

---

[21] *Id.*
[22] *Id.* at 540-41.
[23] *Id.* at 540-42.
[24] *See Second Remand Results* at 5-7.

Hitech's FS states: "The company has been support {sic} for production screws (SCREW) Category 4.7 Manufacture of wire products, metal wire, Promotional Number 1447/2538 on July 10, 1995." We infer this statement means that Hitech maintained a specific identification number during the reported fiscal period, which, by its own description, is for support in the production of screws. In *Steel Wire Garment Hangers from China*, a contemporaneous administrative review to the *Final Determination*, we found the statement in Note 1 of Hitech's FS sufficiently demonstrated receipt of a subsidy and declined to consider Hitech's FS in our calculation of surrogate values to value factors of production.[25] With regard to Hitech's FS, the facts of the instant case are exactly the same as those in *Steel Wire Garment Hangers from China*, wherein we found the statement in Note 1 of Hitech's FS sufficiently indicated subsidization. While the record of each proceeding stands alone, we found the evidence regarding Hitech's FS in *Steel Wire Garment Hangers from China* sufficiently indicated subsidies, and the instant record presents the same evidence. Therefore, consistent with the evidentiary finding in that case, we find here that Hitech's FS contain evidence of subsidies.

The only other company on the record of the investigation which Commerce has not declined to use that produces comparable merchandise, *i.e.*, Sundram, also received subsidies during the fiscal period, which mirrors the POI. Part C of Sundram's cash flow statement in its FS recognizes receipt of 30 Lakhs during the 2013-14 period, which according to note 31, accounting standard (AS) 12, Sundram received from the "state government of Uttarakhand as

---

[25] *See Steel Wire Garment Hangers from the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review; 2012-2013*, 79 FR 65616 (November 5, 2014), and accompanying Preliminary Decision Memorandum (PDM) at 26.

special capital subsidy, for setting up an industrial undertaking in the state."[26]  We have

previously found this program to be countervailable.[27]

Therefore, we find that both Hitech and Sundram received subsidies during the fiscal

period. While it is not our preference to use data which include subsidies, we consider Hitech

and Sundram equal in that they both indicate that they received some form of a subsidy.

Commerce's practice is to not dissect the FS of a surrogate company as if the surrogate company

were the respondent under investigation/review in the proceeding, because we do not seek

information from or verify the information from the surrogate company.[28]  Because the record

shows that no other companies derived profit from the production and sale of comparable

merchandise, we must rely on the FS of either Hitech or Sundram, even though both companies

received some form of a subsidy.  Therefore, we continued our comparative analysis to assess

other criteria to determine the better candidate as a source for CV profit and ISE.

In evaluating FS for use in the calculation of CV profit and ISE under section

773(e)(2)(B)(iii) of the Act, we follow the framework established in *Pure Magnesium from

Israel* and *CTVs from Malaysia*.[29]  Pursuant to that analysis, we considered:  (1) the similarity

---

[26] *See* Mid Continent's Letter, "Certain Steel Nails from the Sultanate of Oman:  Submission of New Factual
Information on Constructed Value Profit and Selling Expenses," dated October 31, 2014 (Mid Continent's CV
Submission) at Exhibit 10A.

[27] *See, e.g.*, *Certain Cold-Drawn Mechanical Tubing of Carbon and Alloy Steel from India:  Preliminary Results of
Countervailing Duty Administrative Review, 2017-2018*, 85 FR 12897 (March 5, 2020), and accompanying PDM at
29.  In this case, we identified the respondent reported use of the program Uttarakhand Capital Investment Subsidy
Scheme, operated by the state government of Uttarakhand, and provides incentives to new and existing industrial
units to expand in various kinds of industrial centers.  This language closely mirrors the language in Sundram's FS
at Note 31, AS 12, where Sundram explains it received capital subsidies from the state government of Uttarakhand
for setting up an industrial undertaking in the state.

[28] *See, e.g.*, *Certain Activated Carbon from the People's Republic of China:  Final Results and Partial Rescission of
Second Antidumping Duty Administrative Review*, 75 FR 70208 (November 17, 2010), and accompanying IDM
Comment 4; and *Certain New Pneumatic Off-The-Road Tires from the People's Republic of China:  Final
Affirmative Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical
Circumstances*, 73 FR 40485 (July 15, 2008), and accompanying IDM at Comment 18A.

[29] *See Notice of Final Determination of Sales at Less than Fair Value:  Pure Magnesium from Israel*, 66 FR 49349
(September 27, 2001) (*Pure Magnesium from Israel*), and accompanying IDM at Comment 8; *see also Notice of
Final Determination of Sales at Not Less Than Fair Value:  Certain Color Television Receivers from Malaysia*, 69
FR 20592 (April 16, 2004) (*CTVs from Malaysia*), and accompanying IDM at Comment 26.

between a potential surrogate's business operations and products and those of the respondent; (2) the extent to which a potential surrogate has sales in the United States and the home market; (3) the contemporaneity of the surrogate data; and (4) the similarity of customer base between a potential surrogate and the respondent.

We are unable to consider criterion (2) above, because the record of this investigation does not sufficiently identify the geographical breakdown of sales for either Hitech or Sundram, so we cannot evaluate each company's respective sales to either the United States or the home market (*i.e.*, Oman).[30]  Therefore, we examined Hitech and Sundram's data against the first, third, and fourth criteria listed above, *i.e.*, production of comparable merchandise, its impact on customer base, and the contemporaneity of the data on the record, respectively.

Both Hitech and Sundram produce comparable merchandise.[31]  The record indicates that Hitech produces various screws and rivets (*i.e.*, fasteners) and Sundram produces high tensile fasteners, all of which we find comparable to steel nails.  Similar to the analysis in the *First Remand Results*, sustained by this Court,[32] producers of comparable merchandise will likely share a number of similarities in their respective production experiences and raw material consumptions, and those raw materials would be subject to the same supply and demand conditions in the global marketplace and be used in similar plant facilities, machinery, and equipment.[33]  Because both Hitech and Sundram produce comparable merchandise, their respective production experiences, raw materials consumption, supply and demand conditions, and facilities should resemble those of Oman Fasteners.  Further, their respective profit experiences and customer bases should also closely match those of Oman Fasteners.

---

[30] *See* Mid Continent's CV Submission at Exhibit 7B, Exhibit 10A.
[31] *Id.*
[32] *See Mid Continent*, 273 F. Supp 3d at 1351.
[33] *See First Remand Results* at 4-5.

**Appx0032**

Record evidence indicates that Sundram also produces products besides high tensile fasteners, which are dissimilar to the merchandise under consideration in this investigation. Sundram produces various auto components for the automobile sector, including pump assemblies, engine components, and powder metal parts. Such products are not in the same general category as subject merchandise, and they account for approximately 64 percent of Sundram's production. In contrast, Hitech's production consists wholly of various fasteners. Based on this evidence, in the *Second Remand Results*, we found Hitech's FS superior to those of Sundram because Hitech's production appears to align with Oman Fasteners' production more closely than that of Sundram's production.

In continuing our evaluation of the above criteria, however, we found that Hitech's FS are not contemporaneous with the POI. Hitech's FS cover the calendar year 2012, which ends four months before the POI begins (*i.e.*, the period from April 1, 2013, through March 31, 2014). Thus, there is no overlap in Hitech's fiscal period with the POI, indicating Hitech's reported profit and selling experience reflects a different operating environment from Oman Fasteners. In contrast, Sundram's FS cover the period April 1, 2013, through March 31, 2014, which covers the POI exactly and are, in fact, the only data on the record reflecting profit from the production and sale of comparable merchandise during the entirety of the POI.[34]

Commerce's preference is to use contemporaneous data in selecting surrogate data to use in calculating accurate dumping margins.[35] Contemporaneous data better reflect a mandatory respondent's cost and sales data, along with the same market conditions and operating

---

[34] *See* Mid Continent's CV Submission at Exhibit 10A.

[35] *See, e.g.*, *Dupont Teijin Films v. United States,* 997 F. Supp. 2d 1338 (CIT 2014) (finding "Commerce's use of the financial statement that most overlapped with the POR (*i.e.*, were the most contemporaneous) is both reasonable and consistent with its current practice."); and *M S International, Inc. v. United States,* 547 F.Supp.3d 1254, 1276 (CIT 2021) (Commerce found that certain financial statements were "unusable or less preferable" when compared to other data, in part due to the fact that the "company's data was not contemporaneous.")).

environment of the respondent.  Sundram is the only company on the record for which we have contemporaneous data reflecting production and sale of comparable merchandise.  Thus, Sundram is the only company on the record with contemporaneous data in the POI and experience in producing and selling comparable merchandise, unlike Hitech, which produced comparable merchandise, but whose FS do not reflect contemporaneous data within the POI.

Moreover, Commerce's ultimate selection of a surrogate for CV information in any given proceeding must be sourced from the record—and, thus, Commerce's determination of what constitutes the best information on the record will vary by the choices available on the record. None of the sources on the record of this investigation perfectly satisfy the statutory preference for both the home market and comparability in merchandise; nevertheless, the record contains two companies with imperfect data which produce and sell comparable merchandise.  Sundram's FS are the only contemporaneous FS on the record reflecting production, sale, and profit from the sale of comparable merchandise.  Therefore, when weighing the quality of the data against the criteria established under section 773(e)(2)(B)(iii) of the Act and in *Pure Magnesium from Israel* and *CTVs from Malaysia*,[36] including accounting for the potential distorting effects of production of dissimilar merchandise, record evidence indicates that the profit of Sundram more closely reflects the experience of a nail producer during the POI than Hitech.

## IV.    INTERESTED PARTIES' COMMENTS ON THE DRAFT REDETERMINATION

---

[36] *See Notice of Final Determination of Sales at Less Than Fair Value:  Pure Magnesium from Israel*, 66 FR 49349 (September 27, 2001) (*Pure Magnesium from Israel*), and accompanying IDM at Comment 8; *see also Notice of Final Determination of Sales at Not Less Than Fair Value:  Certain Color Television Receivers from Malaysia*, 69 FR 20592 (April 16, 2004) (*CTVs from Malaysia*), and accompanying IDM at Comment 26.

On March 16, 2022, Commerce released the draft results of redetermination,[37] and

invited interested parties to comment on the draft remand.  On March 23, 2022, Oman Fasteners

and Mid Continent each submitted comments regarding the draft results of redetermination.[38]

**Issue 1: Whether the Draft Remand Satisfactorily Analyzes the Potential Sources for CV Profit and ISE Information on the Record**

Mid Continent's Comments:

- Mid Continent supports Commerce's determination to continue to decline to use:  (1) Oman Fasteners' FS to calculate CV profit and ISE ratios, as Oman Fasteners' volume of home market sales is not meaningfully significant; (2) the FS of the six Omani companies on the record, because none produced steel nails or any type of comparable merchandise; and (3) the FS of two Taiwanese companies because they are not fully translated.[39] These aspects of Commerce's determination have been affirmed by the CAFC.[40]
- Mid Continent supports Commerce's determination to use Sundram's FS, finding that Commerce reasonably determined that Sundram's FS are superior to Hitech's FS based on the criteria set in *Pure Magnesium from Israel* and *CTVs from Malaysia*.[41]
- While Sundram and Hitech both received subsidies during the POI, they are the best options on the record for CV profit and ISE information because they are the only companies on the record engaged in the production and sale of comparable merchandise.[42]

Oman Fasteners' Comments:

- In relying on Sundram's FS for CV profit and ISE information, Commerce fails to address the CAFC's instruction in *Mid Continent I* that Commerce sufficiently articulate a basis for relying on an FS distorted by subsidies in lieu of other information on the record.[43]
- Commerce incorrectly limited its analysis on remand to the two subsidy-distorted FS— Sundram and Hitech.[44]

---

[37] *See* Draft Results of Remand Redetermination, *Mid Continent Steel & Wire Inc. v. United States*, Consol. Court No. 15-00214, Slip Op. 21-172, dated December 22, 2021  (Draft Remand).
[38] *See* Mid Continent's Letter, "Certain Steel Nails from Oman:  Comments on Draft Results of Redetermination Pursuant to Court Remand in Mid Continent Steel & Wire, Inc. v. United States, Court No. 15-00214, Slip Op. 21-172 (CIT Dec. 22, 2021)," dated March 23, 2022 (Mid Continent's Draft Remand Comments); *see also* Oman Fasteners' Letter, "Certain Steel Nails from Oman; Investigation - Remand Redetermination Comments on Draft Results of Redetermination Pursuant to Court Order," dated March 23, 2022 (Oman Fasteners' Draft Remand Comments).
[39] *See* Mid Continent's Draft Remand Comments at 2.
[40] *Id.*
[41] *Id.* at 2-3.
[42] *Id.* at 3.
[43] *See* Oman Fasteners' Draft Remand Comments at 2 and 8.
[44] *Id.* at 2.

- Commerce determined that Sundram and Hitech received subsidies, rendering both unsuitable sources for CV profit and ISE information.[45]  Commerce consistently finds FS containing subsidies to be unsuitable sources for CV information.[46]
- In enacting the non-market economy provisions, Congress made clear that Commerce could not use data distorted by subsidies.[47]
- Commerce failed to articulate a sufficient basis for why the subsidies in Sundram and Hitech's FS are preferable to the flaws identified by Commerce with respect to the other FS included on the record.  Even if Commerce prefers not to use FS that are not fully translated or of companies that do not produce comparable merchandise, that is no different from Commerce's preference against subsidy-distorted information.[48]
- The CAFC noted that a subsidy's distortive effect on profit may be sufficiently large "that Commerce would no longer have a sound reason to choose {one FS} over another, whether from {Oman Fasteners'} home country or elsewhere.  The size of any subsidies would obviously be relevant, as would the comparative deficiencies of the alternative sources."[49]
- In *CP Kelco U.S. Inc. vs. United States* (*CP Kelco*), this Court ruled that, when faced with various potential but imperfect sources of surrogate data sources, including potential sources that are deficient due to their partial translations, Commerce must fairly compare the strengths and weaknesses of each potential source before deciding which to use.[50]
- LSI is the only company on the record that produces identical merchandise to Oman Fasteners, *i.e.*, steel nails.  In *Steel Nails from China*, Commerce relied upon LSI's FS for surrogate values and denied relying upon Hitech's FS because, in addition to being distorted by subsidies, Hitech's FS reflected production of only comparable merchandise.[51]  Commerce's prior preference for LSI's partially translated FS over subsidy-distorted Hitech's FS applies to Sundram too, because Sundram received subsidies and produces a small proportion of comparable merchandise.[52]
- Al Jazeera provides a home market experience lacking the distortion of subsidies, making it a superior source for CV information.  The fact that Al Jazeera produces fabricated steel products, and not steel fasteners, is less relevant than the fact that Hitech and Sundram are in other countries and receive subsidies.[53]  Al Jazeera is particularly superior to Sundram, given that two-thirds of Sundram's production consists of dissimilar merchandise to that of Oman Fasteners, and Al Jazeera served as the basis for Commerce's initiation of the investigation.[54]

---

[45] *Id.* at 3.

[46] *Id.* (citing to *Steel Wire Garment Hangers from China*).

[47] *Id.* at 4 (citing to H.R. Rep. No. 100-576, at 590 (1988) (Conf. Rep. accompanying H.R.3 - Omnibus Trade and Competitiveness Act of 1988)).

[48] *Id*. at 6.

[49] *Id*. at 7.

[50] *Id.* (citing *CP Kelco US Inc. vs. United States*, Slip Op. 15-27, 2015 WL 1544714 (CIT March 31, 2015) at 13 (*CP Kelco*).

[51] *Id*. at 9 (citing *Certain Steel Nails from the People's Republic of China:  Final Results of the Fourth Antidumping Duty Administrative Review*, 79 FR 19316 (April 8, 2014) (*Steel Nails from China*), and accompanying IDM at Comment 2.

[52] *Id*.

[53] *Id* at 10.

[54] *Id*.

12

**Appx0036**

**Commerce's Position:** Throughout its comments, Oman Fasteners argues that Commerce failed to address and consider adequately the deficiencies of *all* available options for consideration in calculating the CV profit and ISE ratios. We disagree with Oman Fasteners. As we stated in the draft remand (mentioned above) we acknowledged and considered all eleven FS on the record of the investigation. Based on our analysis of the record, we declined to rely upon ten FS on the record due to their respective deficiencies and found that, of the available options, Sundram's FS best reflect the production and profit from sale of comparable merchandise during the POI.

First, we considered the six Omani FS on the record. None produce identical merchandise (*i.e.*, steel nails) and none produce comparable merchandise (*i.e.*, fasteners). All six Omani FS represent companies involved in production of dissimilar merchandise outside of the steel nails general category of merchandise. Therefore, all six Omani FS likely do not share similarities to Oman Fasteners in their respective production experiences or raw material consumptions and are not subject to the same supply and demand conditions in the global marketplace as Oman Fasteners. Accordingly, these six FS are less ideal sources for CV profit and ISE information vis-à-vis companies which produce and sell subject merchandise.

While it is Commerce's preference to rely on profit information from the home country of the respondent under investigation, when such information is unavailable, it is Commerce's practice to select a FS of a producer whose operations most closely reflect those of the mandatory respondent.[55] Therefore, we did not reject "out of hand" any potential source for CV profit and ISE information on the record, but rather, following fresh consideration, declined to rely on the six Omani FS on the record because the record contains FS that more closely reflect the experience of the mandatory respondent. Our determination to rely on third-country

---

[55] *See Mid Continent I* at 1308-9.

**Appx0037**

information which better reflects the profit experience of the mandatory respondent is not unreasonable, is consistent with our previous determinations, and has been sustained by the CAFC.[56]

We also declined to rely upon the two Taiwanese FS and LSI's FS because they fail to reflect reliably the profit experience of a steel nails producer.  In attempting to justify using LSI's partially-translated FS, Oman Fasteners cites to the investigation of *Xanthan Gum from China*, where Commerce relied upon FS containing subsidies because they were the only available data on the record once Commerce rejected another set of FS for being incompletely translated.[57]  In *CP Kelco,* the CIT remanded Commerce's decision in *Xanthan Gum from China* to reconsider and compare the FS it selected against the FS it rejected and elaborate on whether the subsidy is preferable to the partial-translation.[58]  Based on the record in the instant proceeding and considering *CP Kelco*, we continue to find that the two Taiwanese FS and LSI's FS have significant defects which rendered both FS inferior to other FS on the record.  Following our analysis from the First Redetermination in this proceeding, the LSI and two Taiwanese FS are incomplete, *i.e.*, missing an auditor's report and the majority of their data disclosures under their countries' respective generally accepted accounting principles (GAAP).[59]  Without the auditor's report and data disclosures, there is no way to ascertain whether the companies have properly captured their revenues and costs (and thereby their profits) in accordance with their respective GAAP or whether the FS can serve as reliable sources for the profit "normally"

---

[56] *See CAFC Remand Order,* 941 F.3d at 538-40.

[57] *See Xanthan Gum from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value*, 78 FR 33351 (June 4, 2013), and accompanying IDM (*Xanthan Gum from China*).

[58] *See* Oman Fasteners' Draft Remand Comments at 7-8 (citing *CP Kelco* at 13).

[59] *See* First Remand Results at 12-13; *see also* Oman Fasteners' Letter, "Certain Steel Nails from Oman; Antidumping Investigation:  Submission of Factual Information for CV Profit and Selling Expenses," dated October 31, 2014 at exhibit SCV-6; *see also* Mid Continent's Letter, "Certain Steel Nails from the Sultanate of Oman; Submission of Factual Information on Constructed Value Profit and Selling Expenses," dated October 31, 2014 at exhibits 1, 2 and 11.

experienced by a producer of steel nails. Our analysis of the three FS is reasonable given the CAFC has upheld our rejection of the Taiwanese FS and LSI's FS.[60] In the instant case, we find that the Taiwanese FS and LSI's FS contain significant defects which prevent Commerce from effectively evaluating their appropriateness as sources for CV profit and ISE information. Therefore, we find that the LSI and both Taiwanese FS are less preferable than Sundram's FS because Sundram's FS include all of the information necessary to calculate accurate and reliable financial ratios.

Additionally, Oman Fasteners argues that the draft remand failed to address how the particular deficiencies in nine of the FS described above compare to the deficiencies in Sundram's 2013-2014 FS. We disagree with Oman Fasteners. In our draft remand, we explained that we seek information which most closely exhibits a profit experience from the production and sale of identical or comparable merchandise during the POI.[61] Further, data reflecting the production and profit from sale of comparable merchandise are always preferable to a profit experience wholly dissimilar to the mandatory respondent.[62] Therefore, based on the analysis in the draft remand and reiterated above, we find that nine of the eleven companies on the record do not reliably reflect a suitable source for CV profit information, *i.e.,* profit from the production and sale of identical or comparable merchandise.

---

[60] *See CAFC Remand Order* at 540-42.

[61] *See* Draft Remand at 10.

[62] *Id.* at 9-10; *see also, e.g.*, *Mattresses From Cambodia: Final Affirmative Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances*, 86 FR 15894 (March 25, 2021), and accompanying IDM at 22 (When determining the best source for CV information on the record, Commerce relied upon the FS of Emirates Sleep, a third-country FS of comparable merchandise instead of the FS of GTI, a manufacturer in the home market because, *inter alia,* "Emirates Sleep represents a mattress producer that has business operations, products, and a customer base that are very similar to that of a Cambodian mattress producer. GTI on the other hand, as a producer of apparel and garment products, which are not comparable merchandise, is less representative of a Cambodian mattress producer's business operations, products, and customer base.")

We acknowledged that both Hitech and Sundram received subsidies, however, these subsidies do not negate the fact that each company produces comparable merchandise. While Hitech and Sundram's profit may be distorted by subsidies, their respective profits are still based on production and sale of comparable merchandise, unlike the other FS on the record. Furthermore, we find Hitech's FS not reliable because the data on the record is not contemporaneous with the POI. Therefore, based on record evidence, we find that Sundram's FS are the best option on the record for calculating CV profit and ISEs because: (1) they reflect profit from production and sale of comparable merchandise, unlike the six Omani FS; (2) they contain the necessary information to confirm the company's data is reliable, unlike the three partially-translated FS; and (3) the data are contemporaneous, unlike Hitech's.

**Issue 2: Whether Commerce Must Reopen the Record and Elicit Additional Information**

Oman Fasteners' Comments:

- Commerce has the authority to re-open the record and obtain readily available, highly relevant information.[63] Indeed, the CAFC explicitly warned that Commerce should not refuse to do so.[64]
- Commerce fails to demonstrate why it continues to "refuse {} to obtain readily available, highly relevant information."[65]

**Commerce's Position:** We disagree with Oman Fasteners' contention that Commerce continues to "refuse to obtain readily available, highly relevant information."[66] First, interested parties already had the opportunity to submit readily available, highly relevant information during the investigation, and it is the responsibility of interested parties to build the record.[67] While it is within Commerce's discretion to reopen the record of a proceeding, we will only reopen the

---

[63] *See* Oman Fasteners' Draft Remand Comments at 11.
[64] *Id*. (citing *CAFC Remand Order* at 544.)
[65] *Id.* at 2.
[66] *Id.*
[67] *See QVD Food Co., Ltd. v. United States*, 658 F.3d 1318, 1324 (CAFC 2011) ("{T}he burden of creating an adequate record lies with interested parties and not with Commerce.").

record when there is a compelling need for additional information.  In the instant case, the record contains sufficient FS in order to render an accurate determination.

Additionally, a decision to not reopen the record is not a refusal to reopen the record. The CIT states that: "while {Commerce} is not required to reopen the record, such a decision is within {Commerce}'s discretion if it determines that reopening would provide the most reasonable path forward.[68]  In this redetermination, we considered the utility of reopening the record in order to elicit relevant information, pursuant to the CAFC's guidance that "it can be unreasonable for an agency to refuse to obtain readily available, highly relevant information."[69] We concluded that the record contains potential sources for CV profit and ISE information reflecting profit from production and sale of comparable merchandise during the POI and that we could calculate CV profit and ISE ratios which reasonably reflect the profit experience of the mandatory respondent.  Therefore, we determined that reopening the record was not necessary.

**Issue 3: Whether the Draft Remand CV Profit and ISE Ratios Should Be Revised**

<u>Oman Fasteners' Comments:</u>

- Were Commerce to continue to rely on Sundram's FS, it should revise the profit rate derived from Sundram's FS to include the 1,000 lakhs loss reported as an "exceptional item" in Sundram's profit and loss statement.  The loss is for "provision for diminution in value of investment," and the FS contain no information as to the nature of the investment the reason for the diminution.[70]
- Commerce should also revise the ISE ratio to exclude the 1,712.06 lakhs reported as "consultancy fees."  While the nature of this expense is not described in the FS, evidence suggests it included fees related to research and development and joint venture activity, which are not ISEs but general expenses.  Conversely, nothing in the FS ties the consultancy fees to ISE.[71]

---

[68] *See Remand Order* at 16.
[69] *See CAFC Remand Order* at 544-545.
[70] *See* Oman Fasteners' Draft Remand Comments at 13.
[71] *Id.* at 2.

**Commerce's Position:** We disagree with Oman Fasteners' appraisal of the "exceptional item" in Sundram's profit and loss statement, as well as the "consultancy fees" reported under "miscellaneous expenses."

First, contrary to Oman Fasteners' claim, the record demonstrates the "exceptional item" is not related to Sundram's normal course of business.[72] On page 31 of Sundram's FS, Sundram's profit and loss statement states that the "exceptional item" references note 31(5(i)), which lists the "details of income and expenses in the period which are not in the normal course of the business," including the 1,000 lakhs loss for "provision for diminution in value of investment."[73] Thus, based on record evidence, we find the record demonstrates that the "provision for diminution in value of investment" is unrelated to the normal course of business. Therefore, for the final redetermination, we will continue to exclude the "provision for diminution in value of investment" from Sundram's profit calculation.[74]

Further, we disagree with Oman Fasteners' argument that the "consultancy fees" of 1,712.06 lakhs listed in note 22 under "miscellaneous expenses" should be removed from the numerator in Sundram's ISE calculation. First, Oman Fasteners highlights that Sundram's FS includes consultancy fees under note 26, "expenditure in foreign currency," note 27, "details of research and development expenditure" (R&D), and note 27(A(ii(D))), "expenditure" for "transactions with respect to Jointly Controlled entities" (Joint Ventures).[75] Oman Fasteners

---

[72] *See* section 773(f)(1)(A) of the Act: "Costs shall normally be calculated based on the records of the exporter or producer of the merchandise, if such records are kept in accordance with the generally accepted accounting principles of the exporting country (or the producing country, where appropriate) and reasonably reflect the costs associated with the production and sale of the merchandise"; *see also NTN Bearing Corp. of America v. U.S.,* 104 F.Supp.2d 110, 146-48 (CIT 2000) (aff'd 295 F.3d 1263, 1267 (2002 CAFC)).
[73] *See* Mid Continent's CV Submission at Exhibit 10A.
[74] *See* Memorandum, "Final Results of the Third Remand Redetermination in the Antidumping Duty Investigation of Certain Steel Nails from the Sultanate of Oman: Final Analysis Memorandum for Oman Fasteners, LLC," dated concurrently with this final redetermination (Final Analysis Memorandum).
[75] *Id.*

**Appx0042**

concludes from these various consultancy fee line items throughout the notes to the FS that the "consultancy fees" of 1,712.06 lakhs listed in note 22 includes expenses unrelated to ISEs. However, the other consultancy fees in the FS highlighted by Oman Fasteners are accounted for in other notes of the FS. For example, note 22, "miscellaneous expenses" includes the line item "Research and Development Expenditure (refer note 27)." Note 27, "Details of Research and Development Expenditure," includes as a line item for consultancy fees. The consultancy fees associated with R&D are captured in note 27. Thus, according to the FS, the R&D consultancy fees have been accounted for in "Research and Development Expenditure (refer note 27)," not in "consultancy fees."[76] Consequently, we find that the "consultancy fees" of 1,712.06 lakhs does not include the various consultancy fees (*i.e.*, associated with foreign currency, R&D, and Joint Ventures) highlighted by Oman Fasteners because those expenses are accounted for in other notes to the FS.

Furthermore, Sundram's FS do not have any statements that tie the "consultancy fees" to any specific production or sales. Absent this information, we cannot confirm that the "consultancy fees" are direct in nature, unrelated to the production of comparable merchandise, or outside the ordinary course of business. Therefore, we continue to find the "consultancy fees" of 1,712.06 lakhs to be an ISE. Therefore, for the final determination, we will continue to include "consultancy fees" in Sundram's ISE calculation.[77]

## IV.    FINAL RESULTS OF REMAND REDETERMINATION

Pursuant to the Court's remand order, for *Mid Continent,* Commerce recalculated Oman Fastener's weighted-average dumping margin by relying on the 2013-14 FS of Sundram

---

[76] *Id.*
[77] *See* Final Analysis Memorandum.

**Appx0043**

Case: 23-1039    Document: 16    Page: 118    Filed: 02/13/2023

Case 1:15-cv-00214-MAB   Document 150-1   Filed 04/12/22   Page 20 of 20

Fasteners Limited for information in calculating CV profit and ISE ratios.  Accordingly, the
revised weight-averaged dumping margin for Oman Fasteners is listed in the chart below:

| Exporter or Producer | Final Investigation Weighted-Average Dumping Margin[78] | Final Results of Remand Redetermination Weighted-Average Dumping Margin[79] |
|---|---|---|
| Oman Fasteners LLC | 9.10 | 4.22 |

4/11/2022

X  _[signature]_

Signed by: LISA WANG

_____
Lisa Wang
Assistant Secretary
  for Enforcement and Compliance

---

[78] *See* Memorandum, "Analysis Memorandum for the Amended Final Determination of the Antidumping Duty Investigation of Certain Steel Nails from the Sultanate of Oman:  Oman Fasteners, LLC," dated June 12, 2015.
[79] *See* Final Analysis Memorandum.

**Appx0044**

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type–volume limitation of Federal Circuit Rule 32(b)(1). The brief contains 11,939 words, excluding the portions exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b)(2).

2.    This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6). The brief has been prepared in a proportionally spaced typeface using Microsoft® Word and 14-point Valkyrie A type.

Dated: February 13, 2023            /s/Michael P. House
                                                            Michael P. House

## CERTIFICATE OF AUTHORITY

I certify that I have the authorization of my co-counsel Michael P. House to file this brief with his electronic signature.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated: February 13, 2023

/s/Jonathan I. Tietz

Jonathan I. Tietz