2023-1039

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT**

---

**MID CONTINENT STEEL & WIRE, INC.,**

Plaintiff-Appellee

**v.**

**UNITED STATES,**

Defendant-Appellee

**OMAN FASTENERS, LLC,**

Defendant-Appellant

---

Appeal from the United States Court of International Trade in Nos. 15-00214 and 15-00215, Chief Judge Mark A. Barnett

---

**RESPONSE BRIEF OF PLAINTIFF-APPELLEE
MID CONTINENT STEEL & WIRE, INC.**

Adam H. Gordon
Jennifer M. Smith
Lauren Fraid
**THE BRISTOL GROUP PLLC**

Dated: April 27, 2023

*Counsel to Plaintiff-Appellee Mid
Continent Steel & Wire, Inc.*

FORM 9. Certificate of Interest

Form 9 (p. 1)
March 2023

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

| | |
|---|---|
| **Case Number** | 2023-1039 |
| **Short Case Caption** | Mid Continent Steel & Wire, Inc. v. US |
| **Filing Party/Entity** | Mid Continent Steel & Wire, Inc. |

---

**Instructions:**

1.  Complete each section of the form and select none or N/A if appropriate.

2.  Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3.  In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4.  Please do not duplicate entries within Section 5.

5.  Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 04/27/2023

Signature: /s/ Adam H. Gordon

Name: Adam H. Gordon

**FORM 9. Certificate of Interest**

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☐ None/Not Applicable |
| Mid Continent Steel & Wire, Inc. | | Wholly owned by DEACERO USA Inc., a subsidiary of DEACERO S.A.P.I. de C.V. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐  Additional pages attached

FORM 9. Certificate of Interest

---

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐   None/Not Applicable          ☐   Additional pages attached

| | | |
|---|---|---|
| The Bristol Group PLLC | Adam H. Gordon | Jennifer M. Smith |
| Lauren Fraid | | |
| | | |

---

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐   Yes (file separate notice; see below)   ☑   No   ☐   N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

---

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑   None/Not Applicable          ☐   Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

Page

STATEMENT OF RELATED CASES ...................................................... 1

JURISDICTIONAL STATEMENT ........................................................... 1

STATEMENT OF THE CASE ................................................................. 2

  I.  NATURE OF THE CASE ................................................................. 2

  II. STATEMENT OF FACTS ................................................................ 4

SUMMARY OF ARGUMENT ................................................................ 22

STANDARD OF REVIEW .................................................................... 24

ARGUMENT ....................................................................................... 26

  I.  COMMERCE'S FACTUAL DETERMINATION TO SELECT
     SUNDRAM AS THE SOURCE OF PROFIT AND SG&A
     EXPENSES IS REASONABLE, LAWFUL, AND SUPPORTED BY
     SUBSTANTIAL RECORD EVIDENCE ........................................... 26

    A. Commerce Reasonably Selected Sundram As The Most Suitable
       Source Of Profit And SG&A Expenses Data ................................ 27

    B. Commerce's Iterative Approach To Narrowing The Field Of
       Options Was Affirmed By This Court In 2019 ............................ 30

    C. Commerce Properly Declined To Reopen The Record To Let OF
       Fix Strategic Errors It Made During The Investigation ............. 37

CONCLUSION ..................................................................................... 41

# TABLE OF AUTHORITIES

## CASES

*Ad Hoc Shrimp Trade Action Comm. v. United States,*
  802 F.3d 1339 (Fed. Cir. 2015) ............................................................. 26

*Atl. Sugar Ltd. v. United States,*
  744 F.2d 1556 (Fed. Cir. 1984) ............................................................. 26

*Chemtall, Inc. v. United States,*
  878 F.3d 1012 (Fed. Cir. 2017) ............................................................. 24

*Consol. Edison Co. of N.Y. v. NLRB,*
  305 U.S. 197 (1938) ............................................................................... 25

*Consolo v. Fed. Mar. Comm'n,*
  383 U.S. 607 (1966) ............................................................................... 26

*CP Kelco US, Inc. v. United States,*
  2015 WL 1544714 (CIT Mar. 31, 2015) .......................................... 20, 21

*CP Kelco US, Inc. v. United States,*
  211 F. Supp. 3d 1338 (Ct. Int'l Trade 2017) .................................. 34, 35

*CP Kelco US, Inc. v. United States,*
  949 F.3d 1348 (Fed. Cir. 2020) ................................... 32, 33, 34, 35

*CP Kelco US, Inc. v. United States,*
  Consol. Ct. No. 13-00288, , 2020 WL 2315251
  (Ct. Int'l Trade May 8, 2020) ............................................................. 35

*CP Kelco US, Inc. v. United States,*
  Consol. Ct. No. 13-00288, 2016 WL 1403657
  (Ct. Int'l Trade Apr. 8, 2016) ........................................................ 33, 35

*CP Kelco US, Inc. v. United States,*
  Consol. Ct. No. 13-00288, 2018 WL 1703143, at
  *2 (Ct. Int'l Trade Apr. 5, 2018) ............................................. 32, 34, 35

*CP Kelco US, Inc. v. United States,*
  Consol. Ct. No. 13-00288, 2018 WL 4469912
  (Ct. Int'l Trade Sep. 17, 2018) ........................................................ 34, 35

*Dongtai Peak Honey Industry Co., Ltd. v. United States,*
  777 F.3d 1343 (Fed. Cir. 2015) ........................................................ 40

*Dupont Teijin Films USA, LP v. United States,*
  407 F.3d 1211 (Fed. Cir. 2005) ........................................................ 24

*INS v. Elias-Zacarias,*
  502 U.S. 478 (1992) ........................................................ 26

*Mid Continent Steel & Wire, Inc. v. United States,*
  941 F. 3d 530 (Fed. Cir. 2019) ........................................................ passim

*Nippon Steel Corp. v. United States,*
  458 F.3d 1345 (Fed. Cir. 2006) ........................................................ 25

*PAM, S.p.A. v. United States,*
  582 F.3d 1336 (Fed. Cir. 2009) ........................................................ 25

*QVD Food Co., Ltd. v. United States,*
  658 F.3d 1318 (Fed. Cir. 2011) ........................................................ 39

*United States v. Eurodif S.A. et al.,*
  555 U.S. 305 (2009) ........................................................ 25

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.,*
  435 U.S. 519 (1978) ........................................................ 21, 22, 40

## STATUTES

19 U.S.C. § 1516a(b)(1)(B)(i) ........................................................ 25

19 U.S.C. § 1677b(a)(1)(B) ........................................................ 5

19 U.S.C. § 1677b(a)(1)(C) ........................................................ 5

19 U.S.C. § 1677b(a)(4) ........................................................ 5

19 U.S.C. § 1677b(e) ....................................................................5

19 U.S.C. § 1677b(e)(1) .............................................................6

19 U.S.C. § 1677b(e)(2) .............................................................6

19 U.S.C. § 1677b(e)(2)(B) ........................................................6

19 U.S.C. § 1677b(e)(2)(B)(i) .....................................................6

19 U.S.C. § 1677b(e)(2)(B)(ii) ....................................................6

19 U.S.C. § 1677b(e)(2)(B)(iii) ...................................................6

28 U.S.C. § 1295 ........................................................................2

28 U.S.C. § 1581(c) ....................................................................2

## ADMINISTRATIVE DETERMINATIONS & PUBLICATIONS

*Notice of Final Determination of Sales at Less Than*
  *Fair Value: Pure Magnesium from Israel,*
  66 Fed. Reg. 49,349 (Sep. 27, 2001) ......................................23

*Notice of Final Determination of Sales at Not Less Than*
  *Fair Value: Certain Color Television Receivers from Malaysia,*
  69 Fed. Reg. 20,592 (Apr. 16, 2004) ......................................23

## STATEMENT OF RELATED CASES

The underlying case before the United States Court of International Trade ("Trade Court") was previously before this Court in two concurrent appeals. Both arose from the U.S. Department of Commerce's ("Commerce") final determination in the original antidumping investigation of certain steel nails from Oman: No. 18-1250, an appeal filed by Plaintiff-Appellee Mid Continent Steel & Wire, Inc. ("Mid Continent"), and No. 18-1296, an appeal filed by Defendant-Appellant Oman Fasteners LLC ("OF").

This Court (Judges Dyk, Lynn, and Taranto) affirmed the Trade Court's decision in 18-1250. *Mid Continent Steel & Wire, Inc. v. United States*, 777 F. App'x 515 (Fed. Cir. 2019) (per curiam). The same panel affirmed all but one issue in 18-1296, which was remanded for further proceedings and that is the subject of this appeal. *See Mid Continent Steel & Wire, Inc. v. United States*, 941 F. 3d 530 (Fed. Cir. 2019).

## JURISDICTIONAL STATEMENT

Pursuant to Rule 28(a)(5) of the Rules of the United States Court of Appeals for the Federal Circuit, counsel for Mid Continent states that this Court's jurisdiction rests upon the following bases:

(a)    The Trade Court possessed jurisdiction pursuant to 28 U.S.C. § 1581(c).

(b)    The statutory basis for this Court's jurisdiction is 28 U.S.C. § 1295.

(c)    The Trade Court entered its judgment on August 8, 2022.

## STATEMENT OF THE ISSUE

(1)    Whether Commerce's factual determination, on remand of a 2019 decision of this Court, to select a certain financial statement as the source of profit and SG&A data for its antidumping ("AD") calculation is supported by substantial evidence and otherwise in accordance with law?

## STATEMENT OF THE CASE

## I.    NATURE OF THE CASE

This appeal challenges Commerce's choice of information to use as the source for certain financial data in its calculations.  OF challenges the decision in *Mid Continent Steel & Wire, Inc. v. United States*, 586 F. Supp. 3d. 1349 (Ct. Int'l Trade 2022), in which the Trade Court affirmed Commerce's selection of an Indian company (Sundram) as the source of surrogate financial data (profit and SG&A expenses).  In so doing,

Commerce fully complied with the Court's 2019 decision remanding the original appeal to the agency.

OF challenges the source of information Commerce selected after reconsidering its choice in a 2015 investigation in light of this Court's 2019 remand. Commerce reexamined the record and realized that the financial statement it initially used (from Hitech Fastener Manufacture (Thailand) Co., Ltd. ("Hitech")) covered a different, earlier time period than that covered by the investigation. This meant that it was not contemporaneous, and the financial experience reported reflected economic and business conditions that did not pertain to the period of investigation. As a result, Commerce selected Indian producer Sundram Fasteners Limited ("Sundram"), because 34% of the company's production was of comparable merchandise (fasteners), and its financial statement was timely submitted, complete, fully translated, and covered exactly the same period of time covered by the investigation.

To be sure, Commerce selected Sundram even though the company had received a very, very small subsidy from the Indian government. OF repeatedly characterizes Sundram's information as

"subsidy-distorted". In fact, as shown below, the amount of subsidies reflected in the company's financial statement represents only 0.0145 percent of the company's revenue – just over one hundredth of one percent – hardly enough to register, much less distort its financial information and render it unreliable. The subsidy received by Sundram "distorts" its financial experience the way a drop of ink would distort the color of Lake Michigan. OF's efforts to defeat a reasonable choice based on substantial record evidence and made in accordance with law should be denied.

OF also seeks to relitigate multiple issues decided in 2019 by this Court in the appeal of the original investigation. These efforts also should be denied.

## II.     STATEMENT OF FACTS

An AD order involving imports of steel nails from Oman was imposed in 2015. An AD investigation determines whether imports of merchandise are being "dumped," or sold in the United States at prices that are less than fair (or "normal") value. This is determined by comparing prices charged in the United States with the "normal value" of the same or similar goods. The statute presumes that the "normal

4

value" is set using prices a foreign producer charges in its home market (*i.e.*, Oman), 19 U.S.C. § 1677b(a)(1)(B), but recognizes that the volume of sales in home market may be too small to provide a reliable basis for comparison. *Id.* § 1677b(a)(1)(C).

When this happens, Commerce next examines whether the foreign producer sold a sufficient quantity in a third country market (for example, in Germany). *Id.* § 1677b(a)(1)(C). If no viable third country market exists, the statute directs Commerce to "construct" the normal value to compare against U.S. price to determine the amount of dumping. *Id.* § 1677b(a)(4).

The statute identifies four methods for calculating constructed normal value: one preferred method and three alternative methods among which there is no hierarchy or preference. *Id.* § 1677b(e). All four methods require Commerce to use the company's costs of producing and packaging the merchandise. They differ in terms of where Commerce obtains data to value profit and selling, general and administrative ("SG&A") expenses.

The preferred method directs Commerce to look at the company's actual amounts of profits and SG&A expenses in connection with the

production and sale of the merchandise under investigation, made in the ordinary course of trade, for consumption in the company's home market. *Id.* §§ 1677b(e)(1)-(2).  It is undisputed that the preferred method was not available to Commerce.

Each of the three alternative methods also requires consideration of profit and SG&A expenses, though each method specifies a different source.  *Id.* § 1677b(e)(2)(B).  The first method focuses on profit and SG&A data associated with the respondent's other products in the same general category as the subject merchandise.  *Id.* § 1677b(e)(2)(B)(i).  It is undisputed that this option was not available to Commerce.

The second option focuses on profit and SG&A data from other respondents in the investigation.  *Id.* § 1677b(e)(2)(B)(ii).  It is undisputed that this approach was not available to Commerce because OF was the only respondent in the investigation.

The third option allows Commerce to use "any other reasonable method" to establish profit and SG&A expenses.  *Id.* § 1677b(e)(2)(B)(iii).[1]  Because the other options were not available,

---

[1] This approach is subject to a limitation or "cap" on the amount of profit that is not challenged in this appeal.

Commerce used this third approach to determine the level of profit and SG&A expenses when calculating the "constructed" normal value in the original investigation. The propriety of its choice is not in dispute.

Given that the parties have the burden of developing the record, during the investigation Commerce provided the parties a specific opportunity to submit factual information and argument concerning the appropriate source(s) of constructed value profit and SG&A expenses. Appx1047. OF and Mid Continent submitted a total of 11 financial statements in response.

OF argued for the use of its own or other Omani companies' data for the calculation of CV profit and SG&A expenses. Appx0721-0726. At no time prior to the investigation's preliminary determination did OF argue for the use of data from any third country source. Instead, OF argued that Commerce should use data from its own home market sales, despite their extremely small volume, or alternatively, should use data from Omani companies producing wholly non-comparable products such as cardboard boxes, basic steel products, or construction services. Appx0721-0726, Appx1386-1390.

OF also submitted the almost entirely untranslated financial statements of a Thai company, L.S. Industry Co. Ltd. ("LSI"). Appx1081-1111. LSI is not a pure-play producer of nails, and produces chain and wire as well. Appx1083 (describing the company as "Manufacturer of steel nails, chain, wire"). Additionally, the LSI financial statement was for calendar year 2012, and thus predates the investigative period by at least four months. Appx1024, Appx1081, Appx1083.

Importantly, OF only submitted the LSI financial statement to corroborate the profit and SG&A amounts of another company, and <u>not</u> as a potential source of CV profit and selling expenses:

> Oman Fasteners submits herewith…one of the financial statements on the record of the most recent segment of the China case (a producer located in Thailand) <u>as corroborating evidence</u> of the reasonableness of {the profit and SG&A amounts from a different company}.

Appx0727 (emphasis added).

LSI's financial statements were (and are) unusable. Most pages were wholly untranslated, and only one of 23 individually enumerated notes to the financial statements was translated. Appx1081-1111. Moreover, as noted above the LSI financial statement OF submitted is

for 2012, and thus the financial experience it reflected has no

connection whatsoever to the period of the Oman investigation, which

began in April 2013. Appx1024, Appx1081, Appx1083.

In the Preliminary Determination, Commerce used the financial

statements of Hitech, a Thai producer of comparable merchandise

(other fasteners, specifically, screws and rivets), to calculate CV profit

and SG&A expenses.  Commerce reasoned as follows:

> Because Oman Fasteners manufactures only nails and
> did not sell any non-subject comparable merchandise in
> the home market during the POI, we are unable to
> calculate profit under section 773(e)(2)(B)(i), *i.e.*, based
> on sales of the same general category of product.
> Further, as Oman Fasteners is the only respondent in
> this investigation, we are unable to calculate profit
> under 773(e)(2)(B)(ii), *i.e.*, based on the preferred
> method of averaging the profit ratios of the other
> exporters or producers being examined.  Thus, we must
> calculate profit under section 773(e)(2)(B)(iii), *i.e.*, any
> other reasonable method.

Appx1446.  To select a source of profit and SG&A expenses, Commerce

analyzed the financial statements that the parties had submitted on the

record.  The agency observed that each had its limitations.  Appx1446-

1448.  Commerce ultimately used Hitech's financial statement to

calculate CV profit, because it was a reasonable source among the

available options on the record and the statute allows Commerce to use

financial statements from a company located in a third country when necessary.  Appx1447.

Seeing this decision, OF recognized the significant strategic error it made when it ignored Commerce's authority to use a third-country source, and when it chose to argue only for the use of other Omani companies producing fundamentally different goods to calculate CV profit and SG&A expenses.  OF then attempted to pivot, and claimed that Commerce had committed a "significant ministerial error" because

> the Department entirely overlooked, and failed to apply, a highly relevant source of data that was timely filed and properly before the Department on the record of this investigation: the financial statement of L.S. Industry Co. Ltd., a third country (Thai) producer of steel nails, the merchandise under consideration in this investigation.

Appx1681.  This assertion, of course, is false, being completely at odds with OF's prior claims that it submitted LSI only as corroborating information, that "{t}he best evidence on the record to value Oman Fasteners' profit and selling expenses for constructed value are Oman Fasteners' own data or, in the alternative, the financial statements of {Omani manufacturers} offered previously by Oman Fasteners." Appx1387, and that the untranslated LSI statement was unusable.

10

Commerce rejected OF's claim, because it had

> considered all of the available record evidence,
> including the LSI financial statements referred to by
> Oman Fasteners. We acknowledge that <u>we did not
> specifically mention LSI's financial statements in our
> *Preliminary Determination* because no party to this
> proceeding suggested that these statements should be
> used to calculate the CV profit ratio</u>. Regardless, we
> note that LSI's statements are not useable because
> they lack complete English translations.

Appx1768 (emphasis added).

Months later, nearly at the end of the investigation, OF belatedly attempted to submit a full translation of the LSI financial statements, alternatively asking that Commerce unilaterally place the full translation on the record or reopen the record to allow parties to submit new information. Appx2873-2874. Mid Continent opposed this request. Appx2950-2963. Commerce correctly rejected this attempt to subvert the administrative process. Appx2908-2910.

In the Final Determination, Commerce continued to calculate CV profit and SG&A expenses under section 773(e)(2)(B)(iii) (*i.e.*, any other reasonable method). Appx3276-3278. Commerce again analyzed all possible sources on the record for calculating CV profit and SG&A

expenses, and concluded that Hitech's financial statements remained the best option.  Appx3276-3283.

Commerce declined to use the other timely presented financial statements for the following reasons: (1) the 2013 financial statements of Al Jazeera (an Omani producer of basic steel products like steel bars and pipes), the 2012 financial statements of Larsen & Toubro (an Omani construction conglomerate), and the 2013 financial statements of two Omani producers of corrugated boxes were all rejected because they did not reflect production of products comparable to downstream manufactured steel products like nails and other fasteners (Appx3279); (2) the 2012 financial statements of LSI and the 2013 financial statements of Chun Yu Works & Co., Ltd. and Sumeeko Industry Co., Ltd., two other Taiwanese producers of screws and fasteners submitted by Mid Continent, were rejected because they also were not fully translated (Appx3280); (3) the financial statements of an Indian producer of fasteners, Sundram Fasteners Limited, were rejected because, while the company produced comparable products (fasteners) and its financial statements were completely translated, its production

of steel nails or comparable products accounted for only 34% of its production, in contrast to Hitech (Appx3280).

Commerce rejected OF's argument that Hitech was unusable because it had previously been found to receive an extremely tiny countervailable subsidy, drawing a distinction between the agency's practice in cases involving non-market economy countries like China, and cases involving market economy countries like Oman. Appx3282.

Commerce also considered and rejected, in detail, OF's challenges to Commerce's decisions not to use the Omani companies' financial statements or the untranslated LSI financial statements, and its claim that Commerce unilaterally should have placed the fully translated LSI financial statements on the record. Appx3281-3282.

OF challenged certain aspects of the original decision to the Trade Court and then to this Court, including Commerce's decision to rely on Hitech as the source of profit and SG&A expense data.

This Court affirmed Commerce on all but one issue, concerning its selection of Hitech as the source of certain financial data for its AD analysis when its financial statements suggested it had received a countervailable subsidy. *See Mid Continent Steel & Wire, Inc.*, 941 F.3d

at 543-44.  Specifically, this Court found that Commerce erred in

refusing to consider the effect on Hitech's profits of the subsidy Hitech's

financial statements reported, and that its "explanation is wanting."

*Id.* at 544.  The Court remanded for further explanation, but specifically

noted:

> We do not decide that Commerce must reject Hitech or
> lower the profit figure to be borrowed for OF, but we
> remand for further consideration and explanation.

*Id.*  This Court further stated that:

> As a logical matter, Hitech would be a weaker
> surrogate for constructed value if government subsidies
> heavily distort its profits. It might be so much weaker
> that Commerce would no longer have a sound reason to
> choose Hitech over another proposed source of profit
> information, whether from OF's home country or
> elsewhere. The size of any subsidies would obviously be
> relevant, as would the comparative deficiencies of the
> alternative sources. Choice of a different source is not
> the only possible response to a determination of the
> existence, likelihood, or magnitude of subsidies that
> artificially increase a surrogate's profit. If the statute
> permits, Commerce might determine the amount of
> subsidies and adjust its calculation of constructed
> value downward to eliminate the effect of the subsidies.
> Or Commerce might decide that the subsidies are so
> insignificant that no change needs to be made at all.
>
> *         *         *
>
> We do not prescribe an ultimate result. Rather, we
> require that Commerce reconsider an important aspect
> of its determination. Whatever result it reaches upon

14

> such reconsideration, it must articulate an explanation
> of why its result is a reasonable one, given relevant
> statutory duties, including the broad duty to strive for
> accuracy. We remand to give Commerce an opportunity
> to conduct this analysis and provide this explanation.

*Id.* at 544.

Apart from the issue remanded to Commerce, this Court affirmed, *inter alia*, Commerce's decision to reject the Omani financial statements submitted by OF as a threshold matter before proceeding to consider the other potential sources, Commerce's determination to reject the untranslated LSI financial statement, and Commerce's decision not to reopen the record to allow OF to belatedly submit the translated LSI financial statement. *Id.* at 542-543. While these issues were decided in this Court's 2019 decision, OF now seeks to relitigate them in hopes of obtaining a different outcome.

Two remand proceedings took place from 2019 through 2022. In the remand determination that is now before this Court, Commerce ultimately selected a different company, the Indian company Sundram, as the source of the financial data. Appx0034.

To reach this determination, Commerce considered all 11 of the financial statements on the record. Appx0028-0029. Commerce first

excluded the six Omani financial statements because none of the
companies produced steel nails or any type of comparable merchandise,
exactly as it did in the original investigation (which this Court affirmed
in 2019).  Appx0028-0029.  As discussed above, these companies
produced basic steel products (as opposed to downstream, fabricated
steel products), provided large-scale construction services, or produced
corrugated boxes – activities and goods bearing no resemblance to
production of steel nails or other fasteners, or the markets they serve.

Commerce continued to reject the untranslated LSI financial
statement, consistent with its regulations and this Court's 2019 ruling.
Appx0029.  Commerce also continued to find it unnecessary to reopen
the record for new information, consistent with this Court's 2019
decision, because the record contained usable information.   Appx0029.

This previously-affirmed iterative process left two potential
sources of information:  Hitech and Sundram.  As discussed above, both
financial statements were timely filed, complete and fully translated,
and reflected production of comparable merchandise.

As directed by both this Court and the Trade Court, Commerce
reexamined its selection of Hitech and the effect of its receipt of

subsidies.  Commerce determined that Note 1 to Hitech's financial

statement in fact indicated that the company was the recipient of an

unknown amount of subsidies:

> Note 1 in Hitech's FS states: "The company has been
> support {sic} for production screws (SCREW) Category
> 4.7 Manufacture of wire products, metal wire,
> Promotional Number 1447/2538 on July 10, 1995." We
> infer this statement means that Hitech maintained a
> specific identification number during the reported
> fiscal period, which, by its own description, is for
> support in the production of screws. In *Steel Wire
> Garment Hangers from China*, a contemporaneous
> administrative review to the Final Determination, we
> found the statement in Note 1 of Hitech's FS
> sufficiently demonstrated receipt of a subsidy and
> declined to consider Hitech's FS in our calculation of
> surrogate values to value factors of production. With
> regard to Hitech's FS, the facts of the instant case are
> exactly the same as those in *Steel Wire Garment
> Hangers from China,* wherein we found the statement
> in Note 1 of Hitech's FS sufficiently indicated
> subsidization. While the record of each proceeding
> stands alone, we found the evidence regarding Hitech's
> FS in *Steel Wire Garment Hangers from China*
> sufficiently indicated subsidies, and the instant record
> presents the same evidence. Therefore, consistent with
> the evidentiary finding in that case, we find here that
> Hitech's FS contain evidence of subsidies.

Appx0030 (footnote omitted).  Having found that Hitech's financial

statement contained evidence of countervailable subsidies, Commerce

examined the only other potential source it had not disqualified, the

Indian company Sundram.  Commerce observed that Sundram's financial statement also contained evidence of receiving a subsidy, in the amount of 30 Lakhs.  Appx0039. A lakh is one hundred thousand rupees, so in plain terms the subsidy amount was 3,000,000 rupees, or roughly **$49,000** using Commerce's exchange rate for March 31, 2014, the final day of Sundram's fiscal year at issue.  *See* https://access.trade.gov/resources/exchange/india.txt.  For context, Sundram's total revenue in the financial statement at issue was Rs. 207,099.56 lakhs (20,709,956,000 rupees), or nearly **$336,000,000**. Appx0457.  Thus, the subsidy was equivalent to **30/207,099.56 = 0.0145 percent of Sundram's revenue** – just over one hundredth of one percent – hardly enough to register, much less distort its financial information and render it unreliable.

At this point, both Sundram and Hitech were fairly equivalent options.  Both companies' financial statements were timely-filed and fully translated.  Both companies produced comparable merchandise albeit in differing proportions, and both apparently received some amount of subsidies – an unknown amount in Hitech's case, and an infinitesimal amount in Sundram's case.

Commerce then examined both Hitech and Sundram using its standard four factor framework for evaluating potential sources of CV profit and SG&A expenses: (1) the similarity between a potential surrogate's business operations and products and those of the respondent; (2) the extent to which a potential surrogate has sales in the United States and the home market; (3) the contemporaneity of the surrogate data; and (4) the similarity of customer base between a potential surrogate and the respondent. Appx0031-0032.

No information to evaluate the second criterion was on the record. Appx0032. Commerce found that both companies produced comparable merchandise and had similar customer bases (criteria 1 and 4) given their operations discussed above. Appx0032-0033.

Commerce then turned to the third criterion, whether the companies' financial data were contemporaneous with the period of time covered by the investigation. Appx0033. Commerce observed that while Sundram's statement covered **exactly** the same time period as the original investigation (April 1, 2012 through March 31, 2013), Hitech's statement was covered calendar year 2012, **which ended four**

**months before the period of time covered by the investigation even began**.  Appx0033.

For obvious reasons, this meant that Sundram's statement was preferable to Hitech's.  As Commerce observed, "{c}ontemporaneous data better reflect a mandatory respondent's cost and sales data, along with the same market conditions and operating environment of the respondent."  Appx0033-0034.  For this reason, and given the relative equivalence of the other factors that could be evaluated, Commerce determined to rely on the Sundram statement instead of the Hitech statement.  Appx0034.

The Trade Court affirmed Commerce, rejecting OF's argument that Commerce was required to compare all 11 financial statements side-by-side.  Appx0013-0014.  Consistent with this Court's 2019 decision, the Trade Court affirmed Commerce's decision to disregard the six Omani financial statements as an initial matter, then to disregard the untranslated LSI, Chun Yu, and Sumeeko financial statements, and then to scrutinize the Hitech and Sundram statements.  Appx0013-0016.  In so doing, the Trade Court distinguished *CP Kelco U.S., Inc. v. United States*, 2015 WL 1544714 (CIT Mar. 31, 2015)), a 2015 decision

20

that required Commerce to fully compare two financial statements

proposed as sources of profit and SG&A expenses for constructed value

analysis.  Appx0013-0014.  The Trade Court held that

> while Commerce did not directly compare each of the
> eleven financial statements on the record, Commerce
> explained its decision to reject the financial statements
> from the six Omani companies, the two Taiwanese
> companies, and LSI, such that it did not need to
> compare these statements to those of Hitech and
> Sundram.

Appx0013.  Further:

> Commerce's explanation of its rejection of the LSI,
> Taiwanese companies', and Omani companies' financial
> statements was sufficient to justify its choice not to
> further compare these financial statements to other
> financial statements on the record, but, instead, to use
> an iterative process to eliminate these statements from
> consideration.

Appx0016.  The Trade Court specifically found that "{w}ith a focus on

contemporaneity and comparability of merchandise, Commerce

provided a well-reasoned explanation of its choice of Sundram over

Hitech," summarizing the agency's analysis.  Appx0017.

Finally, the Trade Court rejected OF's request that Commerce be

required to reopen the record so OF could belatedly submit a translated

version of the LSI financial statement, correctly noting that the burden

of developing the record is borne by the parties, and that "{t}he interests

of finality also suggest that the court should limit interfering with the agency's procedures and deadlines." Appx0018-0019 (*citing, inter alia, Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 554-555 (1978)).

OF renews its claims before this Court, claiming that Sundram's financial information is distorted by subsidies and unusable. As noted above, OF also attempts to relitigate issues already decided. For the reasons discussed below, this Court should decline to revisit previously-decided issues and should affirm Commerce's choice of Sundram as the source of profit and SG&A data for the antidumping analysis.

## SUMMARY OF ARGUMENT

Commerce's selection of the Sundram financial statement as the source of profit and SG&A expenses data for its antidumping calculations is supported by substantial evidence and in accordance with law. Faced with the financial statements of 11 companies as possible options for its data source, Commerce used an iterative process that this Court affirmed in 2019 to disqualify companies that produced goods wholly unlike steel nails and companies whose financial statements were not fully translated.

Having done so, Commerce scrutinized the financial statements

from the remaining two options using its standard articulated in *Pure*

*Magnesium from Israel*[2] and *Certain Color Television Receivers from*

*Malaysia*,[3] which is not challenged.  In the process of doing so,

Commerce observed that both companies produced merchandise

comparable to nails, that both financial statements were timely

submitted and completely translated, and that both financial

statements contained evidence of countervailable subsidies.  For one

company (Hitech), the amount was not identified; for the other

(Sundram), the amount was so small as to be meaningless.  Commerce

deemed the companies equivalent in that both appeared to receive some

type of countervailable subsidy.  However, Commerce then observed

that the financial statement of Hitech was not contemporaneous with

any portion of the time period covered by the AD investigation, meaning

[2] *Notice of Final Determination of Sales at Less Than Fair Value: Pure Magnesium from Israel*, 66 Fed. Reg 49,349 (Sept. 27, 2001) and accompanying Decision Memorandum at Comment 8.

[3] *Notice of Final Determination of Sales at Not Less Than Fair Value: Certain Color Television Receivers from Malaysia*, 69 Fed. Reg. 20,592 (Apr. 16, 2004), and accompanying Issues and Decision Memorandum at Comment 26.

that its financial experience was affected by different factors.  The financial statement of Sundram, however, was perfectly contemporaneous with the investigation time period, rendering it a better choice.

OF's challenges to Commerce's iterative process, and to its decision not to reopen the record, should be denied.  Both issues were addressed by this Court in its 2019 decision, and nothing has changed to warrant a different result.  Commerce's decisions are reasonable and reveal no legal error.

## STANDARD OF REVIEW

The Court applies the same standard of review that was applied by the Trade Court when reviewing a final antidumping determination by Commerce.  *See Dupont Teijin Films USA, LP v. United States*, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (internal citation omitted).  In this context, the Court "give{s} great weight to the informed opinion of that court, which has expertise in international trade matters." *Chemtall, Inc. v. United States*, 878 F.3d 1012, 1018 (Fed. Cir. 2017) (internal quotation marks and citation omitted).

Commerce's determination must be sustained unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with the law." 19 U.S.C. § 1516a(b)(1)(B)(i). Additionally, "{t}he specific factual findings on which {Commerce} relies in applying its interpretation are conclusive unless unsupported by substantial evidence." *United States v. Eurodif S.A. et al.*, 555 U.S. 305 (2009) at 316 n.6. Accordingly, a party challenging Commerce's findings under the substantial evidence standard "has chosen a course with a high barrier to reversal." *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (internal citation and quotation marks omitted).

Substantial evidence means "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *PAM, S.p.A. v. United States*, 582 F.3d 1336, 1339 (Fed. Cir. 2009) (internal citations and quotation marks omitted); *see also Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938) (internal citation omitted). Here, because Congress has entrusted Commerce to administer the statute at issue in fact-intensive inquiries, Commerce's conclusions should be reversed only if the record contains

evidence "so compelling that no reasonable factfinding" could reach the same conclusion. *INS v. Elias-Zacarias*, 502 U.S. 478, 483–84 (1992).

Moreover, "{a}n agency finding may still be supported by substantial evidence even if two inconsistent conclusions can be drawn from the evidence." *Ad Hoc Shrimp Trade Action Comm. v. United States*, 802 F.3d 1339, 1348 (Fed. Cir. 2015) (quoting *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966)). In other words, Commerce's factual determinations will be upheld if they are reasonable and supported by the record, even if some evidence detracts from them. *See Atl. Sugar Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984).

## ARGUMENT

## I. COMMERCE'S FACTUAL DETERMINATION TO SELECT SUNDRAM AS THE SOURCE OF PROFIT AND SG&A EXPENSES IS REASONABLE, LAWFUL, AND SUPPORTED BY SUBSTANTIAL RECORD EVIDENCE

OF raises three general arguments challenging Commerce's decision. First, it claims that Commerce unreasonably relied on "subsidy-distorted financial information associated with dissimilar products." OF Br. at 37-46. Second, OF contends that Commerce should have conducted a side-by-side comparison of all 11 financial statements, notwithstanding this Court's prior approval of the precise

approach Commerce did take.  OF Br. at 46-56.  Third, OF argues that

Commerce should have reopened the record to allow it to fix its

strategic blunder of only submitting the untranslated LSI financial

statement for the limited purpose corroborating data of another

company.  OF Br. at 56-61.  None of OF's contentions has merit.

### A.   Commerce Reasonably Selected Sundram As The Most Suitable Source Of Profit And SG&A Expenses Data

OF invites the Court to re-weigh the record evidence considered by

Commerce, arguing that the tiny subsidy received by Sundram and the

fact that it produced products other than fasteners renders it

unsuitable.  OF Br. at 37-39.

OF claims that "Sundram's subsidies ... significantly undermined

its fitness for selection as a surrogate for Oman Fasteners."  OF Br. at

37-28.  This is a canard.  As shown above, the subsidy (singular)

received by Sundram amounted to 0.0145% of its revenue, barely

enough to register, much less distort its financial data.

OF emphasizes the names of the various types of fasteners

Sundram produces – "elaborate fasteners such as friction-grip bolts and

flange weld nuts." *Id.* at 38.  Exactly what "elaborate" means in this

context is never made clear, though OF appears to imply that having

27

accurate names somehow means the goods are not fasteners, are not produced using similar processes and inputs, and are not used for the same general purposes (fastening surfaces together).

More to the point, OF's contentions reflect ignorance of the fact that steel nails are just as specialized as the fasteners Sundram produces. Exhibit General-4 to the Petition filed at the start of the underlying investigation includes a copy of ASTM-F1667, the generally recognized consensus industry standard for driven fasteners: nails, spikes, and staples. Appx5011, Appx5079, Appx5105-5142. ASTM F1667 does not cover all of the steel nails covered by the case – many other types of specialized nails exist, such as those that are patented or made to customer-specific specifications. Nonetheless, ASTM F1667 includes 32 pages of detailed specifications calling out hundreds (if not thousands) of highly specialized nails covered by the underlying investigation, such as pallet nails (Appx5121), double-headed nails (Appx5117), gypsum-wallboard, gypsum board, and drywall nails (Appx5122), and post-frame shank nails (Appx5135). OF's attempt to distinguish Sundram's fasteners on this basis is factually incorrect and unavailing.

As this shows, Sundram's financial statements cannot reasonably be described as "distorted" by the tiny subsidy it received, and the fasteners it produced, while not nails, unquestionably are comparable fasteners.

As OF notes, Hitech's financial statement also contained evidence suggesting that the company received a subsidy, but the amount was not identified. Accordingly to OF, this means that "Commerce was unable to quantify the subsidies' effects on accuracy". OF Br. at 42. With respect to Hitech, this is irrelevant because the period covered by its financial statement ended four months before the start of the investigative period, meaning that its financial data do not reflect the same economic conditions that existed during the period covered by the investigation, whereas Sundram's statement matched the period of investigation precisely. Moreover, if anything, the absence of information quantifying the magnitude of the subside provides additional support for Commerce's decision to decline to use this source in this context.

### B.  Commerce's Iterative Approach To Narrowing The Field Of Options Was Affirmed By This Court In 2019

OF next attempts to relitigate issues decided in 2019.  OF claims that "Commerce did not weigh the comparative deficiencies of the alternative sources" and "instead took a categorical approach that focused on the possible uncertainties or weaknesses of individual sources."  OF Br. at 46-47.  OF is referring to Commerce's initial disqualification of the six Omani companies because they did not produce products remotely resembling nails, and then its disqualification of three incompletely-translated financial statements from producers of comparable merchandise before its examination of the Hitech and Sundram statements.

OF fails to acknowledge, however, that this Court affirmed exactly this approach in its 2019 decision, in a discussion worth quoting at length:

> OF argues that Commerce acted unreasonably in selecting Hitech, a Thai seller of screws, over LSI, a seller of nails, and over certain Omani companies not in the nails business. Putting aside for now the issue of subsidies discussed in the next subsection of this opinion, we reject this argument.

> \*     \*     \*

30

Commerce first considered the statements of the Omani companies on the record. Commerce determined that none of the Omani companies on the record sold products "identical or comparable to" steel nails and excluded these companies from consideration. With the financial statements of the Omani companies eliminated, Commerce noted that while it would prefer to use statements "of a producer of steel nails that primarily produces and sells steel nails in Oman, such information is not available on the record." That was so because Commerce had excluded the LSI financial statements for the reasons we have discussed—the lateness of the fully translated version and the unreliability of the partly translated version. Accordingly, Commerce turned to statements of companies from outside Oman and determined that because Hitech sold comparable merchandise and was the only fully translated statement available, Hitech was the only potential option. Commerce recognized that nails and screws are not identical merchandise, but it reasoned:

> Both nails and screws share a similar production process whereby wire is drawn, heat treated and galvanized. Further, both may undergo threading and both may be collated for use in gun applications. Nails and screws are both within the same family of fasteners, and they both can be used in the same applications, *i.e.*, fastening surfaces together.

After the Trade Court remanded for further explanation, Commerce bolstered this conclusion, explaining that Oman and Hitech "use the same or similar type of plant facilities, machinery, and equipment. Accordingly, they are both subject to similar levels of capital expenditures and are also subject to similar market conditions when purchasing or replacing machinery."

> Again putting aside the subsidies issue discussed next,
> we conclude that Commerce's application of the statute
> was reasonable on the record here.

*Mid Continent Steel & Wire, Inc.*, 941 F.3d at 543-544 (internal citations

omitted).  While OF apparently would prefer a different approach to

weighing the record evidence, Commerce's approach was reasonable in

2019, remains reasonable today, and should be affirmed.

OF devotes several pages of its brief to *CP Kelco US, Inc. v. United*

*States*, 949 F.3d 1348 (Fed. Cir. 2020), claiming that Commerce

misapplied that decision, and, worse yet, "ignored what this Court said

in this case."  OF Br. at 51-53.  OF fails, however, to acknowledge a

crucial distinguishing factor: the partially translated Thai

Fermentation's financial statements at issue in *CP Kelco* was only

missing translations of two paragraphs in one footnote (concerning

property, plant, and equipment, *i.e.*, fixed assets).[4]  In contrast, here,

LSI's financial statements are almost *entirely* untranslated: most of the

pages are wholly untranslated, and only one of what appears to be 23

---

[4] *See CP Kelco I*, 2015 WL 1544714, at *5 (discussing the missing
translations); *see also CP Kelco US, Inc. v. United States*, Consol. Ct.
No. 13-00288, 2018 WL 1703143, at *2 (Ct. Int'l Trade Apr. 5, 2018)
("*CP Kelco IV*") (same).

individually enumerated notes to the financial statements is translated.

Appx2950-2954.  Commerce therefore reasonably concluded in its *Final*

*Remand Results* that:

> Following our analysis from the First Redetermination
> in this proceeding, the LSI and two Taiwanese FS are
> incomplete, *i.e.*, missing an auditor's report and the
> majority of their data disclosures under their countries'
> respective generally accepted accounting principles
> (GAAP).  Without the auditor's report and data
> disclosures, there is no way to ascertain whether the
> companies have properly captured their revenues and
> costs (and thereby their profits) in accordance with
> their respective GAAP or whether the FS can serve as
> reliable sources for the profit "normally" experienced
> by a producer of steel nails.  Our analysis of the three
> FS is reasonable given the CAFC has upheld our
> rejection of the Taiwanese FS and LSI's FS.  In the
> instant case, we find that the Taiwanese FS and LSI's
> FS contain significant defects which prevent Commerce
> from effectively evaluating their appropriateness as
> sources for CV profit and ISE information.  Therefore,
> we find that the LSI and both Taiwanese FS are less
> preferable than Sundram's FS because Sundram's FS
> include all of the information necessary to calculate
> accurate and reliable financial ratios.

Appx0038-0039 (footnotes and internal citations omitted).

In any event, in the series of *CP Kelco* cases, during multiple

remands from the Trade Court, Commerce continued to reject one

company's (Thai Fermentation) financial statements for a lack of

complete translation and continued to select another company's (Thai Ajinomoto) financial statements to calculate surrogate financial ratios even though it had received countervailable subsidies. *See generally CP I*, 2015 WL 1544714; *CP Kelco US, Inc. v. United States*, Consol. Ct. No. 13-00288, 2016 WL 1403657 (Ct. Int'l Trade Apr. 8, 2016) ("*CP Kelco II*"); *CP Kelco US, Inc. v. United States*, 211 F. Supp. 3d 1338 (Ct. Int'l Trade 2017) ("*CP Kelco III*"). Commerce advanced several explanations as to why Thai Fermentation's incompletely translated financial statements were unusable in comparison with Thai Ajinomoto's financial statements. The Trade Court rejected the agency's explanations each time and remanded the case repeatedly, until finally in 2018, the Trade Court ordered Commerce to use Thai Fermentation's financial statements. *See generally CP Kelco IV*, 2018 WL 1703143. Commerce did so on remand, and the Trade Court affirmed Commerce's remand determination. *See CP Kelco US, Inc. v. United States*, Consol. Ct. No. 13-00288, 2018 WL 4469912 (Ct. Int'l Trade Sep. 17, 2018) ("*CP Kelco V*").

The case was then appealed to this Court. This Court ruled that Commerce provided sufficient explanation for rejecting Thai

Fermentation's incompletely translated financial statements in its third

remand results, and reversed the Trade Court's decision in this aspect.

*See CP Kelco US, Inc.*, 949 F.3d at 1359.  On remand, the Trade Court

followed this Court's decision and reinstated Commerce's third remand

results, which relied on the Thai Ajinomoto financial statements

showing some evidence of subsidies.  *See CP Kelco US, Inc. v. United*

*States*, Consol. Ct. No. 13-00288, 2020 WL 2315251 (Ct. Int'l Trade May

8, 2020) ("*CP Kelco VI*").   Therefore, the series of *CP Kelco* cases do not

support OF's position that LSI's almost entirely untranslated financial

statements are superior to Sundram's financial statement with evidence

of subsidies.

Moreover, notwithstanding the fact that this Court has already

upheld Commerce's decision to reject LSI's financial statements as a

source for profit and SG&A expenses, OF continues to advocate for their

use.  Commerce and Mid Continent have previously pointed out the

numerous flaws with respect to LSI's financial statements.  In this

context, it bears mentioning again that in addition to being

untranslated, LSI's financial statements are for 2012, and thus, like

Hitech's, are not contemporaneous with the time period covered by the

underlying investigation.

Furthermore, Mid Continent recognizes this Court's concern, as emphasized by OF, that the

> distortive effect of a subsidy on a company's profits may be sufficiently large "that Commerce would no longer have a sound reason to choose Hitech {(or Sundram)} over another proposed source of profit information, whether from OF's home country or elsewhere. The size of any subsidies would obviously be relevant, as would the comparative deficiencies of the alternative sources."

Appx0007 (emphasis omitted) (citing Mid Continent Steel & Wire, Inc., 941 F.3d at 544).

As discussed above, the subsidy received by Sundram was tiny. Specifically, the subsidy amount at issue in Sundram's financial statements is Rs. 30 lakhs. Appx0487. A lakh is one hundred thousand rupees, so in plain numerical terms, the subsidy amount was 3,000,000 rupees, or roughly $48,663 using the exchange rate in effect on the last day of Sundram's fiscal year. To put that into perspective, Sundram's total revenue for FY 13-14 was Rs. 207,099.56 lakhs, or 20,709,956,000 rupees, or $335,936,196.28. Appx0485; Appx0487. Thus, the subsidy was equivalent to **30/207,099.56 = 0.0145 percent** of Sundram's turnover for the fiscal year – just over one hundredth of one percent.

By any reasonable metric the record evidence clearly indicates
that the subsidy in question had a negligible effect on Sundram's
financial experience for its fiscal year and would not have affected
whether or not the company was profitable.  Indeed, viewed in this
light, the presence of the subsidy in Sundram's statement pales in
comparison to the serious and immutable flaws present in the other
options, all of which Commerce and/or Mid Continent detailed in earlier
stages of this litigation, as well as in the most recent remand
redetermination.

### C. Commerce Properly Declined To Reopen The Record To Let OF Fix Strategic Errors It Made During The Investigation

OF finds itself in the position of urging this Court to require
Commerce to ignore data from a fully translated, fully contemporaneous
financial statement of a producer of comparable merchandise and
instead to use of data from a non-contemporaneous, nearly 100%
untranslated financial statement of another producer of comparable
merchandise (nails, chain, and wire (Appx1083)).

OF finds itself in this position, of course, because during the
investigation it failed to recognize that Commerce had the authority to

use data from a producer in a third country, and it chose to submit the
untranslated LSI statement specifically for the limited purpose of
corroborating the levels of profit and SG&A expenses of another
company it wanted to Commerce to use.  Thus, this situation is entirely
OF's own making, and its strenuous, years-long effort to blame
Commerce for its own errors simply lacks credibility.

As it did during the original investigation, on remand Commerce
declined to reopen the record, finding that the information that had
been timely presented during the investigation was usable for its
calculations, stating:

> We disagree with Oman Fasteners' contention that
> Commerce continues to "refuse to obtain readily
> available, highly relevant information."  First,
> interested parties already had the opportunity to
> submit readily available, highly relevant information
> during the investigation, and it is the responsibility of
> interested parties to build the record. While it is within
> Commerce's discretion to reopen the record of a
> proceeding, we will only reopen the record when there
> is a compelling need for additional information. In the
> instant case, the record contains sufficient FS in order
> to render an accurate determination.
>
> Additionally, a decision to not reopen the record is not
> a refusal to reopen the record. The CIT states that:
> "while {Commerce} is not required to reopen the record,
> such a decision is within {Commerce}'s discretion if it
> determines that reopening would provide the most

38

reasonable path forward.  In this redetermination, we considered the utility of reopening the record in order to elicit relevant information, pursuant to the CAFC's guidance that "it can be unreasonable for an agency to refuse to obtain readily available, highly relevant information."  We concluded that the record contains potential sources for CV profit and ISE information reflecting profit from production and sale of comparable merchandise during the POI and that we could calculate CV profit and ISE ratios which reasonably reflect the profit experience of the mandatory respondent. Therefore, we determined that reopening the record was not necessary.

Appx0040-0041 (footnotes omitted) (citing *QVD Food Co., Ltd. v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011) ("{T}he burden of creating an adequate record lies with interested parties and not with Commerce.").

The Trade Court agreed, affirming Commerce's decision. Appx0018-0019. This Court should affirm Commerce's decision not to reopen the record, as it did in its 2019 decision:

> Commerce also offered a simple and reasonable explanation for refusing to accept the fully translated version of the LSI statement when OF eventually offered it. By that time, the expressly stated deadline for submission of this evidence—stated in a case-specific communication from Commerce and in a regulation—had come and gone. OF cannot claim lack of awareness of the deadlines. ***
>
> We see no basis for disturbing Commerce's enforcement of its deadlines. We have said that "[a]

court cannot set aside application of a proper administrative procedure because it believes that properly excluded evidence would yield a more accurate result if the evidence were considered." *PSC VSMPO-Avisma Corp. v. United States*, 688 F.3d 751, 761 (Fed. Cir. 2012). "Absent constitutional constraints or extremely compelling circumstances[,] the administrative agencies should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties." *Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 543, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978) (internal quotation marks and citation omitted). In particular, deadlines are important in proceedings like those at issue here: "[i]n order for Commerce to fulfill its mandate to administer the antidumping duty law, including its obligation to calculate accurate dumping margins, it must be permitted to enforce the time frame provided in its regulations." *Dongtai Peak Honey Industry Co., Ltd. v. United States*, 777 F.3d 1343, 1351 (Fed. Cir. 2015). Because OF had clear notice of the deadlines, it easily could have submitted the fully translated material in time; and Commerce could reasonably determine that the *China Nails* acceptance of the materials was not a good enough reason, in the face of an explicit regulation and established practice, to excuse OF's late submission.

For those reasons, we affirm the Trade Court with respect to OF's challenge to Commerce's rejection of the LSI materials.

*Mid Continent Steel & Wire, Inc.*, 941 F.3d at 541-542.

OF justifies its attempt to relitigate this issue on the fact that

Commerce, on remand, determined that the Hitech statement contained

evidence of a countervailable subsidy, leaving Commerce "only with two inaccurate options – both indisputably subsidy-distorted …" OF Br. at 56. OF's premise – that the financial data of both Sundram and Hitech are distorted – is unsupported and unsupportable. As discussed above, the amount of any subsidy Hitech received is unknown. It could be quite large, or it could be extremely small like that received by Sundram. As for Sundram, the subsidy it received is so small relative to its overall operations as to be meaningless.

Given the availability of usable evidence on the record, and in light of its unchallenged administrative interest in finality, Commerce reasonably and properly declined to reopen the record. This Court should affirm Commerce's decision.

## CONCLUSION

For the foregoing reasons, the Court should affirm the Trade Court's decision affirming Commerce's remand determination.

Respectfully submitted,


*/s/ Adam H. Gordon*
Adam H. Gordon, Esq.
Jennifer M. Smith, Esq.
Lauren Fraid, Esq.
**THE BRISTOL GROUP PLLC**
1707 L Street, NW, Suite 570
Washington, DC 20036
202-991-2700

Dated:  April 27, 2023          *Counsel to Defendant-Appellant Mid*
*Continent Steel & Wire, Inc.*

# <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Federal Circuit Rule 32(b)(1).

This brief contains 7,678 words.

This brief complies with the typeface requirements Rule 32(a)(5) of the Federal Rules of Appellate Procedure, and the typestyle requirements of Rule 32(a)(6) of the Federal Rules of Appellate Procedure.

This response has been prepared in a proportionally spaced type face using Microsoft Word in Century Schoolbook 14-point font.

<div style="text-align: right">

*/s/ Adam H. Gordon*
Adam H. Gordon
**THE BRISTOL GROUP PLLC**
*Counsel to Defendant-Appellant Mid Continent Steel & Wire, Inc.*

</div>

Dated:  April 27, 2023

# CERTIFICATE OF SERVICE

I hereby certify that on this 27th day of April, 2023, a copy of the foregoing opposition was served on the following parties by operation of the Court's electronic-filing system:

Mikki Cottet, Esq.
**U.S. Department of Justice**
Appellate Section
International Trade Litigation
International Trade Field Office,
Room 11066
26 Federal Plaza
New York, NY 10278
Email: Mikki.Cottet@usdoj.gov

Michael P. House, Esq.
**Perkins Coie LLP**
700 Thirteenth Street NW,
Suite 800
Washington, DC 20005
Email:  MHouse@perkinscoie.com

<div style="margin-left:40%">

*/s/ Adam H. Gordon*
Adam H. Gordon
**THE BRISTOL GROUP PLLC**
*Counsel to Defendant-Appellant Mid Continent Steel & Wire, Inc.*

</div>

Dated:  April 27, 2023