23-1039

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

---

MID CONTINENT STEEL & WIRE, INC.,

Plaintiff-Appellee,

v.

UNITED STATES,

Defendant-Appellee,

and

OMAN FASTENERS, LLC,

Defendant-Appellant.

---

On Appeal From The United States Court Of International Trade
Consolidated Court No. 15-00214, Honorable Mark A. Barnett, Chief Judge

---

BRIEF OF DEFENDANT-APPELLEE, UNITED STATES

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. MCCARTHY
Director

OF COUNSEL:

IAN A. McINERNEY
Office of the Chief Counsel
Trade Enforcement & Compliance
Department of Commerce

MIKKI COTTET
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480, Ben Franklin Station
Washington, D.C. 20044

Tel: (202) 307-0962
Fax: (202) 514-7965
Email: Mikki.Cottet@usdoj.gov

April 27, 2023                    Attorneys for Defendant-Appellee

# **TABLE OF CONTENTS**

STATEMENT OF RELATED CASES ....................................................................1

STATEMENT OF THE CASE............................................................................2

I.     Nature Of The Case ...........................................................................3

II.    Factual Background ...........................................................................4

    A.    Initial Administrative Proceedings...........................................4

    B.    Prior Court Proceedings And Remand Redetermination .....................8

    C.    Commerce's Third Remand Redetermination ...................14

    D.    The Trial Court's Judgment In Mid Continent V .....................21

SUMMARY OF THE ARGUMENT ....................................................24

ARGUMENT ....................................................................25

I.     Standard Of Review........................................................25

II.    Commerce's Third Remand Redetermination Is Supported By
Substantial Evidence And In Accordance With Law ...................25

    A.    Legal Framework ...........................................................26

    B.    Commerce's Selection Of Sundram As The Source Of
Financial Statements To Calculate Constructed Value Profit Is
Well-Reasoned And Supported By Substantial Evidence .................30

        1.    Commerce Considered The Strengths And Weaknesses Of
Each Potential Surrogate Data Source Before Choosing
Sundram's Financial Statements................................31

        2.    Commerce's Continued Rejection Of The Financial
Statements Of The Omani Companies Was Reasonable,

Supported By Substantial Evidence, And Consistent With
Mid Continent III ....................................................................38

3.    Commerce's Continued Rejection Of LSI's Financial
Statements Was Reasonable And In Accordance With
Law.........................................................................................40

CONCLUSION ........................................................................................49

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*CP Kelco US, Inc. v. United States*,
   211 F. Supp. 3d 1338 (Ct. Int'l Trade 2017), *affirmed, in part, and*
   *reversed, in part,* 949 F.3d 1348 (Fed. Cir. 2020) ....................................... 42, 43

*CP Kelco US, Inc. v. United States*,
   Slip Op. 15-27, 2015 WL 1544714 (Ct. Int'l Trade Mar. 31, 2015)............. 41, 43

*CS Wind Vietnam Co. v. United States*,
   832 F.3d 1367 (Fed. Cir. 2016) ...........................................................................48

*Diamond Sawblades Mfrs. Coal. v. United States*,
   866 F.3d 1304 (Fed. Cir. 2017) ...........................................................................25

*Dupont Teijin Films USA, LP v. United States*,
   407 F.3d 1211 (Fed. Cir. 2005) ...........................................................................25

*Dupont Teijin Films v. United States*,
   997 F. Supp. 2d 1338 (Ct. Int'l Trade 2014)......................................................36

*Essar Steel Ltd. v. United States*,
   678 F.3d 1268 (Fed. Cir. 2012) .................................................................... 47, 48

*Fillippo Fara S. Martino S.p.A. v. U.S.*,
   216 F.3d 1027 (Fed. Cir. 2000) ...........................................................................48

*Gallant Ocean (Thailand) Co. v. United States*,
   602 F.3d 1319 (Fed. Cir. 2010) ...........................................................................48

*M S International, Inc. v. United States*,
   547 F. Supp. 3d 1254 (Ct. Int'l Trade 2021)......................................................36

*Mid Continent Steel & Wire Inc. v. United States*,
   551 F. Supp. 3d 1360 (Ct. Int'l Trade 2021)........................................... 2, 14, 49

*Mid Continent Steel & Wire Inc. v. United States*,
   No. 18-1250, 2019 WL 4316996, 775 F. App'x  (Fed Cir. Sept. 12, 2019)..........2

*Mid Continent Steel & Wire, Inc. v. United States*,
    203 F. Supp. 3d 1295 (Ct. Int'l Trade 2017) ................................................ passim

*Mid Continent Steel & Wire, Inc. v. United States*,
    273 F. Supp. 3d 1348 (Ct. Int'l Trade 2017) ...................................................1, 10

*Mid Continent Steel & Wire, Inc. v. United States*,
    586 F. Supp. 3d 1349 (Ct. Int'l Trade 2022) ................................................ passim

*Mid Continent Steel & Wire, Inc. v. United States*,
    941 F.3d 530 (Fed. Cir. 2019) ....................................................................... passim

*NEXTEEL Co., Ltd. v. United States*,
    28 F.4th 1226 (Fed. Cir. 2022) .............................................................................29

*Novartis AG v. Torrent Pharm. Ltd.*,
    853 F.3d 1316 (Fed. Cir. 2017) ............................................................................25

*Novosteel SA v. United States*,
    284 F.3d 1261 (Fed. Cir. 2002) ............................................................................25

*NTN Bearing Corp. of Am. v. United States*,
    997 F.2d 1453 (Fed. Cir. 1993) ............................................................................48

*Pro-Team Coil Nail Enter., Inc. v. United States*,
    587 F. Sup. 3d 1364, 1374 (Ct. Int'l Trade 2022) ........................................ 23, 49

*PSC VSMPO-Avisma Corp. v. United States*,
    688 F.3d 751 (Fed. Cir. 2012) ...................................................................... 23, 46

*QVD Food Co. v. United States*,
    658 F.3d 1318 (Fed. Cir. 2011) .................................................................... 24, 46

*Rhone Poulenc, Inc. v. U.S.*,
    899 F.2d 1185 (Fed. Cir. 1990) ............................................................................48

*SKF USA Inc. v. United States*,
    263 F.3d 1369 (Fed. Cir. 2001) ............................................................................27

*Tianjin Mach. Imp. & Exp. Corp.v. United States*,
   806 F. Supp. 1008 (Ct. Int'l Trade 1992) ............................................................46

*Universal Camera Corp. v. NLRB*,
   340 U.S. 474 (1951) ...........................................................................................25

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*,
   435 U.S. 519 (1978) ...........................................................................................23

*Yangshou Bestpak Gifts & Crafts Co., Ltd. v. U.S.*,
   716 F.3d 1370 (Fed. Cir 2013) ...........................................................................48

**Statutes**

19 U.S.C. § 1677 ..................................................................................... passim

**Regulations**

19 C.F.R. § 351.303 ................................................................................ 16, 45

**Administrative Determinations**

*Certain Steel Nails From India, the Republic of Korea, Malaysia, the Sultanate
of Oman, Taiwan, the Republic of Turkey, and the Socialist Republic of Vietnam*,
   79 Fed. Reg. 36,019 (Dep't of Commerce June 25, 2014) ...................................4

*Certain Steel Nails From the Republic of Korea, Malaysia, the Sultanate of
Oman, Taiwan, and the Socialist Republic of Vietnam*,
   80 Fed. Reg. 39,994 (Dep't of Commerce July 13, 2015) ...............................3, 8

*Certain Steel Nails from the Sultanate of Oman*,
   80 Fed. Reg. 28,972 (Dep't of Commerce May 20, 2015) ...................................3

*Mattresses From Cambodia: Final Affirmative Determination of Sales at Less
Than Fair Value and Final Negative Determination of Critical Circumstances*,
   86 Fed. Reg. 15894 (Dep't of Commerce Mar. 25, 2021) .................................17

*Notice of Final Determination of Sales at Less than Fair Value: Pure
Magnesium from Israel*,
   66 Fed. Reg. 49,349 (Dep't of Commerce Sept. 27, 2001) .......................... 11, 29

*Notice of Final Determination of Sales at Not Less Than Fair Value: Certain Color Television Receivers from Malaysia*,
  69 Fed. Reg. 20,592 (Dep't of Commerce Apr. 16, 2004) .................................11

*Steel Wire Garment Hangers from the People's Republic of China*,
  79 Fed. Reg. 65,616 (Dep't of Commerce Nov. 5, 2014) ...................................8

23-1039

IN THE UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

MID CONTINENT STEEL & WIRE, INC.,

Plaintiff-Appellee,

v.

UNITED STATES,

Defendant-Appellee,

and

OMAN FASTENERS, LLC,

Defendant-Appellant.

On Appeal From The United States Court Of International Trade
Consolidated Court No. 15-00214, Honorable Mark A. Barnett, Chief Judge

**BRIEF FOR DEFENDANT-APPELLEE, UNITED STATES**

**STATEMENT OF RELATED CASES**

In accordance with Federal Circuit Rule 47.5, counsel for defendant-appellee
states that there were two appeals before this Court from judgments in this
consolidated civil action, *Mid Continent Steel & Wire, Inc. v. United States*, 203 F.
Supp. 3d 1295, 1310 (Ct. Int'l Trade 2017) (*Mid Continent I*), and *Mid Continent
Steel & Wire, Inc. v. United States*, 273 F. Supp. 3d 1348 (Ct. Int'l Trade 2017)
(*Mid Continent II*).  These appeals were originally consolidated under *Mid*

*Continent Steel & Wire, Inc. v. United States*, Nos. 2018-1250, 2018-1296, and later were deconsolidated. Pursuant to Federal Circuit Rule 36, the Court summarily affirmed No. 18-1250 in *Mid Continent Steel & Wire Inc. v. United States*, No. 18-1250, 2019 WL 4316996, 775 F. App'x 515 (Fed Cir. Sept. 12, 2019). The appeal in No. 2018-1296 was affirmed in part and vacated and remanded in part by *Mid Continent Steel & Wire, Inc. v. United States*, 941 F.3d 530 (Fed. Cir. 2019) (*Mid Continent III*). Counsel for defendant-appellee states that no other appeal in or from *Mid Continent Steel & Wire, Inc. v. United States*, 586 F. Supp. 3d 1349 (Ct. Int'l Trade 2022) (*Mid Continent V*), the proceeding below, was previously before this or any other appellate court.

Counsel for defendant-appellee understands that *Oman Fasteners, LLC v. United States*, Court No. 22-00348, an action pending in the U.S. Court of International Trade, may be directly affected by the Court's decision in this appeal.

## STATEMENT OF THE CASE

In its "Factual Background," *see* Applnt. Br. 4-23, defendant-appellant, Oman Fasteners, LLC, inaccurately summarizes or omits facts upon which the Department of Commerce's determinations and the courts' judgments in *Mid Continent I*, *Mid Continent II*, *Mid Continent III*, *Mid Continent Steel & Wire Inc. v. United States*, 551 F. Supp. 3d 1360 (Ct. Int'l Trade 2021) (*Mid Continent IV*)

2

(Appx0020-0021), and *Mid Continent V* (Appx0001-0019) are based.  Because

Commerce's third remand determination was guided by certain of the facts that are

incorrectly stated or omitted, we provide this statement of the case as permitted by

Federal Circuit Rule 28(b).

## I.    <u>Nature Of The Case</u>

This appeal concerns Commerce's determinations in the less-than-fair-value

investigation of certain steel nails from the Sultanate of Oman.  *Certain Steel Nails*

*from the Sultanate of Oman*, 80 Fed. Reg. 28,972 (Dep't of Commerce May 20,

2015) (final determination of sales at less than fair value) (*Final Determination*),

and the accompanying Issues and Decision Memorandum) (Appx3265-3293,

Appx3296-3298); *Certain Steel Nails From the Republic of Korea, Malaysia, the*

*Sultanate of Oman, Taiwan, and the Socialist Republic of Vietnam*, 80 Fed. Reg.

39,994 (Dep't of Commerce July 13, 2015) (antidumping order) (*Order*).

Oman Fasteners challenges the trial court's judgment in *Mid Continent V*,

sustaining Commerce's reliance on the financial statements of Sundram Fasteners

Limited (Sundram), a third-country company, to determine constructed value

profit.  Oman Fasteners argues that Commerce:  (1) should not have selected

Sundram's financial statements because they contain evidence of subsidies; (2)

failed to conduct a side-by-side comparison of the 11 financial statements on the

record; and (3) should have used the partially translated financial statement of L.S. Industry Co., Ltd (LSI), a Thai producer of steel nails, or, alternatively, should have reopened the record to permit Oman Fasteners to submit LSI's full financial statement, which Oman Fasteners had failed to timely submit to Commerce in 2014.

## II.   **Factual Background**

### A.   **Initial Administrative Proceedings**

Following the filing by plaintiff-appellee Mid Continent Steel & Wire, Inc. (Mid Continent), a domestic steel nails producer, of an antidumping duty petition concerning imports of certain steel nails from Oman, in June 2014, Commerce initiated an investigation to determine if imports of steel nails from Oman were being sold at less than fair value. *Certain Steel Nails From India, the Republic of Korea, Malaysia, the Sultanate of Oman, Taiwan, the Republic of Turkey, and the Socialist Republic of Vietnam*, 79 Fed. Reg. 36,019 (Dep't of Commerce June 25, 2014) (initiation) (Initiation Notice) (Appx0737-0744).  Commerce selected Oman Fasteners, the largest producer/exporter of steel nails in Oman during the period of investigation, as the sole mandatory respondent.  Appx0745-0751.

Commerce determined early in the investigation that Oman Fasteners did not have a sufficiently high volume of home or third-country market sales to use to

calculate normal value and, therefore, solicited data from the parties for use in

calculating constructed value for Oman Fasteners. Appx1284. Commerce directed

the parties to submit any comments or information for use in calculating Oman

Fasteners's constructed value no later than October 31, 2014. *Id.* Mid Continent

and Oman Fasteners submitted information, which included the financial

statements of 11 different companies.

On December 29, 2014, Commerce published its affirmative preliminary

determination. Appx2771-2773. Commerce preliminarily determined that Oman

Fasteners's home and third country markets were not viable for purposes of

calculating normal value pursuant to 19 U.S.C. § 1677b(a)(4), and Commerce

determined normal value based on constructed value. Appx2671-2674. In

determining constructed value profit, a component of constructed value, 11

potential sources are on the record: (1) profit recorded in the financial statements

of six Omani companies; (2) profit recorded in the financial statements of two

Taiwanese companies; (3) profit recorded in the financial statements of two Thai

companies, Hitech Fastener Manufacture (Thailand) Co., Ltd. (Hitech), and LSI;

and (4) profit recorded in the financial statements of an Indian company, Sundram.

Commerce declined to rely upon profit recorded in the financial statements

of the six Omani companies because none of those companies produced steel nails

5

or any type of merchandise comparable enough to steel nails to satisfy the statutory preferences.  Appx3279.  Commerce further declined to use LSI's and the two Taiwanese companies' financial statements that were incomplete because substantial portions of the statements lacked English translations.  Appx3457. And, although Sundram produced comparable merchandise, Commerce declined to use Sundram's financial statements because Sundram also produced products that were not comparable.  Accordingly, Commerce preliminarily relied upon the profit recorded in Hitech's financial statements to calculate Oman Fasteners's constructed value profit pursuant to 19 U.S.C. § 1677b(e)(2)(B)(iii).  Appx2671-2674.

After Commerce issued its preliminary determination, Oman Fasteners asserted that Commerce had failed to address LSI's financial statements. Appx2689-2770.  Oman Fasteners argued that Commerce had accepted the partially translated LSI financial statement in concurrent proceedings involving steel nails from China and was therefore bound to use the LSI statements in this proceeding.  Commerce responded that ***no*** party in this proceeding had advocated for the use of LSI's financial statements for the calculation of constructed value profit and, in any event, those financial statements were unusable because they lacked full English translations.  Appx2774-2777.  Indeed, many sections of LSI's

6

financial statements were untranslated, including the audit report, several financial statements, and nearly every footnote. Appx1896-1925; *see also* Appx3247. Oman Fasteners subsequently attempted to submit a full English translation of LSI's financial statements; however, because this submission constituted new factual information filed several months *after* the October 31, 2014, deadline established for the parties to submit constructed value profit sources, Commerce rejected that submission as untimely. Appx2786-2787.

In its *Final Determination*, Commerce continued to find that Oman Fasteners had sold steel nails at less than fair value during the period of investigation. Appx3270-3272, Appx3232-3260. Commerce also found that Oman Fasteners's home market sales of steel nails were negligible and, therefore, continued to calculate Oman Fasteners's profit using constructed value. Appx4877-4878. Commerce continued to reject the profit data of the Omani companies because they were unrepresentative of products in the same general category as nails. Appx3235-3250. Commerce also concluded that the partially translated LSI financial statements filed by Oman Fasteners were so flawed due to their lack of English translation as to be unusable to determine constructed value profit. *Id.* Accordingly, Commerce continued to base Oman Fasteners's constructed value profit on Hitech's financial statements and assigned to Oman

7

Fasteners and all other Omani companies a final weighted-average dumping margin of 9.10 percent.  Appx3270.

Following the affirmative injury determination by the U.S. International Trade Commission, Commerce published an antidumping duty order covering steel nails from Oman.  *Order*, 80 Fed. Reg. 39,994.

### B.    Prior Court Proceedings And Remand Redetermination

Mid Continent and Oman Fasteners each challenged aspects of Commerce's *Final Determination* in the trial court.[1]  Oman Fasteners argued that Commerce erred in relying on data from Hitech when determining the constructed value profit rate.  In particular, Oman Fasteners argued that Commerce had erred when it (1) refused to use Oman Fasteners's own home-market sales of steel nails to calculate the constructed value profit of the steel nails, (2) relied on third-country profit data of comparable products instead of home market profit data to calculate constructed value profit, (3) rejected the partially translated LSI financial statement and, alternatively, refused to allow Oman Fasteners to supplement the record with the

---

[1]  Because this appeal solely involves issues raised by Oman Fasteners, our statement of the case does not discuss Mid Continent's arguments, and we refer only to that part of Commerce's determinations and the courts' judgments involving issues raised by Oman Fasteners that are relevant to this appeal.

fully translated LSI statement, and (4) refused to calculate a profit cap on the constructed value profit rate.

The trial court sustained, in substantial part, Commerce's determinations. *Mid Continent I*, 203 F. Supp. 3d at 1299-1300, 1307-1316. The trial court sustained Commerce's rejection of the partially translated LSI financial statement and Commerce's refusal to allow Oman Fasteners to supplement the record following the deadline for submitting such information. *Id*. at 1311-1314. The trial court held that Commerce had acted reasonably and in accordance with prior practice when it rejected the partially translated LSI statement, and that substantial evidence supported Commerce's finding that the financial statement lacked vital information, "preclud[ing] the Department from fully evaluating the appropriateness of the financial information set forth in these financial statements." *Id*. at 1313 (citations and internal quotes omitted). The trial court also held that Commerce had acted reasonably and did not abuse its discretion in denying Oman Fasteners's request to supplement the record, finding that "Oman Fasteners could have submitted a fully translated LSI statement but chose not to do so within the deadline. Commerce did not abuse its discretion by enforcing clear deadlines in a manner that . . . violated no established practice." *Id*. at 1314.

9

The trial court, however, held that Commerce had "failed to explain" why it had "departed from its prior practice" of "rely{ing} on home-market data rather than third-country data to calculate {constructed value} profit." *Mid Continent I*, 203 F. Supp. 3d at 1310. Although the trial court acknowledged that Commerce had explained that "the Omani companies did not produce identical or comparable merchandise" to steel nails, it found this explanation "{in}adequate." *Id*. Accordingly, the trial court remanded the final determination for Commerce to, among other things, further explain or reconsider why third-country data of a producer of comparable merchandise better represents Omani sales of steel nails than home-market sales data of unrelated products. *Id.* Notably, the issue of subsidies was not addressed in *Mid Continent I*. Thus, contrary to Oman Fasteners's assertion, Applnt. Br. at 11, the trial court ***did not*** remand the matter for Commerce "to explain or reconsider its use of subsidy-tainted financial information{.}"

In the first remand redetermination, Commerce continued to rely on the third-country profit data (Hitech) instead of home-market profit data and, implementing the trial court's instructions, Commerce provided reasonable explanations for this decision. *Mid Continent II*, 273 F. Supp. 3d 1348. Commerce explained that, ideally, when selecting data to calculate constructed

10

value profit under 19 U.S.C. § 1677b(e)(2)(B)(iii), Commerce would use data that

reflects all the factors of the *Pure Magnesium*/*CTVs from Malaysia* tests:  similar

business and products, sales in the respondent's home market, contemporaneity,

and similar customer base.[2]  *Id*. at 1350-1351.  "However, the record does not

always contain ideal surrogate data.  Such is the case here."  *Id*. at 1351.  The trial

court affirmed Commerce's first remand redetermination.  Oman Fasteners

appealed.

This Court affirmed a substantial part of the trial court's judgment in *Mid*

*Continent II*,  holding that: (1) Commerce's decision not to use the preferred

statutory method of profit and selling, general, and administrative expense

components of constructed value when calculating constructed value profit rate

was supported by substantial evidence and a reasoned explanation, *Mid Continent*

*III*, 941 F.3d at 538-540; (2) Commerce had acted reasonably and in accordance

with prior practice when it refused to use partially translated financial statement of

third-country producer to calculate Oman Fasteners's constructed value profit rate,

---

[2]  *See Pure Magnesium from Israel*, 66 Fed. Reg. 49,349 (Dep't of
Commerce Sept. 27, 2001) (final less than fair value determination), and
accompanying Issues and Decisions Memorandum at Comment 8 and *Certain
Color Television Receivers from Malaysia*, 69 Fed. Reg. 20,592 (Dep't of
Commerce Apr. 16, 2004) (final less than fair value determination) (*CTVs from
Malaysia*)

*id.* at 540-542; (3) Commerce's decision to use third country data from Hitech, a Thai producer of steel screws, rather than data from Omani companies that produced unrelated products when calculating constructed value profit rate, was supported by substantial evidence and reasoned explanation, *id.* at 542-543; and (4) Commerce's decision not to calculate a profit cap when using Hitech's data to determine constructed value profit rate was supported by substantial evidence and reasoned explanation, *id.* at 545.

The Court, however, vacated and remanded a portion of the trial court's judgment "to secure further explanation from Commerce" about "Commerce's refusal to consider the effect of subsidies on whether the information it selected was accurate for the relevant statutory purpose." *Id.* at 534.  Although the Court had found Commerce's subsidies explanation insufficient, it did "not decide {that} Commerce must reject Hitech or lower the profit figure to be borrowed for {Oman Fasteners.}" *Id.* at 544.  The Court further explained:

> As a logical matter, Hitech would be a weaker surrogate for constructed value if government subsidies heavily distort its profits.  It might be so much weaker that Commerce would no longer have a sound reason to choose Hitech over another proposed source of profit information, whether from {Oman Fasteners's} home country or elsewhere.  The size of any subsidies would obviously be relevant, as would the comparative deficiencies of the alternative sources.  Choice of a different source is not the only possible response to a

> determination of the existence, likelihood, or magnitude
> of subsidies that artificially increase a surrogate's profit.
> If the statute permits, Commerce might determine the
> amount of subsidies and adjust its calculation of
> constructed value downward to eliminate the effect of the
> subsidies. Or Commerce might decide that the subsidies
> are so insignificant that no change needs to be made at
> all.

*Id*. at 544. On this issue, the Court emphasized that it was not "prescrib{ing} an

ultimate result. Rather, we require that Commerce reconsider an important aspect

of its determination. Whatever result it reaches upon such reconsideration, it must

articulate an explanation of why its result is a reasonable one, given relevant

statutory duties, including the broad duty to strive for accuracy." *Id*. at 545. Thus,

the Court remanded that part of the case "to give Commerce an opportunity to

conduct this analysis and provide this explanation." *Id*. Following the Court's

directive in *Mid Continent III*, the trial court remanded the action to Commerce for

further consideration and explanation of the Hitech subsidy issue in accordance

with this Court's opinion.

Commerce continued to rely upon Hitech's financial statements in the

second remand redetermination. *See* Appx3452-3467. Commerce had analyzed

Hitech's potential receipt of subsidies from the Thai government during the period

of investigation and acknowledged that Commerce has countervailed this program

13

in other cases, but it concluded that Hitech's financial statement did not contain conclusive evidence of a subsidy.  Appx3457-3460.

The trial court again remanded to Commerce, holding that Commerce had failed to justify its reliance on Hitech's financial statements because the agency "did not explain why this case is distinguishable from a case in which Hitech's financial statements were disregarded due to evidence of a countervailable subsidy" or "why, given its finding that the potential subsidies could not be quantified, Hitech's financial statements were a better choice than Sundram's." *Mid Continent IV*, 551 F. Supp. 3d at 1366.  Therefore, the trial court ordered Commerce to "seriously engage with the possible inclusion of subsidies" in Hitech's statements, and to "address whether a comparative analysis inclusive of the other financial statements on the record is appropriate."  *Id*. at 1368.  The trial court ***did not*** require Commerce to reopen the record, leaving that decision to Commerce's discretion.  *Id*.

## C.    <u>Commerce's Third Remand Redetermination</u>

On this third remand, Commerce again reviewed and indeed, freshly considered, the 11 financial statements on the record.  Appx0028-0034, Appx0037-0040.

14

First, Commerce considered the financial statements of the six Omani companies on the record. Appx0028-0029. Commerce determined that "none of the six Omani companies produced steel nails or any type of merchandise that is comparable enough to steel nails to satisfy the statutory preferences[.]" *Id.*; *see also* Appx0037. Therefore, Commerce declined to rely on those financial statements and chose, instead, to rely on the third country data on the record, which better reflected the profit experience of the mandatory respondent. Appx0029. Commerce's identical determination with respect to the financial statements of these six Omani companies was reviewed by the Court in *Mid Continent III*, and the Court concluded that Commerce's application of the statute was permissible and that the agency's explanation for eliminating the financial statements of the Omani companies was supported by substantial evidence. *See Mid Continent III*, 941 F.3d at 543.

Second, Commerce again declined to use the partially translated financial statements of LSI and two Taiwanese companies on the record. Appx0029. These financial statements are missing an auditor's report and most of the data disclosures under their countries' respective generally accepted accounting principles (GAAP). Appx0038. Without the auditor's report and data disclosures, Commerce determined that "there is no way to ascertain whether the companies

15

have properly captured their revenues and costs (and thereby profits) in accordance with their respective GAAP or whether the {financial statements} can serve as reliable sources for the profit 'normally' experienced by a producer of steel nails." Appx0038-0039.  Therefore, as it had done in the *Final Determination*, Commerce declined to rely upon these partially translated financial statements because they contain "significant defects which prevent Commerce from effectively evaluating their appropriateness as sources for CV profit and {indirect selling expense} information" and which render them inferior to other financial statements on the record.  Appx0038-0039.  Commerce's identical determination with respect to these partially translated financial statements was reviewed by the Court in *Mid Continent III*, and the Court concluded that Commerce's treatment accords with 19 C.F.R. § 351.303(e), the regulation upon which it relied, and its explanation for why the rejected financial statements were especially unreliable is supported by substantial evidence and is reasonable.  *See Mid Continent III*, 941 F.3d at 540-541.

Additionally, Commerce addressed the "comparative" deficiencies in the financial statements of the six Omani companies, the three partially translated financial statements, and Hitech's financial statements against Sundram's financial statements.  Appx0037-0040.  Initially in this regard, Commerce explained:

16

> In our draft remand, we explained that we seek
> information which most closely exhibits a profit
> experience from the production and sale of identical or
> comparable merchandise during the {period of
> investigation.}  Further, data reflecting the production
> and profit from sale of comparable merchandise are
> always preferable to a profit experience wholly dissimilar
> to the mandatory respondent.{}  Therefore, based on the
> analysis in the draft remand and reiterated above, we find
> that nine of the eleven companies on the record do not
> reliably reflect a suitable source for {constructed value}
> information, *i.e.*, profit from the production and sale of
> identical or comparable merchandise.

Appx0039 (citing Appx3553-3554, and *Mattresses From Cambodia*, 86 Fed. Reg.

15,894 (Dep't of Commerce Mar. 25, 2021) (final less than fair value

determination), and accompanying Issues and Decision Memorandum at 22 (when

determining the best source for constructed value information on the record,

Commerce relied upon the financial statement of Emirates Sleep, a third-country

financial statement of comparable merchandise instead of the financial statement

of GTI, a manufacturer in the home market because, among other things, "Emirates

Sleep represents a mattress producer that has business operations, products, and

customer base that are very similar to that of a Cambodian mattress producer.  GTI

on the other hand, as a producer of apparel and garment products, which are not

comparable merchandise, is less representative of a Cambodian mattress

producer's business operations, products, and customer base.") (footnotes omitted).

17

Continuing this analysis, Commerce acknowledged that the two remaining financial statements on the record, Hitech's and Sundram's, reflected receipt of subsidies.  Appx0040.  Commerce determined, however, that these "subsidies do not negate the fact that each company produces comparable merchandise{,}" and, notwithstanding that they may be distorted by subsidies, Hitech's and Sundram's "respective profits are still based on production and sale of comparable merchandise, unlike the other {financial statements} on the record."  *Id*.

Commerce concluded its comparative analysis with the analysis of Hitech's and Sundram's financial statements.  Appx0029-0034, Appx0040.  Commerce reconsidered certain aspects of Hitech's financial statement, particularly the following line-item:  "The company has been support {sic} for production screws (SCREW) Category 4.7 Manufacture of wire products, metal wire, Promotional Number 1447/2538 on July 10, 1995."  Appx0030.  Commerce explained that while Hitech's financial statement does not report an amount associated with the subsidy, the identification of the program in the statement and the fact that Commerce had found that this exact line-item was countervailed in *Steel Wire Garment Hangers from China*, demonstrated receipt of a subsidy.  *Id*. (citing *Steel Wire Garment Hangers from the People's Republic of China*, 79 Fed. Reg. 65,616 (Dep't of Commerce Nov. 5, 2014) (prelim. admin. review), and accompanying

18

Preliminary Decision Memorandum at 26 (Steel Wire Garment Hangers from China). While the record of each proceeding stands on its own, on remand Commerce determined that the facts of this case are indistinguishable from the facts in *Steel Wire Garment Hangers from China* and, therefore, Commerce concluded that Hitech's financial statements contain evidence of subsidies. *Id.*

Commerce acknowledged that Sundram also received subsidies during its fiscal period, which mirrors the period of investigation. Appx0030. Sundram's cash flow statement in its financial statement shows receipt of 30 Lakhs during the 2013-2014 period from the "state government of Uttarakhand as special capital subsidy, for setting up an industrial undertaking in the state." Appx0030-0031; *see also* Appx0042-0043.

With both Hitech's and Sundram's financial statements containing evidence of subsidies, Commerce concluded that these statements were equal with regard to subsidies and, following the framework established in *Pure Magnesium from Israel* and *CTVs from Malaysia*, continued with its comparative analysis to determine the appropriate source for constructed value profit and independent selling expenses. Appx0030-0031. Commerce concluded that it was unable to consider the second criterion, *i.e.*, the extent to which a potential surrogate has sales in the United States and the home market, because there is no record evidence that sufficiently

19

identifies the geographical breakdown of sales for either Hitech or Sundram. Appx0031-0032; Appx0351-0353. Therefore, Commerce examined Hitech's and Sundram's data against the first, third, and fourth criteria, *i.e.*, production of comparable merchandise, its impact on customer base, and the contemporaneity of the data on the record, respectively. Appx0032. Commerce concluded that both Hitech and Sundram produce comparable merchandise and, therefore, have similar types of customers. Appx0032-0033. Continuing with its comparative analysis, Commerce determined that Sundram's financial statement mirrors the period of investigation, while Hitech's financial statement ends four months prior to the period of investigation. Appx0033, Appx0042-0043. Commerce explained that contemporaneous data better reflect both the respondent's cost and sales but also the market condition and operating environment of the respondent. *Id*. Therefore, Commerce reasonably concluded that Sundram's financial statement was the only remaining financial statement on the record reflecting profit from the production and sale of comparable merchandise during the entirety of the period of investigation.

Finally, Commerce explained its selection of Sundram as a surrogate for constructed value.

> Commerce's ultimate selection of a surrogate for {constructed value} information in any given proceeding

20

must be sourced from the record – and, thus,
Commerce's determination of what constitutes the best
information on the record will vary by the choices
available on the record.  None of the sources on the
record of this investigation perfectly satisfy the statutory
preference for both home market and comparability in
merchandise; nevertheless, the record contains two
companies with imperfect data which produce and sell
comparable merchandise.  Sundram's {financial
statements} are the only contemporaneous {financial
statements} on the record reflecting production, sale, and
profit from the sale of comparable merchandise.
Therefore, when weighing the quality of the data against
the criteria established under section 773(e)(2)(B)(iii) of
the Act and in *Pure Magnesium from Israel* and *CTVs
from Malaysia*,{} including accounting for potential
distorting effects of production of dissimilar
merchandise, record evidence indicates that the profit of
Sundram more closely reflects the experience of a nail
producer during the {period of investigation} than
Hitech.

Appx0034.

### D.    **The Trial Court's Judgment In *Mid Continent V***

The trial court reviewed Commerce's third remand redetermination "against

the backdrop of its prior opinions in this case and the opinion of {this Court,}" *Mid

Continent V*, 586 F. Supp. 3d at 1356, and sustained Commerce's use of Sundram's

financial statements to calculate constructed value profit.  *Id*. at 1351-1352.

First, the trial court found that "Commerce's explanation of its rejection of

the LSI, Taiwanese companies', and Omani companies' financial statements was

21

sufficient to justify its choice not to further compare these financial statements to other financial statements on the record but, instead, to use an iterative process to eliminate these statements from consideration." *Id*. at 1357-1358.

Second, the trial court found that Commerce's comparative analysis of Hitech's and Sundram's financial statements satisfied the remand order in *Mid Continent IV*. *Id*. The court noted that: (1) Commerce had examined the record evidence and determined that Hitech's and Sundram's financial statements included evidence of subsidies; (2) Commerce had turned to other considerations, explaining how the four criteria for selecting surrogate financial statements applied to its evaluation of Hitech and Sundram; (3) Commerce had explained how contemporaneity played into its selection of Sundram; and (4) acknowledging that neither Hitech's nor Sundram's financial statements were perfect, Commerce explained why it chose Sundram's statements, and presented the evidence it relied on and the criteria it prioritized. *Id*. at 1358-1359. The court found that "Commerce's choice of Sundram's financial statements is supported by substantial evidence and in accordance with law." *Id*. at 1359.

Finally, the trial court held that Commerce had properly enforced its deadlines when it declined to allow Oman Fasteners to submit a full translation of the LSI financial statements after the deadline for such information. *Id*. at 1360.

The court reasoned that Commerce had found that the record contained sufficient

financial statements for it to render an accurate determination. *Id*. at 1359.

Furthermore, the court explained:

> Reopening the record "is not something the court will
> require simply based on a plaintiff's argument that better
> information is available." *Pro-Team Coil Nail Enter.,*
> *Inc. v. United States*, 587 F. Sup. 3d 1364, 1374 (CIT
> 2022). Instead, "Commerce retains significant discretion
> to determine whether to reopen the record on remand."
> *Id*.
>
> Interested parties bear the burden of developing the
> record, *QVD Food Co. v. United States*, 658 F.3d 1318,
> 1324 (Fed. Cir. 2011), and the court will not "'set aside
> application of a proper administrative procedure because
> it believes that properly excluded evidence would yield a
> more accurate result if the evidence were considered,"
> *Mid Continent {III}*, 941 F. 3d at 541 (quoting *PSC*
> *VSMPO-Avisma Corp. v. United States*, 688 F.3d 751,
> 761 (Fed. Cir. 2012)). The interests of finality also
> suggest that the court should limit interfering with the
> agency's procedures and deadlines. *See, e.g., Vt. Yankee*
> *Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435
> U.S. 519, 554-55, 98 S. Ct. 1197, 55 L. Ed. 2d 460
> (1978); *Pro-Team*, 587 F. Supp. 3d at 1374.

*Id*. Thus, the trial court found no error in Commerce's determination not to reopen

the record. *Id*. at 1359-1360.

    This appeal followed.

## **SUMMARY OF THE ARGUMENT**

The Court should affirm the trial court's judgment sustaining Commerce's third remand redetermination.

Commerce complied with the remand orders in all respects, and its remand redetermination is supported by substantial evidence and otherwise in accordance with law. Commerce walked through the analysis of all the financial statements on the record to ensure compliance with the courts' orders. Commerce's selection of Sundram's financial statements as the source of constructed value profit in the third remand redetermination is supported by substantial record evidence. Commerce provides a comprehensive explanation that reasonably ties its redetermination to the governing statutory standard and to the record evidence. Commerce's redetermination is consistent with prior opinions issued by this Court and the trial court in this case. Finally, Oman Fasteners fails to demonstrate any error by the trial court.

Accordingly, the trial court's judgment sustaining Commerce's third remand determination should be affirmed.

# **ARGUMENT**

## I.    **Standard Of Review**

The Court reviews Commerce's determinations using the same standard of review as applied by the trial court, while carefully considering that court's analysis. *Mid Continent III*, 94 F.3d at 537 (citing *Diamond Sawblades Mfrs. Coal. v. United States*, 866 F.3d 1304, 1310 (Fed. Cir. 2017)); *see also Novosteel SA v. United States*, 284 F.3d 1261, 1269 (Fed. Cir. 2002) (the Court gives "due respect to the informed opinion of the Court of International Trade" (internal quotation marks omitted)). The Court decides legal issues *de novo* and upholds factual determinations if they are supported by substantial evidence. *Id*. (citing 19 U.S.C. § 1516a(b)(1)(B)(i); *Diamond Sawblades*, 866 F.3d at 1310; *Dupont Teijin Films USA, LP v. United States*, 407 F.3d 1211, 1215 (Fed. Cir. 2005)). And "substantial evidence is 'such relevant evidence as a reasonable mind might accept to support a conclusion' considering the record as a whole." *Id*. (citing *Novartis AG v. Torrent Pharm. Ltd.*, 853 F.3d 1316, 1324 (Fed. Cir. 2017); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–88 (1951)).

## II.    **Commerce's Third Remand Redetermination Is Supported By Substantial Evidence And In Accordance With Law**

Oman Fasteners argues that "Commerce's methodology was unreasonable because it relied on admittedly unreliable data, did not evaluate the comparative

deficiencies of the data that it had, and did not reopen the record despite knowing

that reliable, accurate data were readily available." Applnt Br. at 24. Although the

Court remanded for Commerce to consider the issue of subsidies, and the trial

court properly found that Commerce provided a reasonable explanation for its

decision to use Sundram's financial statement that included evidence of

subsidization, the thrust of Oman Fasteners's appeal consists of arguments that

were previously rejected by this Court in *Mid Continent III*. Therefore, as we

demonstrate below, Oman Fasteners's arguments are unavailing.

### A. **Legal Framework**

When determining whether a company is dumping, Commerce normally

compares the export price (*i.e.*, the price in the United States market) of the

merchandise under investigation to the normal value (*i.e.*, price in the home market

or in a third-country market). 19 U.S.C. §§ 1677(35), 1677b(a)(1)(A)-(C). Under

19 U.S.C. § 1677b(a)(1), the normal value of subject merchandise is generally the

home-market price of the merchandise. However, if the aggregate quantity of

home-market sales of the subject merchandise is less than five percent of U.S. sales

of the subject merchandise, Commerce uses a third-country price as the normal

value. 19 U.S.C. § 1677b(a)(1)(B)(ii). If the normal value cannot be determined

through a comparison of the U.S. price and the home market because the

investigated company does not have a viable home market or third-country market, as was the case in this investigation, Commerce may use constructed value to determine normal value. *Id*. § 1677b(a)(4).

Constructed value of imported merchandise is equal to the sum of (1) the cost of materials and fabrication or other processing in producing merchandise and (2) the actual amounts incurred and realized by the specific exporter or producer being examined in the investigation or review for selling, general, and administrative costs and for profits, in connection with the production and sale of a foreign like product, in the ordinary course of trade, for consumption in the foreign country, and (3) an amount for profit. 19 U.S.C. § 1677b(e). "The method used for the constructed value profit calculation depends upon what data is available: Commerce either uses the 'preferred method,' which is based on actual profits and expenses, or, if no 'actual data' are available, one of three alternative methods, among which there is no hierarchy or preference." *Mid Continent V*, 586 F. Supp. 3d at 1352 (quoting *SKF USA Inc. v. United States*, 263 F.3d 1369, 1374 (Fed. Cir. 2001). The preferred method contains a preference for "actual data" reflecting *both* (1) the production and sale in the foreign country and (2) the foreign like product (the merchandise under consideration). However, when "actual data" are

27

not available, as in this case, the statute permits Commerce to calculate constructed

value profit under one of three alternatives:

> (i) the actual amounts incurred and realized by the
> specific exporter or producer being examined in the
> investigation or review {. . .} for profits, in connection
> with the production and sale, for consumption in the
> foreign country, of merchandise that is in the same
> general category of products as the subject merchandise,
>
> (ii) the weighted average of the actual amounts incurred
> and realized by exporters or producers that are subject to
> the investigation or review (other than the exporter or
> producer described in clause (i)) {. . .} for profits, in
> connection with the production and sale of a foreign like
> product, in the ordinary course of trade, for consumption
> in the foreign country, or
>
> (iii) the amounts incurred and realized {. . .} for profits,
> based on any other reasonable method, except that the
> amount allowed for profit may not exceed the amount
> normally realized by exporters or producers (other than
> the exporter or producer described in clause (i)) in
> connection with the sale, for consumption in the foreign
> country, of merchandise that is in the same general
> category of products as the subject merchandise; {(*i.e.*,
> the "profit cap")}.

19 U.S.C. § 1677b(e)(2)(B)(i)-(iii).

As previously noted, the statute does not establish a hierarchy for selecting

among the alternatives for calculating constructed value profit.  *See* Statement of

Administrative Action accompanying the Uruguay Round Agreements Act (SAA),

H.R. Rep. No. 103-316, vol. I, at 840 ("{a}t the outset, it should be emphasized

that, consistent with the Antidumping Agreement, new section 773(e)(2)(B) does not establish a hierarchy or preference among these alternative methods. Further, no one approach is necessarily appropriate for use in all cases."). Accordingly, Commerce has discretion to select any of the alternative methods, depending upon the information available on the record. By its express terms, the data used under the "any reasonable method" of alternative (iii) may, but does not have to, come from a foreign country or be a foreign like product. Therefore, as is relevant here, under the "any reasonable" alternative method, the data used may, but does not have to, come from Oman or be steel nails.

When evaluating financial statements for use in the constructed value profit calculation under 19 U.S.C. § 1677b(e)(2)(B)(iii), Commerce "follow{s} the framework established in *Pure Magnesium from Israel* and *CTVs from Malaysia*." *Mid Continent III*, 941 F.3d at 534-36. *See also NEXTEEL Co., Ltd. v. United States*, 28 F.4th 1226, 1240-41 (Fed. Cir. 2022); Appx0031-0032 (citing *Pure Magnesium from Israel*, 66 Fed. Reg. 49,349 (Dep't of Commerce Sept. 27, 2001) (final less than fair value determination)). Utilizing this framework, Commerce considers (1) the similarity between a potential surrogate's business operations and products and those of the respondent; (2) the extent to which a potential surrogate has sales in the United States and the home market; (3) the contemporaneity of the

29

surrogate data; and (4) the similarity of customer base between a potential

surrogate and the respondent. *Mid Continent III*, 941 F.3d at 534-36.

Commerce utilized the third of the alternative methods available under 19

U.S.C. § 1677b(e)(2)(B), *i.e.*, "any other reasonable method," to determine

constructed value profit. Any other reasonable methods may include the use of

financial statements from a third-country company. *See Mid Continent III*, 941

F.3d at 542-545.

Oman Fasteners does not challenge Commerce's use of the third alternative

method.

### B. Commerce's Selection Of Sundram As The Source Of Financial Statements To Calculate Constructed Value Profit Is Well-Reasoned And Supported By Substantial Evidence

Following the remand instructions in *Mid Continent IV* and the framework

established in *Pure Magnesium from Israel* and *CTVs from Malaysia*, on the third

remand, Commerce chose Sundram's financial statements.

Oman Fasteners challenges Commerce's rejection of certain LSI financial

statements and Commerce's adoption of Sundram over LSI and other sources of

profit information, such as the financial statements of the Omani company Al

Jazeera. Oman Fasteners argues that: (1) Commerce unreasonably relied on

Sundram's financial statements because they include evidence of subsidies and

pertain to "dissimilar products," Applnt. Br. 37-46; (2) Commerce acted

unreasonably by not comparing the accuracy of Sundram's financial statements

with the accuracy of other financial statements on the record, *id*. at 46-51; and (3)

Commerce should have reopened the record to obtain more "accurate" financial

statements, *i.e.*, the fully translated LSI financial statement, *id*. at 56-61. Oman

Fasteners's arguments trying to chip away at Commerce's reasonable conclusion

are unavailing.

### 1. Commerce Considered The Strengths And Weaknesses Of Each Potential Surrogate Data Source Before Choosing Sundram's Financial Statements

When evaluating the 11 financial statements on the record for use in the

constructed value profit calculation under 19 U.S.C. § 1677b(e)(2)(B)(iii), during

the third remand, Commerce utilized the framework established in *Pure*

*Magnesium from Israel* and *CTVs from Malaysia*. Appx0031. Utilizing this

framework, Commerce considered (1) the similarity between a potential

surrogate's business operations and products and those of the respondent; (2) the

extent to which a potential surrogate has sales in the United States and the home

market; (3) the contemporaneity of the surrogate data; and (4) the similarity of

customer base between a potential surrogate and the respondent. Appx0032.

Commerce reconsidered the financial statements of the six Omani companies. Appx0028-0029. Commerce analyzed the deficiencies in these potential sources for constructed value profit and indirect selling expenses information in comparison to the companies on the record that produce merchandise in the same general category as steel nails. Appx0037. Commerce found that the Omani companies' business operations and products were not like those of Oman Fasteners. Not only do these companies not produce steel nails, but they are all involved in the production of dissimilar merchandise outside of the steel nails general category of merchandise. Appx0037. Further, Commerce found that "all six Omani {financial statements} do not share similarities to Oman Fasteners in their respective production experiences or raw material consumptions and are not subject to the same supply and demand conditions in the global marketplace as Oman Fasteners." *Id*. Commerce concluded that "these six {financial statements} are less ideal sources for {constructed value} profit and {indirect selling expenses} information vis-à-vis companies which produce and sell subject merchandise." *Id*. Therefore, consistent with its prior determination that was sustained by this Court in *Mid Continent III*, 941 F.3d at 543, Commerce declined to rely on the Omani financial statements because the record contains

financial statements that more closely reflect the experience of the mandatory respondent.  *Id*.

Commerce also reconsidered the three incomplete and defective financial statements.  Consistent with its prior determination that was sustained by this Court in *Mid Continent III*, 941 F.3d at 540-41, Commerce declined to rely upon the financial statements of two Taiwanese companies and LSI because they were only partially translated and contain "significant defects which prevent Commerce from effectively evaluating their appropriateness as sources for {constructed value} profit and {indirect selling expense} information" which render them inferior to other financial statements on the record.  Appx0029, Appx0038-0039.

Finally, Commerce reconsidered the remaining two companies, Hitech and Sundram, each of which produces merchandise that is comparable to steel nails and reflects Oman Fasteners's production experience better than the six Omani companies that do not produce comparable merchandise.  Appx0029-0034, Appx0039.  On this remand, Commerce scrutinized these financial statements and squarely addressed the subsidy issue.

As discussed in the background section, Commerce determined that both Hitech's and Sundram's financial statements contain evidence of subsidies.  *Id*.

33

Appx0030-0031.  Having found that both Hitech and Sundram received subsidies

during the fiscal period, Commerce explained:

> While it is not our preference to use data which include
> subsidies, we consider Hitech and Sundram equal in that
> they both indicate that they received some form of a
> subsidy.  Commerce's practice is not to dissect the
> {financial statements} of a surrogate company as if the
> surrogate company were the respondent under
> investigation/review in the proceeding, because we do
> not seek information from or verify the information from
> the surrogate company{}  Because the record shows that
> no other companies derived profit from the production
> and sale of comparable merchandise, we must rely on the
> {financial statement} of either Hitech or Sundram, even
> though both companies received some form of a subsidy.
> Therefore, we continued with our comparative analysis to
> assess other criteria to determine the better candidate as a
> source for {constructed value} profit and {indirect selling
> expenses.}

Appx0031 (footnote and citation omitted).

Following the framework established in *Pure Magnesium from Israel* and

*CTVs from Malaysia*, Commerce continued with its comparative analysis to

determine the appropriate source for constructed value profit.  Appx0031-0034.

Because there is no record evidence that sufficiently identifies the geographical

breakdown of sales for either Hitech or Sundram, Commerce concluded that it was

unable to consider the second criterion, *i.e.*, the extent to which a potential

surrogate has sales in the United States and the home market.  Appx0031-0032.

34

Therefore, Commerce examined Hitech's and Sundram's data against the first, third, and fourth criteria, *i.e.*, (1) production of comparable merchandise, (3) its impact on customer base, and (4) the contemporaneity of the data on the record, respectively. Appx0032-0034. Commerce concluded that both Hitech and Sundram produce comparable merchandise: "Hitech produces various screws and rivets (*i.e.*, fasteners) and Sundram produces high tensile fasteners, all of which are comparable to steel nails." Appx0032. Commerce explained:

> producers of comparable merchandise will likely share a number of similarities in their respective production experiences and raw materials consumption, and those raw materials would be subject to the same supply and demand conditions in the global marketplace and be sued in similar plant facilities, machinery, and equipment.{} Because both Hitech and Sundram produce comparable merchandise, their respective production experiences, raw materials consumption, supply and demand conditions, and facilities should resemble those of Oman Fasteners. Further, their respective profit experiences and customer bases should also closely match those of Oman Fasteners.

*Id*. (footnote omitted).

Commerce determined that Sundram's financial statement mirrors the period of investigation, *i.e.*, April 1, 2013, through March 31, 2014, while Hitech's financial statement ends four months prior to the period of investigation, covering calendar year 2012. Appx0033. Commerce's preference is to use

35

contemporaneous data in selecting surrogate data. *See, e.g., Dupont Teijin Films v.*
*United States*, 997 F. Supp. 2d 1338, 1346 (Ct. Int'l Trade 2014) ("Commerce's
use of the financial statement that most overlapped with the POR (*i.e.*, was the
most contemporaneous) is both reasonable and consistent with its current
practice."); *see also M S International, Inc. v. United States*, 547 F. Supp. 3d 1254,
1276 (Ct. Int'l Trade 2021) (Commerce found that certain financial statements
were "unusable or less preferable" when compared to other data, in part due to the
fact that the "company's data was not contemporaneous."). Contemporaneous data
better reflect both the respondent's cost and sales but also the market condition and
operating environment of the respondent.  Appx0033.  Therefore, Commerce
reasonably concluded that Sundram's financial statement was the only remaining
financial statement on the record reflecting profit from the production and sale of
comparable merchandise during the entirety of the period of investigation.

Oman Fasteners argues that Commerce should not have selected Sundram's
financial statements, and that Commerce failed to respond to this Court's remand
order.  *See* Applnt. Br. at 45.  Contrary to Oman Fasteners's contentions, as we
demonstrated above, Commerce considered all eleven record financial statements
and reasonably exercised its discretion to select the best information available on
the record.  Commerce considered the completeness of the record evidence, and it

36

also weighed the quality of the evidence against the section 1677b(e)(2)(B)(iii) criteria, and the criteria established in *Pure Magnesium from Israel* and *CTVs from Malaysia*, including accounting for the potential distortive effects of production of dissimilar merchandise.  Appx0034.

Moreover, neither this Court nor the trial court directed Commerce to reach any particular result on remand.  Notably, this Court expressly stated that it "do{es} not prescribe an ultimate result" and instructed that "{w}hatever result {Commerce} reaches upon such reconsideration, it must articulate an explanation of why its result is a reasonable one, given relevant statutory duties, including the broad duty to strive for accuracy."  *Mid Continent III*, 941 F.3d at 544-545. Commerce has articulated an explanation for its determination that is the result of an analysis of the issues in accordance with the statute and the record evidence and, as discussed above, determined that the record supports the conclusion that Sundram's financial statements more closely reflect the experience of a nail producer during the period of investigation because it produces comparable merchandise, and its data are contemporaneous with the period of investigation. Appx0030-0034, Appx0039-0040.  Therefore, Commerce's determination, which is reasonable and supported by substantial evidence, should be sustained.

2.    **Commerce's Continued Rejection Of The Financial Statements Of The Omani Companies Was Reasonable, Supported By Substantial Evidence, And Consistent With _Mid Continent III_**

Oman Fasteners contends that the six Omani companies were rejected because they made dissimilar products; however, Commerce relied upon Sundram's financial statements even though Sundram was a third-country company that produced dissimilar products.  Applnt. Br. at 38.

Commerce acknowledges that record evidence indicates that, in addition to fasteners that are in the same general category as the subject merchandise, Appx0032, Sundram produces other products, such as various auto components for the automobile sector, that are dissimilar to steel nails and not in the same general category as steel nails.  Appx0033.  And, after weighing the quality of Sundram's data against the statutory criteria and the criteria in _Pure Magnesium from Israel_ and _CTVs from Malaysia_, Commerce acknowledged the potential distorting effects of Sundram's production of dissimilar merchandise.  Appx0034.

In contrast, the record evidence indicated that none of the Omani companies produced steel nails or any other type of merchandise that is comparable enough to steel nails to satisfy the statutory preferences.  Appx0028-0029.  Commerce explained:

38

> None produce identical merchandise (*i.e.*, steel nails) and
> none produce comparable merchandise (*i.e.*, fasteners).
> All six Omani {financial statements} represent
> companies involved in production of dissimilar
> merchandise outside of the steel nails general category of
> merchandise. Therefore, all six Omani {financial
> statements} do not share similarities to Oman Fasteners
> in their respective production experiences or raw material
> consumptions and are not subject to the same supply and
> demand conditions in the global marketplace as Oman
> Fasteners. Accordingly, these six {financial statements}
> are less ideal sources for {constructed value} profit and
> {indirect selling expenses} information vis-à-vis
> companies which produce and sell subject merchandise.

Appx0037. Commerce further explained that its preference is to rely on the

respondent's home country profit information, but when that information is

unavailable, its practice is to select the financial statements of a producer whose

operations most closely reflect those of the respondent's. *Id.*

Importantly, Commerce's identical determination with respect to the

financial statements of these six Omani companies was reviewed by the Court,

which concluded that Commerce's explanation for eliminating the financial

statements of the Omani companies was supported by substantial evidence. *Mid*

*Continent III*, 941 F.3d at 543. Therefore, Commerce's determination in the third

remand to exclude the Omani companies' financial statements as the source to

calculate constructive value profit should again be sustained as being supported by

substantial evidence.

39

### 3. Commerce's Continued Rejection Of LSI's Financial Statements Was Reasonable And In Accordance With Law

As discussed above, in this third remand, Commerce continued to decline to use of the partially translated financial statements of LSI. Appx0029. Consistent with its *Final Determination*, Commerce declined to rely upon these financial statements because they fail to reflect reliably the profit experience of a steel nails producer. Appx0038. Following its analysis from the first remand redetermination in this proceeding, Commerce reiterated that:

> the LSI and two Taiwanese {financial statements} are incomplete, *i.e.*, missing an auditor's report and the majority of their data disclosures under their countries' respective generally accepted accounting principles (GAAP).{} Without the auditor's report and data disclosures, there is no way to ascertain whether the companies have properly captured their revenues and costs (and thereby their profits) in accordance with their respective GAAP or whether the {financial statements} can serve as reliable sources for the profit "normally" experienced by a producer of steel nails.

Appx0038-0039 (footnote omitted). Commerce found that LSI's financial statements contain "significant defects which prevent Commerce from effectively evaluating their appropriateness as sources for {constructed value} profit and {indirect selling expense} information." Appx0039. Therefore, Commerce found that LSI's partially translated financial statements "are less preferable than"

40

Sundram's financial statements because the latter "include all of the information

necessary to calculate accurate and reliable financial ratios." *Id.*

Rather than relying on Sundram's financial statements, Oman Fasteners

contends that Commerce had alternative surrogate sources of constructed value

profit data available to it: (1) either select among the surrogate financial statements

already in the record, Applnt. Br. at 2-3, 46-56, or (2) reopen the record to permit

the parties to submit more probative financial statements. *Id.* at 56-61. These

proposed alternatives involve using LSI's partially translated financial statements

or, alternatively, reopening the record to permit the submission of new sources

(*i.e.*, LSI's fully translated financial statement) for calculating constructed value

profit. The Court should flatly reject Oman Fasteners's thinly veiled attempts to

resurrect these failed arguments pursuant to *Mid Continent III*.

In support of its argument that Commerce should have used LSI's partially

translated financial statements as the source for constructed value profit, Oman

Fasteners again erroneously relies on the *CP Kelco* line of cases, arguing that

Commerce and the trial court misapplied precedent by concluding that Commerce

was not required to compare "particular deficiencies" of the various financial

statements on the record. Applnt. Br. at 51. Oman Fasteners's effort to analogize

the facts of this case to the facts in *CP Kelco US, Inc. v. United States*, Slip Op. 15-

41

27, 2015 WL 1544714 (Ct. Int'l Trade Mar. 31, 2015) (*CP Kelco I*), *CP Kelco US, Inc. v. United States*, 211 F. Supp. 3d 1338 (Ct. Int'l Trade 2017) (*CP Kelco II*), affirmed, in part, and reversed, in part, 949 F.3d 1348 (Fed. Cir. 2020) (*CP Kelco III*), is fruitless.  The *CP Kelco* line of cases is not applicable here; indeed, the trial court found Oman Fasteners's arguments unpersuasive as those cases are distinguishable from the facts of this case.  *See Mid Continent V*, 586 F. Supp. 3d at 1356-1357.

Nevertheless, citing the courts' decisions in *CP Kelco II* and *CP Kelco III*, Oman Fasteners argues that, to comply with the courts' remand instructions, Commerce must evaluate the "comparative deficiencies" of each of the potential constructed value profit sources in the record, particularly the LSI partially translated financial statements and the Hitech financial statements that suggest a potential countervailable subsidy.  Applnt. Br. at 51-56.

Although *CP Kelco* involved the application of Commerce's factors of production methodology to determine normal value in nonmarket economy countries under 19 U.S.C.§ 1677b(c), in both this case and in *CP Kelco*, Commerce was presented with financial statements to calculate surrogate values that included partially translated financial statements and financial statements suggesting countervailable subsidies.  In pressing its argument that Commerce

42

should have engaged in a comparative analysis of LSI's financial statements against the Sundram statements, Oman Fasteners cherry-picks certain language from and excludes other critical portions of the *CP Kelco* holding, and it ignores the courts' holdings on this issue in this case.

In *CP Kelco II*, the Court held that "***Commerce can disregard incomplete statements without first comparing and contrasting the strengths and weaknesses of all available data, if the missing information is reasonably deemed vital***.{}" 211 F. Supp. 3d at 1343-1344 (footnote omitted; emphasis added) (citing *Mid Continent I*, 203 F. Supp. 3d at 1312-1313).  In *Mid Continent I*, the trial court explained why this case is distinguishable from *CP Kelco*, and why it was unnecessary for Commerce to compare LSI's and Hitech's financial statements.

> The court recognized that Commerce has "a past practice of rejecting those statements that are missing [vital] information." *CP Kelco*, 2015 WL 1544714, at *8 n.7 (citation omitted). For example, "Commerce has often deemed financial statements to be unusable when they are missing all or many accounting notes." *Id.* (listing proceedings where this occurred) . . . . In *CP Kelco*, however, substantial evidence did not support a finding that the statements at issue were in fact missing vital information. *See CP Kelco*, 2015 WL 1544714, at *6. The court found that the extent of the untranslated portions of the statements at issue was "two paragraphs at the bottom of accounting note twelve, concerning depreciation of assets" and that "[a]ccounting note twelve nonetheless contained a fully translated depreciation schedule." *Id.* On these facts, the court held that

> Commerce was required to compare and contrast the merits and deficiencies of each of the available statements on the record.
>
> In stark contrast here, Commerce found that "for LSI, the audit report was left untranslated, as well as several financial statements and all footnotes with the exception of a note related to income taxes." I&D Mem. 16. This is substantial evidence in support of Commerce's finding that the LSI statement lacked vital information, "preclud[ing] the Department from fully evaluating the appropriateness of the financial information set forth in these financial statements." *Id.* For that reason, Commerce had no obligation to compare the LSI statement to the Hitech statements, as Oman Fasteners argues. Commerce therefore acted reasonably and in accordance with prior practice when it discarded the LSI statement.

*Mid Continent I*, 203 F. Supp. 3d at 1312-1313.

Furthermore, in *CP Kelco III*, this Court upheld Commerce's determination to reject incomplete financial statements after the agency had made a fact-sensitive finding that the incomplete financial statements were missing vital information. 949 F.3d 1359.  The Court also upheld Commerce's decision not to conduct a side-by-side comparison of each of the financial statements when Commerce had sufficiently explained that the missing information in the rejected financial statements was vital. *Id.*  Here, Commerce found that LSI's partially translated financial statements were incomplete because they were missing vital information. Appx0029.

44

Moreover, the Court's affirmance of Commerce's rejection of LSI's partially translated financial statements was unequivocal. *Mid Continent III*, 941 F.3d at 542. The Court highlighted that Oman Fasteners's initial submission of the partially translated LSI financial statements was done contrary to Commerce's regulation at 19 C.F.R. § 351.303(e). *Id.* at 540. Section 351.303(e) explicitly requires that a party obtain Commerce's prior approval for submission of partially translated documents, which Oman Fasteners did not do, and the Court found "no ground for disturbing Commerce's enforcement of the regulations in this case." *Id. See also Mid Continent I*, 203 F. Supp. 3d at 1314 ("Commerce's regulations provided ample notice to Oman Fasteners that submitting partial translations may result in the rejection of the statements…. Oman Fasteners never sought permission before submitting partial translations.")  Also, finding no abuse of discretion in Commerce's refusal to accept the partial translation, the Court held that "Commerce's explanation fulfills its obligation to examine the governing legal standard and the facts and to articulate a satisfactory explanation for its decision." *Id.* at 541. Finally, the Court stated, "{w}ith the LSI financial information properly excluded from the proceeding, Commerce had to choose what source of information about profits to use in calculating constructed value of Oman Fasteners's nails." *Id.* at 542. This is precisely the choice that Commerce had to

45

make on this third remand, and Commerce made a reasonable determination based upon the record before it. Therefore, Oman Fasteners's suggestion that Commerce and the trial court misapplied precedent because the Court's remand mandates a comparison of the LSI and Sundram financial statements is misleading, at best.

Oman Fasteners's alternative contention that Commerce should have reopened the record to consider what it considers to be more accurate sources for calculating constructed value profit should be rejected too. *See* Applnt. Br. at 56-61. Interested parties bear the burden of developing the administrative record. *QVD Food*, 658 F.3d at 1325; *NTN Bearing Corp. of Am. v. United States*, 997 F.2d 1453, 1458-59 (Fed. Cir. 1993); *Tianjin Mach. Imp. & Exp. Corp. v. United States*, 806 F. Supp. 1008, 1015 (Ct. Int'l Trade 1992). Oman Fasteners failed to develop the record with timely submitted, fully translated LSI statements, and Commerce properly rejected its untimely submission of this data. Oman Fasteners had access to a full translation of the LSI financial statements well before the deadline to submit new constructed value profit information. *See* Appx3248. Therefore, Oman Fasteners had the burden to develop the administrative record and had the opportunity to submit a fully translated statement at any time while the record was open. It did not. Instead, Oman Fasteners chose to submit an incomplete translation, without abiding by 19 C.F.R. § 351.303(e) and without

obtaining Commerce's permission prior to doing so. Oman Fasteners's attempt to shift the burden of developing the record to Commerce should be flatly rejected. Commerce should not be required to rectify Oman Fasteners's error and, as the trial court properly found, its determination not to reopen the record is not an abuse of discretion. *See Mid Continent V*, 586 F. Supp. 3d at 1359-60.

Commerce determined that the record contains "potential sources for {constructed value profit and indirect selling expenses} information reflecting profit from production and sale of comparable merchandise during the POI and that {Commerce} could calculate {constructed value} profit and {indirect selling expenses} ratios which reasonably reflect {Oman Fasteners'} profit experience{.}" Appx0041. Given the underlying basis for Commerce rejecting the partially translated LSI statements, and the Court's affirmance of that determination, Commerce's determination not to reopen the record and accept new factual information was reasonable. Thus, there is no basis for reopening the record now to effectively permit Oman Fasteners another proverbial bite at the apple, particularly when, in the absence of either a court order or extraordinary circumstances, neither of which exist here, Commerce is not obligated to reopen the record on remand. *See Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1278 (Fed. Cir. 2012). As the Court explained in *Essar*, the "constant reopening and

supplementation of the record would lead to inefficiency and delay in finality."

*See id.* at 1277.

Simply put, as the Court has stated, there is no basis for disturbing

Commerce's enforcement of its deadlines. *Mid Continent III*, 941 F.3d at 541.

Notably, the Court explained, "[a] ***court cannot set aside a proper administrative***

***procedure because it believes that properly excluded evidence would yield a more***

***accurate result if the evidence were considered***. *PSC VSMPO-Avisma Corp. v.*

*United States*, 688 F.3d 751, 761 (Fed. Cir. 2012)." *Id.* (internal quotation marks

omitted; emphasis added).[3]

---

[3] Oman Fasteners refers to several cases to support its argument that
Commerce has a duty to calculate an "accurate" dumping margin. Applnt. Br. at
29-37 (citing *Yangshou Bestpak Gifts & Crafts Co., Ltd. v. U.S.*, 716 F.3d 1370
(Fed. Cir. 2013); *CS Wind Vietnam Co. v. United States*, 832 F.3d 1367 (Fed. Cir.
2016); *Gallant Ocean (Thailand) Co. v. United States*, 602 F.3d 1319, 1323-24
(Fed. Cir. 2010); *F.lli De Cecco di Fillippo Fara S. Martino S.p.A. v. U.S.*, 216
F.3d 1027 (Fed. Cir. 2000); *Rhone Poulenc, Inc. v. U.S.*, 899 F.2d 1185 (Fed. Cir.
1990). We do not disagree that Commerce is under an obligation to calculate an
accurate dumping margin, and it did so here. Moreover, these cases are inapposite
because the context of this proceeding is wholly different from them. In *Bestpak*,
Commerce was averaging a *de minimis* rate and a rate based on facts available with
an adverse inference. *CS Wind* involved a discrepancy between a respondent's
reported packing information and its own customer's inaccurate account of the
same data. *Gallant Ocean*, *De Cecco*, and *Rhone* all involved Commerce's
application of facts available with an adverse inference. Commerce did not apply
facts available in this proceeding and Oman Fasteners's attempt to paint
Commerce's margin calculation as inaccurate because it did not rely upon
information not on the record must fail.

Finally, any suggestion that Commerce's decision not to reopen the record and solicit new financial statements was inconsistent with the remand orders is simply wrong. Neither this Court nor the trial court ordered Commerce to reopen the record on remand. *See generally Mid Continent III*, 941 F.3d at 541-42; *Mid Continent IV*, 551 F. Supp. 3d at 1368 (where the trial court stated, "the agency is not required to reopen the record," but that "such a decision is within the agency's discretion if it determines that reopening would provide the most reasonable path forward."). Indeed, "reopening the record "is not something the court will require simply based on a plaintiff's argument that better information is available." *Mid Continent V*, 586 F. Supp. 3d at 1359 (quoting *Pro-Team Coil Nail Enter., Inc. v. United States*, 587 F. Supp. 3d 1364, 1374 (Ct. Int'l Trade 2022) (cleaned up). Instead, "Commerce retains significant discretion to determine whether to reopen the record on remand." *Id*.

## CONCLUSION

For these reasons, we respectfully request that this Court affirm the judgment of the Court of International Trade.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

/s/ Patricia M. McCarthy
PATRICIA M. MCCARTHY
Director

OF COUNSEL:                                        /s/ Mikki Cottet
IAN A. McINERNEY                          MIKKI COTTET
Attorney                                               Senior Trial Counsel
U.S. Department of Commerce        U.S. Department of Justice
Office of the Chief Counsel for        Civil Division
  Trade Enforcement & Compliance   Commercial Litigation Branch
                                                            P.O. Box 480
                                                            Ben Franklin Station
                                                            Washington D.C. 20044
                                                            Tel: (202) 307-0962
                                                            Fax: (202) 514-7965
                                                            Email: Mikki.Cottet@usdoj.gov

April 27, 2023                                      Attorneys for Defendant-Appellee

50

## **CERTIFICATE OF SERVICE**

I hereby certify under penalty of perjury that on this 27th day of April, 2023, a copy of the foregoing was filed electronically.

X  This filing was served electronically on all parties by operation of the Court's electronic filing system.

/s/ Mikki Cottet

## <u>CERTIFICATE OF COMPLIANCE</u>

1.      I hereby certify that the foregoing brief complies with the Rules of this Court in that it contains 10,432 words including text, footnotes, and headings. This is within the limit of 14,000 words permitted under Federal Circuit Rule 28.1, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b).

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).  The brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

<u>/s/ Mikki Cottet</u>