2023–1039

---

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

---

MID CONTINENT STEEL & WIRE, INC.,

*Plaintiff-Appellee*

v.

UNITED STATES,

*Defendant-Appellee*

v.

OMAN FASTENERS, LLC,

*Defendant-Appellant*

---

Appeal from the United States Court of International Trade
in Nos. 15-00214 and 15-00228, Chief Judge Mark A. Barnett

---

## APPELLANT'S REPLY BRIEF

---

Michael P. House
Michael R. Huston
Nathan K. Kelley
Andrew Caridas
Jonathan I. Tietz
PERKINS COIE LLP
700 Thirteenth Street N.W., Suite 800
Washington, D.C. 20005
(202) 654–6288
MHouse@perkinscoie.com

Dan L. Bagatell
PERKINS COIE LLP
3 Weatherby Road
Hanover, New Hampshire 03755
(602) 351–8250

Andrew T. Dufresne
PERKINS COIE LLP
33 East Main Street, Suite 201
Madison, Wisconsin 53073
(608) 663–7492

Attorneys for Appellant

June 16, 2023

# TABLE OF CONTENTS

Table of Authorities ........................................................................... iii

Table of Abbreviations and Conventions ....................................... iv

Introduction ........................................................................................1

Argument ........................................................................................... 2

    A.   Commerce acted unreasonably by relying on subsidy-distorted information for dissimilar products on this record ....................................................................................... 2

    B.   Commerce acted unreasonably by failing to evaluate comparative deficiencies of all the potential surrogates ........ 10

    C.   Commerce acted unreasonably by ignoring subsidies instead of reopening the record..................................................16

Conclusion ...................................................................................... 23

Certificate of Compliance

Certificate of Authority

## Table of Authorities

**Cases**                                                                 **Pages**

BMW of N. Am. LLC v. United States,
   926 F.3d 1291 (Fed. Cir. 2019) ..................................................... 20

Calcutt v. FDIC,
   143 S. Ct. 1317 (2023) ......................................... 6, 8, 13

CP Kelco US, Inc. v. United States,
   949 F.3d 1348 (Fed. Cir. 2020) ............................................ 12, 13

Essar Steel Ltd. v. United States,
   678 F.3d 1268 (Fed. Cir. 2012) .............................................. 21, 22

Mid Continent Steel & Wire, Inc. v. United States,
   941 F.3d 530 (Fed. Cir. 2019).... 3, 4, 10, 11, 12, 15, 16, 17, 19, 20, 21, 22, 23

NTN Bearing Corp. of America v. United States,
   997 F.2d 1453 (Fed. Cir. 1993) ....................................... 18

PSC VSMPO-Avisma Corp. v. United States,
   688 F.3d 751 (Fed. Cir. 2012) ........................................ 21

QVD Food Co. v. United States,
   658 F.3d 1318 (Fed. Cir. 2011) ....................................... 18

SEC v. Chenery,
   332 U.S. 194 (1947) ......................................... 6, 8, 13

Vicor Corp. v. SynQor, Inc.,
   869 F.3d 1309 (Fed. Cir. 2017) ....................................... 5

**Statutes and Regulations**                                              **Pages**

19 U.S.C. § 1677e(a) ........................................... 20

19 U.S.C. § 1677e(b)(1) ....................................... 20

## Table of Abbreviations and Conventions

| | |
|---|---|
| Appx____ | appendix page ____ |
| BlueBr___ | appellant's opening brief page ___ |
| Commerce | U.S. Department of Commerce |
| GBr___ | appellee United States' response brief page ___ |
| MCBr___ | appellee Mid Continent's response brief page ___ |
| Mid Continent | plaintiff-appellee Mid Continent Steel & Wire, Inc. |
| Oman Fasteners | defendant-appellant Oman Fasteners, LLC |
| Trade Court | United States Court of International Trade |
| § | unless otherwise specified, all uses of "§" refer to sections of U.S.C. Title 19 |

# Introduction

On remand, Commerce was supposed to make subsidies its priority. It made them an afterthought.

This Court directed Commerce to determine the effect of subsidies on the accuracy of its constructed-value calculation. In turn, that meant weighing the subsidy-based distortion of certain potential surrogate data sources against comparative deficiencies of other sources, and it meant that Commerce might need to reopen the record. Commerce did neither. It left subsidies for last, did not account for them, and did not make those comparisons.

The government and Mid Continent mostly insist that this Court already rejected Oman Fasteners' current arguments and that Commerce simply did what this Court blessed. But those arguments cannot be squared with Commerce's statutory duty of accuracy—or with this Court's prior opinion. The remand was for a specific purpose: to calculate an accurate dumping margin that accounted for the distortions inevitably created by subsidies. If the government's and Mid Continent's positions were correct, there was no point to a remand at all.

Mid Continent also flouts core principles of administrative law by promoting alternative facts on appeal that the agency never found and never

relied on. Not only does that run afoul of *Chenery*; it underscores why Commerce's approach fell short. This Court should vacate and remand.

**ARGUMENT**

### A.      Commerce acted unreasonably by relying on subsidy-distorted information for dissimilar products on this record

Commerce relied on subsidy-distorted financial information despite not quantifying the effect of those subsidies and even though better information was available. BlueBr37-46. That was unreasonable, and the government and Mid Continent do not show otherwise.

The government insists that Commerce "scrutinized" Hitech's and Sundram's financial statements and "squarely addressed" the subsidy issue. GBr33. Hardly. All Commerce did was finally (though begrudgingly) accept that these two potential surrogates *were* subsidized and call them "equal" without any analysis. Appx31. That is the same as not considering subsidies at all.

1.      Commerce did not evaluate the nature or extent of the distortive subsidies. That rendered unreasonable Commerce's continued refusal to consider the other potential surrogates.

The government argues that Commerce declined to rely on the Omani financial statements because the record contained statements that "more closely reflect[ed] the experience of the mandatory respondent." GBr32-33. But without comparatively analyzing the subsidies, Commerce could not have known that.

The government also argues that Commerce declined to rely on LSI data because the accuracy of its partially translated statement could not be determined. GBr33. But Commerce never evaluated whether, *comparatively*, any uncertainty about LSI's accuracy exceeded any uncertainty about Sundram's or Hitech's. Moreover, the record shows that Commerce *knew* that LSI's statement was accurate. BlueBr26-27, BlueBr44-45, BlueBr50-51, BlueBr55.

The government and Mid Continent also argue that Commerce's iterative knock-out approach was true to the framework in *Pure Magnesium from Israel* and *CTVs from Malaysia*. GBr19-21, GBr29-31, GBr34-38; MCBr23. There are several problems with that argument. First, just because something was the agency's prior practice does not make it consistent with the law, and *Pure Magnesium* and *CTVs* are not themselves law. *See Mid Continent Steel & Wire, Inc. v. United States*, 941 F.3d 530, 544 (Fed. Cir. 2019) ("*Mid Continent*

– 3 –

*III*") (rejecting justification that challenged approach was the "Department's practice"). Second, Commerce's application of that general approach here contravened this Court's specific holding that Commerce must account for subsidies, considering the comparative deficiencies of *all* potential sources. *Id.* at 544–45. The *Pure Magnesium/CTVs* framework considers only four things: (1) similarity of operations and products; (2) extent of sales in the United States and home market; (3) contemporaneity of data; and (4) similarity of customer base. GBr31; Appx31-32. It does not consider subsidies.

For Commerce to perform the comparison to know *whether* it could rely on subsidy-tainted information, it needed more information than this record provided. That alone should have led to considering other surrogates (whose deficiencies could be determined with certainty) or reopening the record.

2.   Other reasons also supported rejecting Sundram's data. Sundram's products are dissimilar. Sundram does not make steel nails. Most of its products are car parts like pump assemblies, engine components, and gears and couplings, or specialized, high-tensile non-construction fasteners (e.g., flange screws, track-shoe bolts and nuts, ball pins, *see* Appx1192), all designed for the automotive and industrial sectors. BlueBr38-39 (citing, e.g.,

Appx371; Appx462; Appx1187; Appx1192).[1]  Commerce never explained why those complex, dissimilar products made in India provided a better surrogate than, say, steel rods made in Oman, the home market. BlueBr38-39.

Worse, Commerce never justified reversing its position, from an earlier remand involving the identical factual record, that Sundram's products were "not comparable," had "little overlap in customer base," and "would not involve the same input or production process as either nails or screws." Appx3405-3406. That unexplained about-face within a single proceeding requires remand. *E.g.*, *Vicor Corp. v. SynQor, Inc.*, 869 F.3d 1309, 1323 (Fed. Cir. 2017) (holding "direct conflict" between agency findings to be fatally "unsupported by any rational explanation" in agency's decisions). Neither the government nor Mid Continent addresses the inconsistency.

---

[1] Sundram's "product range includes high tensile fasteners, cold extruded parts, powder metal parts, iron powder, radiator caps, gear shifters, hot forged parts, precision forged differential gears, water pumps, oil pumps, fuel pumps, belt tensioners, rocker arm assemblies, cam followers, bearing housings, hubs and shafts, tappets & other engine components and valve train parts." Appx1189; *see also* Appx1187 (similar). The products are manufactured using "cutting-edge technological competencies in forging, metal forming, close-tolerance machining, heat treatment, surface finishing and assembly." Appx1187.

Mid Continent insists that Sundram's automotive fasteners *are* in fact similar to Oman Fasteners' steel nails. MCBr27-28. It points to "ASTM-F1667," an "industry standard for driven fasteners," which lists lots of different nails. MCBr28. Thus, Mid Continent says, nails can be specialized, like Sundram's fasteners. But the relevant question is whether *Oman Fasteners'* simple nails for pallets and construction *are like Sundram's* complex car parts and high-tensile fasteners—not whether specialized steel nails exist.[2]

More fundamentally, Mid Continent has a *Chenery* problem. Commerce did not rely on ASTM F1667, much less the specific examples that Mid Continent cites. Those arguments therefore cannot support affirmance. *See Calcutt v. FDIC*, 143 S. Ct. 1317, 1318 (2023) (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)).

---

[2] The merits of Mid Continent's comparison are dubious anyway. It calls "pallet" "wallboard," and "drywall nails" all "highly specialized" fasteners, MCBr28 (citing Appx5117, Appx5121-5122), and implies that they are intricate and complex instead of simple commodity products. But a picture debunks that assertion:



Appx5122.

In any event, Mid Continent's citation-laden voyage into technical waters underscores a key problem: as Oman Fasteners pointed out, Commerce never explained *why* Sundram's goods were similar enough to Oman Fasteners' nails to outweigh the subsidy problem and the home-country preference. BlueBr38-39. The government says that Commerce "acknowledged," GBr38, and "account[ed] for" the "potential distortive effects" of dissimilar merchandise, GBr37 (citing Appx34). But the record does not support that Commerce "accounted for" those effects. Any reference to "accounting for" those effects was made in passing without explanation. Appx34. Commerce's non-explanation is made worse by its prior conclusion, on the same record, that Sundram's goods were *not* similar. As a matter of basic administrative law, that non-explanation was not enough.

3.    Finally, Mid Continent insists that the size of Sundram's subsidy makes it irrelevant. MCBr4, MCBr27, MCBr29. Mid Continent's superficial

analogy to drops of ink in Lake Michigan fails,[3] and so does its legal argument.

Although Mid Continent calls the issue of Sundram's subsidy a "canard," MCBr37, it cannot duck *Chenery*. The agency did not rely on subsidy size, and its decision cannot be affirmed on that basis. *Calcutt*, 143 S. Ct. at 1318 (citing *Chenery*, 332 U.S. at 196). Regardless, Mid Continent is wrong that a subsidy's size is everything. Commerce *agreed* that the information was subsidy-distorted. And it could hardly have ruled otherwise, as it had previously found Sundram's subsidy to be countervailable and material—i.e., distortive enough to warrant offsetting duties. Appx31; BlueBr37-38, BlueBr40. Finally, even if Mid Continent's arguments about subsidy size were proper, they do not make mathematical sense. Mid Continent contends that a 0.0145% subsidy could not change anything. But antidumping duty rates are calculated to a hundredth of a percent, and so a 0.0145% difference

---

[3] Lake Michigan holds about 1.3 million billion gallons (4918 cubic km) of water. *See* https://www.glerl.noaa.gov/education/ourlakes/lakes.html. 0.0145% of that would be 190 *billion* gallons, not a mere drop of ink. On a smaller scale, a drop of ink (~50 μL) is 0.0145% of the volume of a glass of beer. Anyone who has seen the tradition of green-dyed pints on St. Patrick's Day will appreciate that one drop can have a significant distortionary effect.

*would* affect the amount of money owed. Moreover, Sundram made a wide array of dissimilar goods, and that subsidy could have been focused on the fasteners segment of its business. Without a remand and full analysis, the precise magnitude of distortion from Sundram's subsidy remains unknown.

Mid Continent also argues that Commerce's inability to quantify Hitech's subsidy is irrelevant because Hitech's information was not contemporaneous and therefore unusable anyway. MCBr29. But Commerce concluded that Sundram and Hitech were "equal" in terms of subsidies, Appx31, not that Hitech's subsidy was irrelevant. Commerce also did not weigh contemporaneity against subsidization. Mid Continent improperly urges this Court to affirm based on a different analytical path than Commerce took, and thus again asks this Court to defy *Chenery*. Moreover, setting aside that *Mid Continent itself* submitted Hitech's information— making it questionable for Mid Continent to disavow its relevance now—accuracy was the whole point of the remand. It would be illogical for Commerce to categorically dismiss *all* non-contemporaneous data as less accurate, no matter the extent and nature of the subsidy—and a failure to evaluate the comparative deficiencies of all potential surrogate sources in the record.

**B.    Commerce acted unreasonably by failing to evaluate comparative deficiencies of all the potential surrogates**

Ultimately, Commerce needed to consider other alternatives beyond Hitech and Sundram in selecting the best surrogate. But Commerce did not weigh the "comparative deficiencies of the alternative sources" against the subsidized Hitech and Sundram data. *Mid Continent III*, 941 F.3d at 544; BlueBr46; *contra* GBr16-17. Instead, it categorically rejected all other options until it was left with the subsidized ones. That left nothing to compare those subsidies to. In doing so, Commerce abused its discretion and knowingly performed an inaccurate analysis.

1.    Mid Continent is wrong that this Court categorically approved Commerce's iterative approach. MCBr30-32; *see* GBr32-33, GBr39 (similar).

For starters, the question in *Mid Continent III* was not whether an iterative framework was reasonable—much less *always* reasonable, regardless of circumstances. The Court instead asked whether, setting aside the issue of subsidies, Commerce erred in selecting Hitech over other sources. 941 F.3d at 542–43. The Court answered no—at least, "putting aside the subsidies issue" and given "Commerce's explanation" on the facts there. *Id.* at 543. That is a

far cry from categorically endorsing *Pure Magnesium* and *CTV Receivers*—neither cited in *Mid Continent III*.[4]

The government also suggests that this Court affirmed Commerce's decision to eliminate the Omani financial statements, but that was not an "identical determination" to the one here. *Contra* GBr39. *Mid Continent III* dealt with the question of surrogate selection *aside from* subsidies. 941 F.3d at 542 ("Putting aside for now the issue of subsidies…."); *id.* at 543 ("Again putting aside the subsidies issue…."). And this Court ultimately instructed Commerce to look at "comparative deficiencies" of all the available sources, "whether from [Oman Fasteners'] home country or elsewhere." *Id.* at 544. Once Commerce was left with two subsidy-tainted sources, it should have done a proper comparison to account for the concerns that this Court articulated.

---

[4] The government (GBr29) purports to quote *Mid Continent III*, 941 F.3d at 534–36, as saying that Commerce "follow[s] the framework established in *Pure Magnesium from Israel* and *CTVs from Malaysia*" (alteration in original). That quotation does not appear in *Mid Continent III*, much less at that pincite. Nor does it appear in any other court opinion available on Westlaw. It appears to come from Commerce's own decision memorandum. Appx31. To the extent the Court addressed a particular framework, it did so with consideration of subsidies "put[ ] aside." 941 F.3d at 542–43.

2.   Mid Continent and the government both argue, *contra Mid Continent III*, 941 F.3d at 544, that Commerce didn't *really* have to evaluate "comparative deficiencies." MCBr30-34; GBr42-44. But doing so was the whole point of the remand. The "comparative deficiencies" were "obviously … relevant." *Mid Continent III*, 941 F.3d at 544.

Like the Trade Court, Mid Continent and the government misapply *CP Kelco*—particularly in addressing the LSI financial statement. MCBr32-35; GBr41-44. Mid Continent cites *CP Kelco* and focuses on what it calls the "crucial distinguishing factor": the number of document sections that were untranslated. MCBr32-33. But the percentage of translation is not the key consideration. What matters is *reliability*, and no one disputes that Commerce *knew* the LSI statement to be accurate despite citing theoretical accuracy concerns. BlueBr26-27, BlueBr44-45, BlueBr50-51, BlueBr55. And there were other potential sources to compare, too.

Other than that, Mid Continent does not meaningfully analyze *CP Kelco*; it simply recites the case history and points out that the outcome was different. MCBr32-35. But Oman Fasteners explained in its opening brief why *CP Kelco* does not support affirmance here: Commerce *did* compare the potential surrogates in that case, and one of them was "complete and reliable."

BlueBr52-54 (quoting *CP Kelco US, Inc. v. United States*, 949 F.3d 1348, 1354 (Fed. Cir. 2020)). The government says that "the *CP Kelco* line of cases is not applicable here." GBr42. It also argues that, like the unselected surrogates in *CP Kelco*, LSI's statement here was "missing vital information." GBr44 (citing Appx29). But that again ignores that the agency in *CP Kelco* did not know whether the partially translated statement was accurate. Here it did.

Mid Continent also argues that this Court should affirm because LSI's financial statements were not perfectly contemporaneous. MCBr35-36. Once again, however, Commerce did not rely on that reasoning, so affirming on that ground would be contrary to *Chenery*. *Calcutt*, 143 S. Ct. at 1318 (citing *Chenery*, 332 U.S. at 196). Anyway, at best, this would be a factor for Commerce to balance against Sundram's subsidies and lack of similar products, not a basis to reject LSI out of hand.

3.     Mid Continent—but not the government—argues that subsidies could not have affected Commerce's comparative analysis on remand because of the modest size of Sundram's subsidy. MCBr36-37. Mid Continent also points to numbers that Commerce did not rely on, MCBr36 (citing Appx485, Appx487), and to "the exchange rate in effect" at the time (without citing the record), MCBr36. Mid Continent's reliance on all three of those

arguments is contrary to *Chenery* because Commerce did not verify the size of the subsidy, its role in Sundram's operations, or its distortive impact.

4.    Oman Fasteners' opening brief also explained that a meaningful comparison among sources would have yielded a more accurate result. BlueBr48-51. The response briefs do not show otherwise.

a.    Oman Fasteners explained that if Commerce *had* meaningfully considered alternative sources in the record, it would have reached a more accurate result. BlueBr48-49. For example, Al Jazeera was an Omani company, had contemporaneous data, lacked subsidies, and made products more like steel nails than Sundram's auto parts. BlueBr48. In contrast, Hitech and Sundram were (1) non-Omani and (2) subsidized, and they either (3) sold highly dissimilar merchandise or (4) presented non-contemporaneous data. *Id.* But Commerce never weighed all those factors. And the response briefs do not engage on that comparison. They suggest that Commerce excluded the Omani companies from consideration because it found their products to be dissimilar, GBr32; MCBr12, MCBr15-16, but Commerce never weighed dissimilarity against subsidization. And although Mid Continent suggests that this Court affirmed Commerce's choice to reject the Omani companies' data, MCBr15-16, it oversimplifies. Commerce might have been able to reject the

Omani statements if there were no subsidy problem with the alternatives, but this Court required looking at "comparative deficiencies" of the sources on the record in the subsidy analysis. *Mid Continent III*, 941 F.3d at 544.

b. Oman Fasteners also explained that, if Commerce were comparing Hitech and Sundram to LSI, it would be weighing the *uncertain* accuracy of the subsidized statements against the *known* accuracy of LSI's. BlueBr49-50. The choice would be clear if Commerce had really made the comparison.

The government argues that Commerce found LSI's statement to be missing information "vital" to assessing its accuracy. GBr44; *see* MCBr32-33 (similar). But no one disputes on appeal that Commerce knew that LSI's statement *was* accurate. BlueBr50-51. And neither the government nor Mid Continent denies that Commerce could have reconsidered that statement if other options turned out to be less accurate. *Id.*

The government insists that this Court's affirmance of Commerce's rejection of LSI's statement was "unequivocal," GBr45, but that is not so. This Court concluded that Commerce did not have to *categorically* accept that statement under its procedural rules. *Mid Continent III*, 941 F.3d at 542–43. But that conclusion was "aside" from "the issue of subsidies." *Id.* at 542. Commerce *could* accept that statement if doing so would produce the most

accurate result. And this Court recognized, in discussing subsidies, that it could be "unreasonable … to refuse to obtain readily available, highly relevant information." *Id.* at 544–45. That is the case here.

⁎⁎

Commerce improperly sidestepped a substantive comparison among its available options. It should have weighed the comparative advantages and disadvantages of the potential surrogates, and its failure to do so was unreasonable.

### C.  Commerce acted unreasonably by ignoring subsidies instead of reopening the record

At the end of the road, Commerce left itself with two options, both distorted by subsidies. On that record, Commerce could not determine those subsidies' effects on accuracy. So, rather than reopening the record, it ignored the subsidies instead. That was unreasonable. BlueBr56-61.

For starters, neither Mid Continent nor the government disputes that Commerce had the discretion to reopen the record. BlueBr56. And Commerce had to exercise that discretion reasonably—and in a way consistent with this Court's opinion and the agency's statutory duty of accuracy. The only reasonable option was to reopen the record. Doing so would have allowed

Commerce to obtain the data it needed to consider Hitech's and Sundram's statements, and it would have allowed Commerce to confirm what it already knew: that LSI's statement was accurate.

1.    The response briefs argue that no reopening was required because interested parties have the burden of developing the record from the beginning. MCBr39; GBr46. That initial-record-only logic would mean that Commerce would never need to reopen the record, yet sometimes Commerce must do so. *See* BlueBr57-58 (discussing *Bestpak* and *CS Wind*).

Anyway, this dispute is not about the initial record. It is about whether Commerce had the information it needed to make an accurate determination *after* considering the subsidy issue. It did not. This Court suggested that Commerce might need to obtain readily available, highly relevant information. *Mid Continent III*, 941 F.3d at 544–45. And no one disputes that Commerce could have obtained it.[5] Failure to do so here was unreasonable.

---

[5] For this reason, whether Oman Fasteners timely submitted the fully translated LSI statement, or had access to it, is not relevant. *Contra* GBr46. This issue is about what information was readily available to Commerce after conducting its subsidy analysis.

The government (GBr46) cites *QVD Food Co. v. United States*, 658 F.3d 1318, 1325 (Fed. Cir. 2011), and *NTN Bearing Corp. of America v. United States*, 997 F.2d 1453, 1458–59 (Fed. Cir. 1993), but neither case supports Commerce's insistence on keeping the record closed after reaching its uncertain-subsidy dilemma. In *QVD*, this Court rejected a party's attempt to base judicial review on information that was not before Commerce when it made its determination. 658 F.3d at 1324–25. And in *NTN Bearing*, this Court declined a request for relief that the appellant had not asked Commerce to provide in the first place—a remand to consider additional evidence. 997 F.2d at 1458.

Mid Continent argues that the inadequacy of the current record is Oman Fasteners' fault because Oman Fasteners submitted LSI's financial statement only partially translated. MCBr37-38; *see also* GBr46 (similar). But Mid Continent has things backwards. It was *Mid Continent* that submitted Hitech's and Sundram's financial statements, Appx4, and it did not submit enough information for Commerce to "verify" or "dissect" them. Appx31. *That* inadequacy is the reason the record needs reopening. *See NTN Bearing*, 997 F.2d at 1458 (faulting party who submitted information without

"supply[ing] the information necessary for Commerce to make [a particular] fact-specific decision").[6]

Mid Continent also flips from its previous position that LSI's partially translated statement was "complete," "usable," and full of "high quality data." BlueBr59 (quoting Appx2878; Appx2915; Appx3038; Appx3041). And it ignores that Commerce knew LSI's statement to be accurate. BlueBr50-51. Indeed, neither the government nor Mid Continent disputes that critical point.

2.    The government and Mid Continent also insist that the record was good enough for Commerce to make an accurate determination. MCBr38-39; GBr47. But as explained in the opening brief, that is not true: Commerce lacked the necessary information to assess either subsidy's effects on accuracy. Indeed, it said so itself. Appx31.

At bottom, Commerce's discretion not to reopen a record, *see* GBr49, is constrained by its duty of accuracy. That was the duty that this Court pointed to in its opinion. *Mid Continent III*, 941 F.3d at 538–39, 545. And that is the

---

[6] To be clear, if the record is reopened to obtain more information regarding Sundram or Hitech, any finality justifications against accepting LSI's fully translated statement vanish.

duty that Oman Fasteners' cited cases confirm. BlueBr29-37. Mid Continent does not address those cases at all. The government tries to distinguish five cases about the scope of that duty in a one-paragraph footnote. GBr48 n.3. But it agrees that Commerce has a duty of reasonable accuracy, and it never explains why its factual distinctions of those cases matter. *Id.*

In particular, the government argues that most of those cases involved adverse inferences and a calculation method called "facts [otherwise] available," unlike this proceeding. *Id.* If anything, that difference confirms that accuracy is important here too. That is, use of "facts otherwise available" is justified when Commerce must rely on facts not in the administrative record, 19 U.S.C. § 1677e(a), and an adverse inference is justified where a respondent flat-out refuses to cooperate, *id.* § 1677e(b)(1). In those cases, accuracy is not the lone guidepost because Commerce has room to tailor the rate to the "seriousness of the non-cooperating party's misconduct" and thereby induce future cooperation. *BMW of N. Am. LLC v. United States*, 926 F.3d 1291, 1301 (Fed. Cir. 2019). Here, there are no such collateral concerns, and accuracy's role is not diluted in that way.

The government further argues that the mere *possibility* of a more accurate result is not enough to require reopening the record. GBr48 (citing *Mid*

*Continent III*, 941 F.3d at 541; *PSC VSMPO-Avisma Corp. v. United States*, 688 F.3d 751, 761 (Fed. Cir. 2012)). But Oman Fasteners didn't seek reopening based on the mere *possibility* of improving accuracy. It argued that if Commerce were left with two subsidy-tainted sources, and admittedly could not calculate the subsidies' impact, then Commerce lacked the ability to determine an accurate result at all.

Regardless, this case is not like *VSMPO-Avisma*. There, this Court held that the appellant's *generalized* accuracy concerns did not compel overriding procedural rules. 688 F.3d at 761. But Oman Fasteners' accuracy concerns are specific and concrete—indeed, they were the whole point of the remand.

The government also insists that only "a court order or extraordinary circumstances" may require Commerce to reopen the record. GBr47 (citing *Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1278 (Fed. Cir. 2012)). First off, the government again has a *Chenery* problem because Commerce did not invoke an "extraordinary circumstances" standard in its decision. In any event, *Essar Steel* does not apply here. That case addressed whether Commerce was required to accept documents that surfaced only long after it made its determination. 678 F.3d at 1278–79. What's more, those documents were unnecessary: the existing record in that case sufficed for Commerce to make

a determination that was supported by substantial evidence. *Id.* Here, in contrast, additional information *is* necessary to address a concern that this Court identified, and substantial evidence cannot otherwise support Commerce's determination.

3.    Finally, the response briefs misapprehend the record-reopening issue as an attempt at relitigation. MCBr40-41; GBr41. The issue here was not decided in the previous appeal.

The question in *Mid Continent III* was whether Commerce had abused its discretion by refusing to accept the fully translated LSI statement as *untimely*. 941 F.3d at 540–41. Oman Fasteners had offered that full statement after Commerce unexpectedly rejected the partially translated one. *Id.* This Court held that Commerce had not abused its discretion by enforcing its deadlines for making the initial record. *Id.* at 541.

This Court did not confront the problem that no reasonable surrogate profit options remained because that problem wasn't before it yet. Commerce was required to account for subsidies, but the remand proceedings made clear that it couldn't do so on the existing record. Moreover, this Court itself suggested that reopening the record might be appropriate after looking into

subsidies. *Mid Continent III*, 941 F.3d at 544–45. That decision did not close the door on later doing so.

## Conclusion

The Court should vacate and remand for further proceedings.


Respectfully submitted,

Perkins Coie LLP

by /s/Michael P. House

> Michael P. House
> Michael R. Huston
> Dan L. Bagatell
> Nathan K. Kelley
> Andrew T. Dufresne
> Andrew Caridas
> Jonathan I. Tietz

Counsel for Appellant

## Certificate of Compliance

1.    This brief complies with the type–volume limitation of Federal Circuit Rule 32(b)(1). The brief contains 4,274 words, excluding the portions exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b)(2).

2.    This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6). The brief has been prepared in a proportionally spaced typeface using Microsoft Word and 14-point Valkyrie A type.

Dated: June 16, 2023                    /s/Michael P. House
                                        Michael P. House

### Certificate of Authority

I certify that I have the authorization of my co-counsel Michael P. House to file this brief with his electronic signature.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated: June 16, 2023

/s/Jonathan I. Tietz
Jonathan I. Tietz